Approved: _David I. Miller_ __ **13 MAG 2201**
DAVID I. MILLER
Assistant United States Attorney

Before:      HONORABLE ANDREW J. PECK
             United States Magistrate Judge
             Southern District of New York

- - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :        **SEALED**
                                         **COMPLAINT**
                                :
                                         Violations of
        - v. -                           15 U.S.C. §§ 78j(b),
                                         78n(e), 78ff;
                                :        17 C.F.R. §§ 240.10b-5,
WALDYR PRADO and                         240.10b5-2, 240.14e-3(a);
IGOR CORNELSEN,                 :        18 U.S.C. §§ 371 and 2

        Defendants.             :        COUNTY OF OFFENSE:
                                         NEW YORK
- - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        CHRISTOPHER DELZOTTO, being duly sworn, deposes and
says that he is a Special Agent with the Federal Bureau of
Investigation and charges as follows:

<u>COUNT ONE</u>

**(Conspiracy to Commit Securities Fraud and
Fraud in Connection with a Tender Offer)**

        1.    From at least in or about May 2010 through in
or about September 2010, in the Southern District of New York and
elsewhere, WALDYR PRADO and IGOR CORNELSEN, the defendants,
willfully and knowingly did combine, conspire, confederate, and
agree together and with each other to commit an offense against
the United States, namely, to commit fraud in connection with the
purchase and sale of securities, in violation of Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 17, Code of
Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and to
commit fraud in connection with a tender offer, in violation of
Title 15, United States Code, Sections 78n(e) and 78ff, and Title
17, Code of Federal Regulations, Section 240.14e-3(a).

        2.    It was a part and an object of the conspiracy that
WALDYR PRADO and IGOR CORNELSEN, the defendants, willfully and
knowingly, directly and indirectly, by use of the means and

instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

3.    It was a further part and an object of the conspiracy that WALDYR PRADO and IGOR CORNELSEN, the defendants, willfully and knowingly, would and did engage in fraudulent, deceptive, and manipulative acts and practices in connection with a tender offer, in that after the offering person had taken substantial steps to commence a tender offer, PRADO and CORNELSEN, while in possession of material information, which related to such tender offer and which PRADO and CORNELSEN knew or had reason to know was non-public, and had been acquired directly and indirectly from the offering person, or the issuer of the securities sought or to be sought by such tender offer, or any officer, director, partner, or employee or any other person acting on behalf of the offering person or such issuer, purchased and sold or caused to be purchased or sold securities, or securities convertible into or exchangeable for any such securities, or an option or right to obtain or to dispose of any of the foregoing securities, without first publicly disclosing such information and its source by press release or otherwise, in violation of Title 15, United States Code, Sections 78n(e) and 78ff, and Title 17, Code of Federal Regulations, Section 240.14e-3(a).

### Overt Acts

4.    In furtherance of the conspiracy and to effect the illegal objects thereof, WALDYR PRADO and IGOR CORNELSEN, the defendants, and others, caused the following overt acts, among others, to be committed in the Southern District of New York and elsewhere:

a.    On or about May 17, 2010, PRADO sent an e-mail to CORNELSEN.

2

b.      On or about May 17, 2010, PRADO purchased 300 Burger King call options with a July 2010 expiration date ("Burger King July 2010 call options"), 200 of which were purchased through the NYSE MKT LLC exchange, located in New York, New York.

c.      On or about May 18 and May 19, 2010, CORNELSEN purchased 2,850 Burger King July 2010 call options through multiple exchanges, including through the International Securities Exchange ("ISE"), located in New York, New York.

d.      On or about June 2, 2010, PRADO made a telephone call to CORNELSEN, and the call lasted approximately nine minutes.

e.      On or about June 2, 2010, CORNELSEN purchased 1,000 Burger King July 2010 call options through an account with a brokerage firm located in New York, New York.

f.      On or about June 3, 2010, PRADO made a telephone call to CORNELSEN, and the call lasted approximately 14 minutes and 24 seconds.

g.      On or about June 3, 2010, PRADO purchased 7,000 shares of Burger King common stock.

h.      On or about August 18, 2010, CORNELSEN sent an e-mail to PRADO.

i.      On or about August 19, 2010, CORNELSEN purchased 1,400 Burger King call options with an October 2010 expiration date ("Burger King October 2010 call options") on the ISE, located in New York, New York, through an account with a brokerage firm located in New York, New York.

j.      On or about August 19, 2010, CORNELSEN purchased 206 Burger King October 2010 call options through another brokerage firm.

k.      On or about August 25, 2010, PRADO purchased 13,000 shares of Burger King common stock.

l.      On or about August 25, 2010, PRADO purchased 100 Burger King call options with a January 2011 expiration date ("Burger King January 2011 call options") through the NYSE MKT LLC exchange.

m. On or about August 26, 2010, and on or about August 27, 2010, CORNELSEN purchased an additional 1,794 Burger King October 2010 call options, 281 of which were purchased through the ISE.

n. On or about September 1, 2010, PRADO purchased 9,000 shares of Burger King common stock.

o. On or about September 2, 2010, CORNELSEN sent an e-mail to PRADO.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud)

5. From at least in or about May 2010 through in or about September 2010, in the Southern District of New York and elsewhere, WALDYR PRADO and IGOR CORNELSEN, the defendants, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, PRADO misappropriated material, non-public information about an impending acquisition of Burger King (the "Inside Information") from his brokerage firm and brokerage client, and then tipped CORNELSEN about that Inside Information, resulting in both PRADO and CORNELSEN trading in Burger King common stock and call options prior to the acquisition's announcement, and together earning illegal profits in excess of approximately $1.6 million.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.)

4

## COUNT THREE

### (Fraud in Connection with a Tender Offer)

6.      From at least in or about May 2010 through in
or about September 2010, in the Southern District of New York and
elsewhere, WALDYR PRADO and IGOR CORNELSEN, the defendants,
willfully and knowingly, engaged in fraudulent, deceptive, and
manipulative acts and practices in connection with a tender
offer, in that after the offering person, a private equity firm,
had taken substantial steps to commence a tender offer of Burger
King securities, PRADO and CORNELSEN, while in possession of
material information that related to such tender offer and which
PRADO and CORNELSEN knew or had reason to know was non-public,
and had been acquired directly and indirectly from the offering
person, or the issuer of the securities sought or to be sought by
such tender offer, or any officer, director, partner, or employee
or any other person acting on behalf of the offering person or
such issuer, purchased and sold or caused to be purchased or sold
such securities, or securities convertible into or exchangeable
for any such securities, or an option or right to obtain or to
dispose of any of the foregoing securities, namely Burger King
common stock and call options, without first publicly disclosing
such information and its source by press release or otherwise.

(Title 15, United States Code, Sections 78n(e) & 78ff;
Title 17, Code of Federal Regulations, Section 240.14e-3(a),
and Title 18, United States Code, Section 2.)

The basis for my knowledge and the foregoing charges
is, in part, as follows:

7.      I am a Special Agent in the New York Field Office
of the Federal Bureau of Investigation, and I have been
personally involved in the investigation of this matter.  For
more than three and a half years, I have been responsible
primarily for the investigation of offenses involving violations
of the federal securities laws and related offenses.  I have
participated in numerous investigations of such offenses, and I
have made and participated in making arrests of individuals for
participating in such offenses.

8.      The information contained in this Complaint is
based upon my personal knowledge, as well as information obtained
during this investigation, directly or indirectly, from other
sources, including, but not limited to: (a) business records,
brokerage and trading records, telephone records, and other
documents provided by various entities; (b) publicly-available

5

information and documents; (c) analyses of telephone records and trading records; (d) conversations with, and reports of interviews with, several witnesses, including representatives of business and brokerage entities; (e) conversations with, and my review of reports prepared by, other law enforcement agents; and (f) conversations with, and my review of documents prepared by, representatives from the U.S. Securities and Exchange Commission ("SEC"). Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in sum and substance and in part unless indicated otherwise. Where figures and calculations are set forth herein, they are approximate.

## Relevant Individuals and Entities

9. At all times relevant to this Complaint, Burger King Holdings, Inc. was a Delaware corporation headquartered in Miami, Florida. It was the parent of Burger King Corporation (both collectively, "Burger King"), a Florida corporation that franchises and operates fast food hamburger restaurants under the well-known Burger King brand in the U.S. and abroad. Until in or about October 2010, Burger King's stock was listed under the symbol "BKC" on the New York Stock Exchange ("NYSE"), which is located in New York, New York, and its options traded on various exchanges, including the NYSE MKT LLC[1] and the ISE, both located in New York, New York, and the Chicago Board Options Exchange ("CBOE"), located in Chicago, Illinois.

10. At all times relevant to this Complaint, 3G Capital Partners ("3G") was a Cayman Islands exempted company and is a private equity firm with its main offices in New York, New York. 3G is the manager of 3G Capital Special Situations Fund II, L.P. (the "3G Fund"), a Cayman Islands exempted limited partnership, which controlled Blue Acquisition Sub, Inc., the Delaware corporation that ultimately purchased Burger King, as discussed below.

---

[1] The NYSE MKT LLC exchange is the successor to the American Stock Exchange ("AMEX"). During the period relevant to this Complaint, the NYSE MKT LLC was known as the NYSE Amex Equities. On or about May 10, 2012, NYSE Amex Equities changed its name to NYSE MKT LLC. For ease of reference, however, the exchange will be referred to as "NYSE MKT LLC" throughout the Complaint.

6

11. On September 2, 2010, before the opening of trading, Burger King and 3G issued a joint press release announcing that they had entered into a definitive agreement under which affiliates of 3G would acquire Burger King stock at $24 per share, or $4 billion in total, including the assumption of Burger King's outstanding debt (the "September 2 Announcement"). On or about October 15, 2010, 3G announced the successful completion of the tender offer with over 93% of shares tendered.

12. From in or about October 2010 through in or about June 2012, Burger King was a private company. In or about April 2012, Burger King announced that 3G would sell a 29% stake to a British investment firm. After the merger with the British firm, a new entity Burger King Worldwide, Inc., began publicly trading on or about June 20, 2012, and is currently traded on the NYSE under the symbol "BKW."

13. From in or about 1999 through in or about May 2012, WALDYR PRADO, the defendant, was employed as a registered representative at a large brokerage firm ("Firm-1"), and its predecessor entities. In or about May 2012, PRADO began working as a registered representative for another brokerage firm ("Firm-2"), where he worked until he was terminated on or about September 13, 2012.

14. At all relevant times to this Complaint, IGOR CORNELSEN, the defendant, was a brokerage client of WALDYR PRADO, the defendant. CORNELSEN is a wealthy and sophisticated investor.

15. At all relevant times to this Complaint, Bainbridge Group, Inc. ("Bainbridge") was a British Virgin Islands limited liability corporation and personal holding company of IGOR CORNELSEN, the defendant, through which CORNELSEN traded securities and made investments. Bainbridge maintained multiple U.S. brokerage accounts through which CORNELSEN traded, among other things, securities listed on U.S. exchanges. CORNELSEN was a director of Bainbridge, was authorized to trade in the Bainbridge accounts, and placed the orders to purchase Burger King call options through certain of Bainbridge's accounts.

## Overview of the Insider Trading Scheme

16. As set forth in more detail below, there is probable cause to believe that WALDYR PRADO and IGOR CORNELSEN, the defendants, conspired to engage in, and did engage in,

7

insider trading. The means by which PRADO and CORNELSEN effectuated the insider trading scheme included the following, among other things: (1) while a registered representative at Firm-1, PRADO misappropriated the Inside Information from Firm-1 and from a brokerage client ("Client-1"); (2) in breach of his duties to Firm-1 and Client-1, PRADO used the Inside Information to trade Burger King securities; (3) PRADO tipped CORNELSEN about the Inside Information; and (4) CORNELSEN traded on the Inside Information. PRADO and CORNELSEN together obtained illegal profits in excess of approximately $1.6 million by trading on the Inside Information.

## Background to 3G's Acquisition of Burger King

17. In or about late 2009, 3G began considering Burger King as a potential investment opportunity. 3G first contacted Burger King about its interest in the company in or about February 2010. On or about March 29, 2010, 3G made its first offer to acquire Burger King. Burger King rejected this initial offer, but continued discussions with 3G regarding a potential acquisition. As part of these discussions, Burger King and 3G executed a confidentiality agreement on or about April 26, 2010.

18. On or about May 11, 2010, 3G sent a second offer to Burger King expressing its interest in acquiring Burger King, which Burger King later rejected. 3G and Burger King continued their discussions about a possible acquisition throughout in or about June 2010, and, on or about June 29, 2010, 3G sent a third offer to Burger King, expressing an interest in acquiring the company. The letter also included terms for the merger agreement pursuant to which 3G proposed to complete the transaction. On or about July 1, 2010, Burger King rejected the third offer, and between on or about July 1 and July 27, 2010, the parties did not have any further contact. 3G, however, continued to work internally on the transaction during this time period.

19. On or about July 27, 2010, the parties resumed their discussions and continued to finalize the terms of the transaction throughout August. On or about August 31, 2010, the parties proposed to complete the transaction through a tender offer directly to Burger King stockholders with a back-end merger through which the acquisition could be completed if the tender offer failed. On or about August 31, 2010, 3G's investment bankers contacted Burger King's bankers and communicated that 3G was willing to acquire Burger King at a price of $24 per share.

20. During the negotiations, all aspects and due diligence were nonpublic. 3G took steps to ensure the negotiation's confidentiality by, among other things, requiring 3G investors and advisors to sign confidentiality agreements that prohibited them from disclosing information about the proposed acquisition.

21. On or about September 2, 2010, before the opening of trading, Burger King and 3G issued the September 2 Announcement. The offer price of $24 per share represented a 46% premium over Burger King's share price of $16.45 on August 31, 2010.[2]

## PRADO's Duties to Firm-1
## Concerning Client Information and Insider Trading

22. In the course of my investigation, I have obtained and reviewed Firm-1's policy manuals concerning the duties and responsibilities of employees of Firm-1. Specifically, I have reviewed the "Associates Guide" for Associates in Firm-1's Latin American Division (the "LATAM Associates Guide"), of which WALDYR PRADO, the defendant, was a member. The policies in the LATAM Associates Guide provide, in relevant part, the following:

> a. "Client Information -- All client records, including names and addresses, are the property of the Firm . . . Associates must not divulge information concerning a client's finances, investment objectives, transactions or any other personal financial information to any other person or entity unless the information is divulged: At the direction of the client; To other Associates when essential to servicing the client accounts; In conjunction with supervisory review or compliance activities; or As required by law. . . . Associates must not release client information to third parties except as required by law or as authorized by the client."

---

[2] Between on or about March 29, 2010, the date of 3G's first offer, and on or about August 31, 2010, Burger King's stock traded between a low of $16.41 and a high of $22.06 on average volume of 1,597,926.

b.      "Firm Information -- Associates may not
        divulge proprietary Firm information to any
        unauthorized person.   The Firm views as
        proprietary information all documentation,
        records, data and information necessary to
        its business or used in connection with its
        day-to-day operations. . . . the proprietary
        information is considered to include: Client
        information. . . ."

c.      "Inside and Proprietary Information -- The
        improper use of material, non-public
        information concerning any company or
        security is prohibited.   Inside information
        is generally defined as material, non-public
        information.   Information is considered
        material if a substantial likelihood exists
        that a reasonable investor would consider it
        important in making an investment decision or
        it could be expected to affect the price of
        an issue or security.   It is prohibited to
        knowingly and improperly use, directly or
        indirectly, for one's own benefit or the
        benefit of any other person, the following
        non-public proprietary or market-sensitive
        information that is: . . . Obtained from a
        client, or individual or representative of
        any entity who is in possession of the
        material non-public information."

        i.      This section further provides that
                those Firm-1 employees that "come
                into possession of such non-public
                information . . . are prohibited
                from," among other things: (a)
                "Effecting transactions in the
                securities of the subject company
                for his or her own accounts"; (b)
                "[d]isclosing the non-public
                information to anyone outside of
                the Firm, except when it is
                necessary and appropriate in the
                course of the Firm's role relevant
                to the particular business matter";
                or (c) "Disclosing such information
                to any person with the expectation
                that such person will use the
                information unlawfully."

                        10

23. Accordingly, as described in Firm-1's policies above, any information regarding a client's business transactions or investment objectives is considered "Client Information." Such "Client Information" is proprietary "Firm Information," and may not be disclosed by a Firm-1 employee to any third person. Further, a Firm-1 employee may not use, trade on, or disclose to a third party any material non-public information obtained from a client of Firm-1.

24. While employed with Firm-1, WALDYR PRADO, the defendant, attested in or about March 2009, and then in or about June 2010 that, among other things, he had "access to the LATAM Associates Guide" and was "in compliance with the policies and procedures contained in that Guide."

## PRADO Obtains Inside Information from Client-1

25. In the course of my investigation, I have interviewed an individual who was a 3G investor ("Client-1") and a brokerage client of WALDYR PRADO, the defendant. Client-1 is a wealthy and sophisticated investor. Based on my investigation in this matter, and statements made by Client-1, I have learned the information set forth below.[3]

26. In or about 2008, Client-1 made a capital commitment of $50 million to the 3G Fund with the understanding that the 3G Fund would ultimately make a corporate acquisition.

27. In or about early March 2010, a 3G principal ("3G Principal-1") called Client-1 and informed Client-1 that 3G was in negotiations to have the 3G Fund acquire Burger King. 3G Principal-1 also told Client-1 that he sent Client-1 a deal book and related Burger King documents.

28. On or about March 14, 2010, Client-1 signed a confidentiality agreement with 3G relating to a potential Burger King acquisition. This confidentiality agreement permitted Client-1 to share information concerning the potential transaction with his "representatives," which included Client-1's financial advisors, "who have a need to receive, review or use" the information in connection with evaluating the potential investment.

---

[3] It is my judgment that the information provided by Client-1 is credible because, among other things, it is corroborated in part by other investigative sources.

29. From in or about March 2010 through the September 2 Announcement, Client-1 received periodic updates about the general progress of the deal from 3G's principals, including 3G Principal-1. During this period, Client-1 evaluated whether Client-1 should liquidate personal holdings for the $50 million commitment, or if Client-1 should obtain financing for it. For these purposes, Client-1 discussed with his financial advisor, WALDYR PRADO, the defendant, this financing issue. During those discussions, Client-1 divulged the fact that the financing was for a commitment to a 3G Fund that was going to acquire Burger King. Based on their professional relationship, Client-1 believed that PRADO was going to keep this information confidential.

30. In or about June 2010, Client-1 hired an assistant ("Assistant-1") to manage his personal holdings. Client-1 informed Assistant-1 about the Burger King transaction and tasked Assistant-1 with evaluating whether or not Client-1 should obtain financing for Client-1's 3G commitment. Assistant-1 worked with WALDYR PRADO, the defendant, on the 3G commitment, and according to Client-1, at some point, Client-1 stopped speaking with PRADO about Burger King because Assistant-1 was handling the investment.[4]

31. Between on or about March 14, 2010 and on or about September 2, 2010, WALDYR PRADO, the defendant, communicated with Client-1 and/or Assistant-1 in person, by e-mail, and over the phone.[5] In addition, PRADO traveled from Miami to São Paolo, Brazil in March, May, and August 2010, and during each of these visits PRADO made brief separate trips to Curitiba, Brazil, where Client-1 resides.

---

[4] By virtue of Assistant-1's efforts, Client-1 ultimately secured a $50 million loan from a Brazilian bank, and the funds were transferred from that bank to Client-1's account at Firm-1 and then to 3G. The financing was secured from the Brazilian bank in or about September 2010, after the September 2 Announcement.

[5] Extensive telephone contact between WALDYR PRADO, the defendant, and Assistant-1 occurred in or about late August 2010 through on or about September 2, 2010, and is referenced in more detail below.

12

## PRADO Misappropriates the Inside Information and Trades

32. On or about May 17, 2010, WALDYR PRADO, the defendant, was in Curitiba and had lunch with Client-1. Within hours of their lunch, and in breach of his duties and responsibilities to Firm-1 and Client-1, PRADO purchased 300 Burger King July 2010 call options at a strike price of $20 for $33,185.[6] PRADO purchased 200 of the 300 options through the NYSE MKT LLC, located in New York, New York. PRADO purchased the Burger King stock and call options referenced in this Complaint through his personal account with Firm-1.

33. During the evening of on or about May 17, 2010, WALDYR PRADO, the defendant, sent an e-mail to an acquaintance in the finance industry ("Witness-1"), who was in Miami, Florida, which stated, as translated from Portuguese to English: "I'm in Brazil with information that cannot be sent by email. You can't miss it...." Approximately 20 minutes after PRADO sent this e-mail, PRADO and Witness-1 spoke by telephone for 17 minutes and 54 seconds.

34. I have spoken with Witness-1, who informed me that, in sum and substance and in part, he had a conversation with WALDYR PRADO, the defendant, following his receipt of the e-mail referenced above. During this conversation, PRADO informed Witness-1 that 3G was going to acquire Burger King. Witness-1 told PRADO that, in sum and substance and in part, PRADO should not trade using this information, nor should he have any of his customers trade on this information, because that would be illegal.

---

[6] A "call option" is an option contract that gives the buyer the right, but not the obligation, to purchase a company's stock at a set price (the "strike price") for a certain period of time (through "expiration"), e.g., the Burger King July 2010 call options referenced above had an expiration date of July 17, 2010. One call option gives the purchaser the right to buy 100 shares of the company's stock. In general, one buys a call option, or call, when the stock price is expected to rise, or sells a call when the stock price is expected to fall. If the underlying stock's value increases above the strike price, the call owner could either exercise the call and acquire the stock at the lower strike price, or sell the call, which would have increased in value. If the underlying stock's price failed to reach the strike price before the call expired and the holder had not sold the option, the call would expire worthless.

35. On or about June 3, 2010, WALDYR PRADO, the defendant, purchased 7,000 shares of Burger King stock for approximately $135,410. PRADO purchased Burger King stock through the over-the-counter market.

36. Ultimately, most of the Burger King July 2010 call options owned by WALDYR PRADO, the defendant, expired worthless on or about July 17, 2010, as the Burger King transaction did not occur.[7] Over the next month and a half, however, PRADO continued to purchase Burger King call options and stock until the September 2 Announcement, as follows:

> a. On or about August 25, 2010, PRADO purchased 13,000 shares of Burger King stock (over multiple trades) for approximately $227,000 through the over-the-counter market.
>
> b. On or about August 25, 2010, PRADO purchased 100 Burger King January 2011 call options with a strike price of $20 for $9,560 through the NYSE MKT LLC.
>
> c. On or about September 1, 2010, the day before the September 2 Announcement, PRADO purchased 9,000 shares of Burger King stock (over multiple trades) for approximately $165,263 through the over-the-counter market.

37. As discussed later in this Complaint, WALDYR PRADO, the defendant, had frequent telephone contact with Assistant-1 in or about late August 2010. Notably, however, PRADO had extensive contact with Assistant-1, and, on one occasion Client-1, on or about September 1 and September 2, 2010:

> a. On or about September 1, 2010, PRADO called Assistant-1 six times, and the calls lasted between approximately two minutes to more than 11 minutes.

---

[7] On or about July 9, 2010, PRADO sold 100 Burger King July 2010 call options for approximately $940, net of commissions. On or about July 15, 2010, PRADO sold 10 Burger King July 2010 call options for $89.49, net of commissions. The remaining options expired.

14

b.    On the same day, Assistant-1 called PRADO four times, and the calls lasted between five seconds and nearly four minutes.

c.    Furthermore, on this day, Client-1 called PRADO and the call lasted approximately 21 seconds.

d.    On or about September 2, 2010, PRADO called Assistant-1 and the call lasted approximately 11 minutes and 18 seconds, and later PRADO called Assistant-1 and the call lasted approximately 54 seconds.

38.    On September 2, 2010, following the September 2 Announcement, PRADO sold his Burger King stock and options positions for a total profit of over approximately $175,000.

## PRADO Tips CORNELSEN and CORNELSEN Trades

39.    In the course of my investigation, I have reviewed e-mails, brokerage and trading records, and telephone records relating to IGOR CORNELSEN, the defendant.    I have also interviewed witnesses and have otherwise learned information demonstrating that WALDYR PRADO, the defendant, provided CORNELSEN with the Inside Information that PRADO had misappropriated from Firm-1 and Client-1 in violation of the duties that PRADO owed to Firm-1 and Client-1.    Specifically, I have learned the information set forth below.

### *PRADO Contacts CORNELSEN*

40.    On or about May 17, 2010, and minutes after WALDYR PRADO, the defendant, sent the e-mail to Witness-1 referenced in paragraph 33 above, PRADO sent a similar e-mail to IGOR CORNELSEN, the defendant.    The e-mail stated, as translated from Portuguese:    "if you are around call me at the Curitiba hotel ... I have some info that I cannot say over the phone ... You have to hear this."    Within minutes, and after the market closed, CORNELSEN called PRADO at PRADO's Curitiba hotel and the call lasted approximately ten minutes.

### *CORNELSEN Trades*

41.    On or about May 18, 2010, IGOR CORNELSEN, the defendant, began trading out-of-the-money Burger King call

options.[8]  In particular, on or about May 18 and May 19, 2010, CORNELSEN purchased 2,850 Burger King July 2010 call options with a strike price of $22.50 -- for a total cost of approximately $98,800 -- through CORNELSEN's Bainbridge account maintained at a large brokerage firm ("Firm-3").  CORNELSEN's call options were purchased through multiple exchanges, including through the ISE, located in New York, New York.

        42.  On or about June 1 and June 2, 2010, IGOR CORNELSEN, the defendant, e-mailed with CORNELSEN's financial advisor ("Broker-1"), who worked at Firm-2 in New York, New York, and inquired about the market prices of Burger King stock and call options.

        43.  On or about June 2, 2010, WALDYR PRADO, the defendant, called IGOR CORNELSEN, the defendant, and the call lasted for approximately nine minutes.  That same day, CORNELSEN purchased 1,000 Burger King July 2010 call options with a strike price of $20 for $73,500 through his Bainbridge brokerage account with Firm-2 in New York, New York.  Nearly all of these call options were purchased through the ISE.  Then, on or about June 3, 2010, PRADO called CORNELSEN, and the call lasted for approximately 14 minutes and 24 seconds.  That same day, PRADO purchased 7,000 shares of Burger King common stock for $135,300.

        44.  Over the next two weeks, while IGOR CORNELSEN, the defendant, remained in frequent telephone and e-mail contact with WALDYR PRADO, the defendant, CORNELSEN continued to purchase Burger King call options through his Bainbridge account with Firm-2.  The following contacts and trading took place:

>        a.  On or about June 7, 2010, PRADO called
>            CORNELSEN and the call lasted approximately
>            one minute and 54 seconds.
>
>        b.  On or about June 8, 2010, CORNELSEN purchased
>            12 Burger King July 2010 call options with a
>            strike price of $20 for $420.96 through the
>            ISE.

_____

[8]  When a call option's strike price is above the price at which the underlying stock is trading, the option is "out-of-the-money" because it would be unprofitable to exercise the call and pay more for the stock than if it were purchased on a stock market.  One might buy an out-of-the-money option when the stock price is expected to increase beyond the option's strike price before the option's expiration date.

16

c.   On or about June 10, 2010, PRADO called
     CORNELSEN and the call lasted approximately
     eight minutes and 18 seconds.

d.   On or about June 14, 2010, CORNELSEN
     purchased 1 Burger King July 2010 call option
     with a strike price of $20 for $60.50 through
     the ISE.

e.   On or about June 17, 2010, CORNELSEN
     purchased 987 Burger King July 2010 call
     options with a strike price of $20 for
     $35,532 through the ISE.

f.   On or about June 17, 2010, CORNELSEN e-mailed
     PRADO and stated, as translated from
     Portuguese: "I bought an additional 1,000
     lots of BK 0.35 for July."

g.   On or about June 18, 2010, PRADO called
     CORNELSEN and the call lasted approximately
     25 minutes and 48 seconds.

     45.   Ultimately, CORNELSEN's July 2010 call options
expired worthless because Burger King's stock price did not trade
at or above $20.

### *CORNELSEN Continues to Trade After July 2010*

     46.   On or about August 16, 2010, WALDYR PRADO, the
defendant, called Client-1 and the call lasted approximately 30
seconds.   Then, on or about August 17, 2010, PRADO called
Assistant-1 and the call lasted approximately five minutes and 48
seconds.

     47.   On or about August 18, 2010, while WALDYR PRADO,
the defendant, was in Brazil, IGOR CORNELSEN, the defendant, sent
PRADO an e-mail asking, as translated from Portuguese, "[i]s the
sandwich deal going to happen," to which PRADO replied, "it's
going to happen."   On the same day, CORNELSEN sent PRADO another
e-mail asking again whether the "sandwich deal" was going to
happen, and PRADO responded that it was a "sure thing."

     48.   On or about August 18, 2010, IGOR CORNELSEN, the
defendant, exchanged e-mails with Broker-1 and another financial
advisor at Firm-2 ("Broker-2") inquiring about the market price
of Burger King stock and October 2010 call options.

17

49. On or about August 19, 2010, IGOR CORNELSEN, the defendant, purchased 1,400 Burger King October 2010 call options with a strike price of $17.50 for $98,735 through his Bainbridge account with Firm-2, and 206 Burger King October 2010 call options with a strike price of $19 for $7,467.50 through his Bainbridge account with Firm-3. The 1,400 call options were purchased through the ISE and the 206 call options were purchased through another exchange.

### Late August 2010 Contact, Trading, and the September 2 Announcement

50. As detailed below, from in or about late August 2010 through on or about September 1, 2010, the day before the September 2 Announcement, WALDYR PRADO and IGOR CORNELSEN, the defendants, and Assistant-1 had frequent contact. During this period, CORNELSEN also continued to trade in Burger King call options.

> a. On or about August 23, 2010, PRADO called Assistant-1 four times. Three of the four calls lasted less than approximately 30 seconds, and one call lasted approximately four minutes and 12 seconds.
>
> b. On or about August 24, 2010, Assistant-1 called PRADO, and the call lasted approximately six minutes and 53 seconds.
>
> c. On or about August 24, 2010, PRADO called CORNELSEN, and the call lasted approximately 32 minutes and six seconds.
>
> d. On or about August 25, 2010, PRADO called CORNELSEN, and the call lasted approximately seven minutes and 18 seconds.
>
> e. Later in the day, on or about August 25, 2010, PRADO called Assistant-1 and the call lasted approximately 54 seconds.
>
> f. On or about August 26, 2010, PRADO called Assistant-1 and the call lasted approximately one minute and 24 seconds.

51. On or about August 26, 2010, and on or about August 27, 2010, IGOR CORNELSEN, the defendant, purchased an additional 1,794 Burger King October 2010 call options with a

18

strike price of $19 for approximately $91,400 through his Bainbridge account with Firm-3. Of these call options, 281 call options were purchased through the ISE, and the remainder through other exchanges.

52. On or about September 2, 2010, shortly before the September 2 Announcement, IGOR CORNELSEN, the defendant, sent an e-mail to WALDYR PRADO, the defendant, and asked, as translated from Portuguese, whether there is "[a]ny news about price they will pay for sandwich?"[9] PRADO responded, as translated from Portuguese, that "[o]n the internet they're already talking about 24.00 per share. CNBC is talking about 4 billion, which according to my math is 29.41." In response, and right after the Announcement, CORNELSEN wrote: "Wow! What a day!"

53. After the September 2 Announcement, IGOR CORNELSEN, the defendant, sold his options for a total profit of over approximately $1.68 million, and a net profit (including the expired July 2010 options) of approximately $1.4 million.

## CORNELSEN's Prior Trading History

54. As part of my investigation, I have interviewed Broker-1. Broker-1 informed me that, in sum and substance, besides the Burger King options trading, the only other options CORNELSEN ever traded were linked to exchange funds involving oil and silver, which CORNELSEN bought in November 2010, and which had longer expiration periods than the Burger King options.

## CORNELSEN's Testimony Before the SEC

55. On or about May 3, 2012, IGOR CORNELSEN, the defendant, provided sworn deposition testimony to the SEC as part of the SEC's investigation of this matter. During CORNELSEN's deposition, CORNELSEN testified, among other things, that CORNELSEN does not remember having conversations with PRADO about trading Burger King options.

---

[9] In the preceding days, there had been news reporting about a possible acquisition of Burger King.

## PRADO Tips Another Individual
## About the Burger King Acquisition

        56.  I have interviewed an individual who advised me,
among other things, that he was tipped by WALDYR PRADO, the
defendant, about the Burger King transaction ("Tippee-1").[10]
From those interviews, I have learned the following information,
in sum and substance:

>        a.  In or about May 2010, PRADO contacted Tippee-
>            1, a brokerage client.  PRADO told Tippee-1
>            that PRADO was in Brazil and that he wanted
>            to meet with Tippee-1.  Subsequently, PRADO
>            went to Tippee-1's house in Brazil.  During
>            PRADO's visit, PRADO and Tippee-1 discussed
>            what PRADO  was personally investing in.
>            PRADO told Tippee-1 that PRADO was buying
>            Burger King securities.  According to Tippee-
>            1, during this conversation, Tippee-1 told
>            PRADO that Tippee-1 saw an article in a São
>            Paolo newspaper indicating that an
>            individual, who, in fact, was a 3G partner,
>            was possibly interested in acquiring Burger
>            King (the "Newspaper Article").  From Tippee-
>            1's conversation with PRADO, however, it
>            became clear to Tippee-1 that PRADO knew more
>            about the potential Burger King transaction
>            than what was written in the Newspaper
>            Article. After Tippee-1's meeting with PRADO,
>            Tippee-1 purchased Burger King stock and call
>            options.
>
>        b.  Before the September 2 Announcement, PRADO
>            initially mentioned to Tippee-1 that 3G was
>            looking at acquiring Burger King, and then
>            ultimately told Tippee-1 that the deal

_____

        [10]  Tippee-1 has entered into a non-prosecution agreement
with the United States Attorney's Office for the Southern
District of New York.  It is my judgment that the information
provided by Tippee-1 referred to in this Complaint is credible
because, among other things, it is corroborated in part by other
investigative sources.

between 3G and Burger King was going to happen.[11]

    c.    From in or about late May 2010 through on or about September 1, 2010, Tippee-1 bought Burger King stock and call options. After the September 2 Announcement, Tippee-1 sold Tippee-1's positions and made an approximate profit of $300,000.

### PRADO's Testimony Before the SEC

57. On or about July 12, 2012, WALDYR PRADO, provided sworn deposition testimony to the SEC as part of the SEC's investigation of this matter. During his deposition, PRADO testified to the following, in sum and substance and in part:

    a.    PRADO was not aware that Client-1 was a 3G investor until in or about late September 2010, after the September 2 Announcement. PRADO was not aware pre-announcement that Client-1 had any involvement with the 3G Fund's acquisition of Burger King.

    b.    By in or about May 2010, PRADO had figured out by himself that Burger King was a good acquisition target.

    c.    PRADO does not remember why he sent the May 17, 2010 e-mail to CORNELSEN (referenced in paragraph 40 above), which stated, as translated from Portuguese: "if you are around call me at the Curitiba hotel ... I have some info that I cannot say over the phone ... You have to hear this." But PRADO believes the e-mail was not about Burger King.

---

[11] Notably, on or about September 1, 2010, the day before the deal was publicly announced, PRADO called Tippee-1 on two occasions and the calls lasted approximately three minutes and 24 seconds and two minutes.

**PRADO Flees to Brazil and
Attempts to Withdraw Money from the U.S.**

58.    During my interview of Witness-1, Witness-1
informed me of the following, in sum and substance and in part:

a.    On or about August 10, 2012, Witness-1
received a subpoena from the SEC concerning
the SEC's investigation of insider trading in
Burger King securities.  Coincidentally,
Witness-1 had a previously-scheduled meeting
with WALDYR PRADO, the defendant, at a Miami
restaurant that same day.

b.    During their meeting, Witness-1 and PRADO
discussed the SEC subpoena Witness-1 had
received.  Also at that meeting, PRADO showed
Witness-1 the Newspaper Article and told
Witness-1 that he was going to tell the SEC
that the Newspaper Article was the reason he
traded in Burger King.  Witness-1 became
uncomfortable and left the meeting.

59.    According to airline travel records, on or about
August 16, 2012, WALDYR PRADO, the defendant, left for Brazil.

60.    I have interviewed PRADO's assistant, who told me
that, in sum and substance and in part:

a.    PRADO called her from Brazil and requested
that she liquidate PRADO's personal holdings
and wire them to Brazil, which she did.

b.    PRADO later called her from Brazil and
requested that she wire him certain
additional money.  After that call, PRADO's
assistant spoke with PRADO's supervisor who
told her not to wire the money to PRADO
because Firm-2 retained an interest in this
money.[12]

61.    I have interviewed the former supervisor of WALDYR
PRADO, the defendant, at Firm-2.  During my interview, PRADO's
supervisor told me, in sum and substance and in part:

_____

[12]    In or about May 2012, PRADO and PRADO's assistant had
left their employment with Firm-1 to work for Firm-2.

22

a. The funds PRADO requested (and was denied) were the proceeds of a promissory note that PRADO signed when he accepted the offer of employment with Firm-2 and required his supervisor's approval to draw upon.

b. On or about September 12, 2012, PRADO's supervisor spoke with PRADO by telephone. During that conversation, PRADO stated that, in sum and substance, PRADO was not going to return to the United States because PRADO believed that he was going to be charged with perjury and Brazil did not have "an extradition policy."

WHEREFORE, deponent prays that arrest warrants be issued for WALDYR PRADO and IGOR CORNELSEN, the defendants, and that they be imprisoned or bailed as the case may be.

_Christopher S Delzotto_
CHRISTOPHER DELZOTTO
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
10th day of September, 2013

_____
HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK