**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

WALDYR PRADO AND
IGOR CORNELSEN,

          Defendants.

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANT
IGOR CORNELSEN'S
MOTION TO DISMISS THE
INDICTMENT**

No. 15 Cr. 516

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
    Michael E. Gertzman
    Shane D. Avidan
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
mgertzman@paulweiss.com
savidan@paulweiss.com

*Attorneys for Defendant Igor Cornelsen*

**Table of Contents**

Preliminary Statement ................................................................................................................... 1

Allegations in the Indictment ...................................................................................................... 3

  A.  3G's Acquisition of Burger King .................................................................................. 3

  B.  Prado's Alleged Misappropriation from Client-1 ....................................................... 3

  C.  Prado's Alleged Tip to Cornelsen, and Cornelsen's Alleged Trading............................ 4

  D.  The Charges.................................................................................................................. 5

Argument...................................................................................................................................... 6

  I.  Legal Standard for Motion to Dismiss ......................................................................... 6

      A.  Failure to State an Offense.................................................................................... 6

      B.  Lack of Specificity ............................................................................................... 7

      C.  The Court's Authority to Find Facts "Peculiar" to This Motion. ............................ 8

      D.  The Court's Authority to Enter an Acquittal. ........................................................ 9

  II.  The Indictment Should Be Dismissed Because the Crimes Charged
       Do Not Apply to Cornelsen's Extraterritorial Conduct. ...............................................10

      A.  None of the Criminal Statutes at Issue Applies Extraterritorially. ...........................10

      B.  The Indictment Does Not Allege a Domestic Crime................................................12

         1.  Securities Fraud (Count 2) ..........................................................................12

            (a)  The Indictment Fails to Allege a Domestic Securities Transaction. .........12

            (b)  The Alleged Violation Is Predominantly Foreign. ..................................13

         2.  Fraud in Connection with a Tender Offer (Count 3) ........................................15

         3.  Conspiracy to Commit Securities Fraud and
            Fraud in Connection with a Tender Offer (Count 1) .......................................16

         4.  Conspiracy to Commit Wire Fraud (Count 4) .................................................16

            (a)  The Indictment Fails to Allege Any
                Domestic Wire Communication. ............................................................16

             (b)  The Indictment Fails to Allege a Domestic
                Wire Communication That Was "Essential."..........................................17

  III.  The Indictment Should Be Dismissed Because It Violates Due Process. .........................18

  IV.  The Fugitive Disentitlement Doctrine Does Not Apply. ................................................19

      A.  Cornelsen Is Not a Fugitive. ...............................................................................19

      B.  Even If Mr. Cornelsen Were a Fugitive, the Court
        Should Exercise Its Discretion Not to Disentitle Him. ...........................................21

Conclusion ..................................................................................................................................24

# Table of Authorities

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd.* v. *Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ............................................................................... 13

*United States* v. *Al Kassar*,
   660 F.3d 108 (2d Cir. 2011) ............................................................................. 18

*United States* v. *Aleynikov*,
   676 F.3d 71 (2d Cir. 2012) .............................................................................. 6, 7

*United States* v. *All Assets Held at Bank Julius*,
   251 F. Supp. 3d 82 (D.D.C. 2017) ................................................................... 18

*Banco Safra S.A.-Cayman Islands Brach* v. *Samarco Mineracao S.A.*,
   849 F. App'x 289 (2d Cir. 2021) ...................................................................... 13

*Bascuñán* v. *Elsaca*,
   927 F.3d 108 (2d Cir. 2019) ............................................................................. 10

*United States* v. *Bescond*,
   7 F.4th 127 (2d. Cir. 2021) ........................................................................*passim*

*United States* v. *Bodmer*,
   342 F. Supp. 2d 176 (S.D.N.Y. 2004) ............................................................. 11

*United States* v. *Bulger*,
   816 F.3d 137 (1st Cir. 2016).............................................................................. 9

*United States* v. *Cassese*,
   273 F. Supp. 2d 481 (S.D.N.Y. 2003) ............................................................... 6

*Cavello Bay Reinsurance Ltd.* v. *Shubin Stein*,
   986 F.3d 161 (2d Cir. 2021) ............................................................................. 14

*SEC* v. *Chi. Convention Ctr., LLC*,
   961 F. Supp. 2d 905 (N.D. Ill. 2013) ............................................................... 10

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ............................................................................. 13

*United States* v. *Covington*,
   395 U.S. 57 (1969).............................................................................................. 8

*United States* v. *Davis*,
139 S. Ct. 2319 (2019) ................................................................................................. 11

*Degen* v. *United States*,
517 U.S. 820 (1996) ...................................................................................................... 22

*United States* v. *Dransfield*,
913 F. Supp. 702 (E.D.N.Y. 1996) .................................................................................9

*Empire Blue Cross & Blue Shield* v. *Finkelstein*,
111 F.3d 278 (2d Cir. 1997) ................................................................................... 19, 21

*In re Grand Jury Subpoenas*,
179 F. Supp. 2d 270 (S.D.N.Y. 2001) ......................................................................... 20

*In re Hijazi*,
589 F.3d 401 (7th Cir. 2009) ................................................................................. 21, 22

*United States* v. *Hoskins*,
902 F.3d 69 (2d Cir. 2018) ............................................................................. 7, 11, 16

*In re iAnthus Cap. Holdings, Inc. Sec. Litig.*,
No. 20-cv-3135 (LAK), 2021 WL 3863372 (S.D.N.Y. Aug. 30, 2021) ............................ 12

*United States* v. *Kaluza*,
780 F.3d 647 (5th Cir. 2015) ....................................................................................... 11

*United States* v. *Kim*,
246 F.3d 186 (2d Cir. 2001) ........................................................................................ 16

*United States* v. *King*,
No. 10 Cr. 122, 2011 WL 1630676 (S.D.N.Y. Apr. 27, 2011) ........................................7

*United States* v. *McLellan*,
959 F.3d 442 (1st Cir. 2020) ....................................................................................... 16

*Morrison* v. *Nat'l Australia Bank Ltd.*,
561 U.S. 247 (2010) ................................................................................ 10, 11, 12, 15

*United States* v. *Napout*,
963 F.3d 163 (2d Cir. 2020) ........................................................................................ 17

*Nen Di Wu* v. *Holder*,
646 F.3d 133 (2d Cir. 2011) ........................................................................................ 23

*In re North Sea Brent Crude Oil Futures Litig.*,
256 F. Supp. 3d 298 (S.D.N.Y. 2017) ......................................................................... 13

*United States* v. *O'Hagan*,
    521 U.S. 642 (1997) .................................................................................. 14

*Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) (per curiam) .................................................... 13, 14

*In re Petrobas Sec. Litig.*,
    150 F. Supp. 3d 337 (S.D.N.Y. 2015) ........................................................ 13

*Petroleos Mexicanos* v. *SK Eng'g & Constr. Co.*,
    572 F. App'x 60 (2d Cir. 2014) ................................................................ 18

*United States* v. *Pirro*,
    212 F.3d 86 (2d Cir. 2000) ....................................................................... 7, 8

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) ....................................................... 13, 14

*United States* v. *Ponto*,
    454 F.2d 647 (7th Cir. 1971) .................................................................... 9

*United States* v. *Ponto*,
    454 F.2d 657 (7th Cir. 1971) (en banc) ...................................................... 8, 9

*United States* v. *Prevezon Holdings Ltd.*,
    122 F. Supp. 3d 57 (S.D.N.Y. 2015) .......................................................... 18

*Prime International Trading, Ltd.* v. *BP plc*,
    937 F.3d 94 (2d Cir. 2019) ...................................................................... 15

*Salman* v. *United States*,
    137 S. Ct. 420 (2016) .............................................................................. 14

*United States* v. *Sattar*,
    272 F. Supp. 2d 348 (S.D.N.Y. 2003) ........................................................ 9

*United States* v. *Schreiber*,
    535 F. Supp. 1359 (S.D.N.Y. 1982) ........................................................... 20

*United States* v. *Serrano*,
    191 F. Supp. 3d 287 (S.D.N.Y. 2016) ........................................................ 8

*United States* v. *Sidorenko*,
    102 F. Supp. 3d 1124 (N.D. Cal. 2015) ...................................................... 7, 9, 19

*Stoyas* v. *Toshiba Corp.*,
    896 F.3d 933 (9th Cir. 2018) .................................................................... 12

*United States* v. *Vilar*,
  729 F.3d 62 (2d Cir. 2013) ............................................................................. 10

**Statutes**

15 U.S.C. § 78aa ................................................................................................. 10

15 U.S.C. § 78j ....................................................................................... 5, 11, 12, 16

15 U.S.C. § 78n ....................................................................................... 5, 11, 15, 16

18 U.S.C. § 371 ..................................................................................................... 11

18 U.S.C. § 1343 ..................................................................................................... 5

28 U.S.C. 2466 ...................................................................................................... 20

**Other Authorities**

17 C.F.R. § 240.10b-5 ......................................................................................... 15

17 C.F.R. § 240.14e-3 ......................................................................................... 16

Exemption for Standardized Options From Provisions of the Securities Act of
  1933 and From the Registration Requirements of the Securities Exchange Act
  of 1934, 68 Fed. Reg. 188 (Jan. 2, 2003) ....................................................... 12

Fed. R. Crim. P. 12 ........................................................................................ 1, 6, 8

Defendant Igor Cornelsen respectfully submits this memorandum of law in support of his Motion to Dismiss the Indictment pursuant to Fed. R. Crim. P. 12.

**Preliminary Statement**

The charges against Defendant Cornelsen should be dismissed because they involve an impermissible extraterritorial extension of the United States insider trading laws to transactions and events that were predominantly foreign. The four criminal statutes at issue—Sections 10(b) and 14(e) of the Securities Exchange Act, the wire fraud statute, and the conspiracy statute— apply only domestically. All of the key events alleged in this case occurred outside the United States: Defendant Cornelsen is a foreign national, who is not alleged to have stepped foot in the United States during the alleged insider-trading conspiracy; both the alleged tipper and tippee were located outside the U.S. at the time of the alleged tips; and the tips are alleged to have involved the misappropriation of information from a non-U.S. person. As a result, the Indictment fails to state an offense; it also lacks sufficient "nexus" to the United States to satisfy fundamental principles of due process. Accordingly, as to Cornelsen, it should be dismissed.

The Indictment fails to allege a domestic securities transaction or a domestic wire communication. But its fatal flaws run even deeper. The alleged fraud is inescapably and predominantly foreign. The Indictment alleges that a foreign fiduciary (defendant Waldyr Prado) fraudulently misappropriated confidential information about a potential acquisition of Burger King from a foreign source ("Client-1") and tipped it to a foreign trader (Cornelsen). None of Prado, Client-1, or Cornelsen is alleged to be a U.S. national, and none of them is alleged to have been present in the United States at the time of any alleged misappropriation, tip, or trade. In fact, all three are indisputably Brazilian nationals who were indisputably present in Brazil (or another foreign country) at the most important times. Cornelsen, for his part, was in

Brazil or Europe during the entire time period, while Prado and Client-1 were in Curitiba, Brazil at the time of both alleged tips from Prado to Cornelsen.

The only fraud alleged is Prado's deceptive non-disclosure to the Brazilian source of the information, Client-1, that he would misappropriate the information in violation of his fiduciary duty. No fraud is alleged upon Burger King, its acquirer, its shareholders, or any trading counterparties. The principles of due process and comity in foreign relations reserve to Brazil, not the United States, the decision to criminalize a predominantly Brazilian misappropriation such as that alleged in the Indictment.

Rule 12 allows, and due process demands, that the territoriality of these alleged offenses, and their insufficient "nexus" to the United States, be determined now, before trial. To require a non-resident foreign national defendant to voluntarily travel to the United States for trial before raising objections of this sort would be paradoxical. Such a procedure would irreparably damage the important interests protected by the presumption against extraterritoriality.

The Second Circuit recently so-held in *United States* v. *Bescond*, 7 F.4th 127 (2d. Cir. Aug. 5, 2021), when it reversed a district court's invocation of the "fugitive disentitlement doctrine" to avoid deciding the merits of a pretrial motion raising similar extraterritoriality arguments. Like Ms. Bescond, Cornelsen is not a "fugitive." He is simply a foreign national living openly in his home country, Brazil, whose law prohibits his extradition. Cornelsen did not "flee" the United States; nor could he, since he was never here during the alleged insider-trading conspiracy. Like Ms. Bescond, he has the right to "stay home" (7 F.4th at 142) while this Court decides the validity of this long-pending Indictment.

**Allegations in the Indictment[1]**

**A.      3G's Acquisition of Burger King**

3G Capital Special Situations Fund II, L.P. was an investment fund managed by 3G

Capital Partners.  Indictment (Dkt. No. 6) ¶ 2.  In March 2010, 3G began negotiating a potential

acquisition of Burger King Holdings Inc., the parent of the hamburger chain, whose stock was

listed on the New York Stock Exchange ("NYSE").  *Id.* ¶¶ 1, 8.  3G proposed a tender offer on

August 31, 2010, which was publicly announced on September 2.  *Id.* ¶¶ 9-10.

**B.      Prado's Alleged Misappropriation from Client-1**

Client-1 was a brokerage client of Prado.  *Id.* ¶ 4.  Client-1 was a resident of Brazil.  *Id.*

¶ 14.  Prado's nationality is not alleged; but he was Brazilian as well.  Ex. A ¶ 6.

Client-1 was an investor in 3G's Fund II.  Indictment ¶ 11.  3G informed Client-1 of the

potential Burger King acquisition in March 2010, and Client-1 informed Prado in April or May

2010.  *Id.* ¶¶ 12-13.  Prado was in Curitiba, Brazil in March, May, and August 2010 to meet in-

person with Client-1.  *Id.* ¶ 14.  The two also communicated by email and telephone.  *Id.*

The indictment alleges that Client-1 was "permitted" to share this information with Prado

pursuant to the terms of a confidentiality agreement between himself and 3G, and that Client-1

"believed and expected" Prado to keep such information confidential.  *Id.* ¶¶ 12-13.  The

indictment alleges that Prado "misappropriated" material, non-public information concerning

Burger King from Client-1, "[i]n breach of his duties" to Client-1.  *Id.* ¶¶ 7, 31, 37.

---

[1]   Solely for purposes of determining whether the Indictment states an offense, the factual
      allegations in the Indictment are assumed to be true.  Cornelsen maintains his innocence and
      reserves all rights.

3

Prado used the misappropriated information to purchase Burger King securities. *Id.* ¶ 7. Specifically, Prado purchased Burger King stock (not on the NYSE, but in the "over-the-counter" market) and Burger King call options on May 17, June 3, August 25, and September 1. *Id*. ¶¶ 16-18, 29, 35(b), (f), (k), (l), (n). After the tender offer was publicly announced, Prado sold his securities for an alleged profit of $175,000. *Id.* ¶ 30.

**C.      Prado's Alleged Tip to Cornelsen, and Cornelsen's Alleged Trading**

Cornelsen was a brokerage client of Prado's, and a citizen of Brazil. *Id*. ¶ 5.

The indictment alleges that Prado and Cornelsen engaged in an "insider trading" conspiracy from May to September 2010. *Id*. ¶¶ 6, 32. The indictment alleges that Prado communicated material non-public information concerning Burger King to Cornelsen and that Cornelsen used that information to purchase Burger King call options. *Id*. ¶ 7.

The first alleged "tip" occurred on May 17, 2010. After eating lunch with Client-1 in Curitiba, Prado emailed Cornelsen: "if you are around call me at the Curitiba hotel … I have some info that I cannot say over the phone … You have to hear this." *Id*. ¶¶ 19, 35(a). Cornelsen called Prado. *Id*. Following that call, Cornelsen allegedly purchased Burger King call options. *Id*. ¶ 20, 35(c)-(e). Cornelsen's location at time of this alleged tip and these trades is not alleged. But, as is beyond dispute, he, like Prado, was in Brazil.[2]

The call options that Cornelsen purchased in May and June 2010 "expired worthless" in July 2010. *Id*. ¶ 21.

---

[2]     Cornelsen's phone records, which were filed on PACER by the SEC, show that Cornelsen, from a phone in São Paulo, called Prado on phone in Curitiba. *See* Ex. B at p. 4 ¶ 8, p. 22. (The relevant call is call #008, the only call on May 17.) In Cornelsen's SEC deposition, he likewise testified that he was in Brazil at this time. Ex. C at p. 75.

The second alleged "tip" occurred on August 18. Cornelsen emailed Prado: "is the sandwich deal going to happen," and Prado replied, "it's going to happen" and "sure thing." *Id.* ¶¶ 23, 35(h). Afterwards, Cornelsen purchased more Burger King call options. *Id.* ¶¶ 24, 35(i)-(j). Prado and Cornelsen's locations at this time are not alleged in the Indictment. But, as is beyond dispute, Prado was again in Brazil, and Cornelsen was then in Europe.[3]

Later in August, Cornelsen purchased more call options. *Id.* ¶¶ 27, 35(m). The Indictment alleges other phone calls between Prado and Cornelsen, *id.* ¶ 25, but it does not allege that Prado communicated material non-public information on any of those calls. Nor are Prado and Cornelsen's locations at the times of such calls alleged. But, to the extent relevant, Cornelsen was either still in Europe or had returned to Brazil. Ex. C at pp. 118-19.

After the transaction was publicly announced, Cornelsen sold his unexpired call options for an alleged profit of $1.68 million. Indictment ¶ 30.

**D.    The Charges**

The indictment charges four counts. Count One alleges a conspiracy to commit securities fraud (Section 10(b) of the Securities Exchange Act of 1934) and fraud in connection with a tender offer (Section 14(e) of the Exchange Act). *Id.* ¶¶ 1-35. Count Two alleges securities fraud. *Id.* ¶¶ 36-37. Count Three alleges fraud in connection with a tender offer. *Id.* ¶¶ 38-39. And Count Four alleges conspiracy to commit wire fraud (18 U.S.C. § 1343). *Id.* ¶¶ 40-42.

---

[3]    In his SEC deposition, Cornelsen testified that he was travelling in Europe. Ex. C at pp. 118-19. As for Prado, his phone records show that he was in Brazil. Ex. B at p. 5 ¶ 11, p. 15. (The relevant calls are #44 through #48, which indicate a location in either Brazilian area code 41 in the Brazilian state of Paraná (PR), in which Curitiba is located, or Brazilian area code 11 in the Brazilian state of São Paulo (SP), in which the city of São Paulo is located.) In the email chain quoted in the Indictment, Prado says, "I'm in Curitiba." *Id.* at p. 27.

## Argument

### I.     Legal Standard for Motion to Dismiss

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Four distinct grounds for such a motion, subject to different standards, are relevant here: the Indictment's failure to state an offense; the Indictment's lack of specificity; the Court's authority to find facts "peculiar" to this motion; and the Court's authority to enter an acquittal.

The first two grounds, "lack of specificity" and "failure to state an offense," are "defect[s] in the indictment." Fed. R. Crim. P. 12(b)(3)(B)(iii), (v). They must be raised by pretrial motion if the basis is "then reasonably available," and must be decided pretrial if "the motion can be determined without a trial on the merits." *Id.* (b)(3). This motion can and should be granted, on those grounds; there is no need to go beyond the Indictment's four corners.

If, however, the Court determines that additional facts are relevant, it should find them, from the indisputable documentary evidence submitted herein, or otherwise. A Rule 12 motion must also be decided pretrial where, as here, "deferral will adversely affect a party's right to appeal." Fed. R. Crim. P. 12(d). "When factual issues are involved in deciding a motion, the court must state its essential findings on the record." *Id.*

#### A.     Failure to State an Offense.

"[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States* v. *Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012); *see, e.g.*, *United States* v. *Cassese*, 273 F. Supp. 2d 481, 485-88 (S.D.N.Y. 2003) (in insider trading case, granting pretrial motion to dismiss securities fraud count because indictment failed to allege "fiduciary or similar" relationship between source of information and alleged

misappropriator).  "The sufficiency of an indictment and the interpretation of a federal statute are both matters of law . . . ." *Aleynikov*, 676 F.3d at 76.  For purposes of such a motion, "the facts alleged in the Indictment are taken as true," and "[t]he Court may not weigh the sufficiency of the evidence underlying the Indictment." *United States* v. *King*, No. 10 Cr. 122, 2011 WL 1630676, at *3 (S.D.N.Y. Apr. 27, 2011) (Koeltl, J.) (citations omitted).

An indictment should be dismissed for failure to state an offense where the relevant criminal statute does not apply extraterritorially and the indictment fails to allege a domestic application of the statute. *See, e.g.*, *United States* v. *Hoskins*, 902 F.3d 69, 76-97 (2d Cir. 2018) (affirming dismissal of that portion of indictment alleging conspiracy to violate 15 U.S.C. § 78dd-2, because defendant was not an enumerated person to whom that section of Foreign Corrupt Practices Act (FCPA) applies extraterritorially); *United States* v. *Sidorenko*, 102 F. Supp. 3d 1124, 1127-32 (N.D. Cal. 2015) (dismissing indictment alleging wire fraud and bribery for failure to allege domestic application).

### B.    Lack of Specificity

An indictment must contain sufficient specificity to inform the defendant of the "nature and cause of the accusation" (as the Sixth Amendment requires) and to "assure[ ]" the defendant "that he is being tried on the evidence presented to the grand jury," that the grand jury "understood the elements of the crime and the evidence necessary to support the indictment," and that the "prosecution will not fill in elements of its case with facts other than those considered by the grand jury" (as the Fifth Amendment requires). *United States* v. *Pirro*, 212 F.3d 86, 92, 95 (2d Cir. 2000).

In some cases, an indictment need only "track the language of the statute charged and state the time *and place* (in approximate terms) of the alleged crime." *Id.* at 92 (quoting *United*

*States* v. *Walsh*, 194 F.3d 37, 44 (2d Cir. 1999)) (emphasis added).  Here, the "place" is at issue.  Even a bare-bones indictment must allege the place of the crime.

In addition, in this case, more than a bare-bones indictment is required.  When, as here, "one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense."  *Id.* at 93 (internal quotation marks omitted).  Where a criminal statute has no extraterritorial application, the territoriality of the alleged offenses is an implicit element, and the facts establishing territoriality must be alleged.  *See, e.g.*, *United States* v. *Serrano*, 191 F. Supp. 3d 287, 290 (S.D.N.Y. 2016) (interstate-commerce element was "implicit" and thus required to be alleged in addition to statutory language).

"The timing of the defendant's objection is important to the level of scrutiny employed; a defendant who objects to the indictment before trial," as here, "is entitled to a more exacting review of the indictment than one who waits until after trial to object."  *Pirro*, 212 F.3d at 92.

### C.  The Court's Authority to Find Facts "Peculiar" to This Motion.

The Court's review of the Indictment is not limited to failure to state an offense or lack of specificity.  Under Rule 12, the Court has authority to decide any pretrial motion that can be "determined without a *trial on the merits*."  Fed. R. Crim. P. 12(b)(1) (emphasis added).  That Rule "permits factual hearings prior to trial if necessary to resolve issues of fact *peculiar* to the motion," *United States* v. *Covington*, 395 U.S. 57, 60 (1969) (emphasis added), such as certain motions that "attack[ ] the indictment by proof of extrinsic facts" (historically known as a "plea in abatement").  *United States* v. *Ponto*, 454 F.2d 657, 660 (7th Cir. 1971) (en banc).

A factual issue that "goes to whether [the statute] applies to the Defendants' alleged criminal conduct, not to the issue of the Defendants' guilt or innocence," can be decided by Rule

12 motion.  *United States* v. *Dransfield*, 913 F. Supp. 702, 707 (E.D.N.Y. 1996).  Territoriality is one such issue; another is constitutionality.  An indictment should also be dismissed if it violates the defendant's right to due process, *United States* v. *Sattar*, 272 F. Supp. 2d 348, 356-62 (S.D.N.Y. 2003) (Koeltl, J.), including where there is an insufficient "nexus" to the United States. *Sidorenko*, 102 F. Supp. 3d at 1132-33 (dismissing indictment for lack of nexus).

### D.     The Court's Authority to Enter an Acquittal.

Finally, Rule 12 grants the authority, in appropriate cases, to decide pretrial a "defense on the merits," "in the nature of an acquittal," even if that defense "could have been decided at trial." *Ponto*, 454 F.2d at 663 (citing *Covington*, 395 U.S. at 60).  In *Ponto*, for example, the district court considered certain documents in Ponto's Selective Service file—neither attached to, nor quoted in, nor referenced in the indictment—and then dismissed the indictment on the ground that Ponto had been mis-classified and had no duty to submit to induction into the Armed Forces. *See United States* v. *Ponto*, 454 F.2d 647, 649-51 (7th Cir. 1971) (panel opinion), *adhered to on rehearing*, 454 F.2d 657.  The issue was not "extraneous to the theories which would have been raised by prosecution or defense at trial if it had occurred." *Id*. at 652.  To the contrary, it was "a classic defense in a Selective Service case." *Id*.

This fact-finding authority is necessary to vindicate a foreign defendant's right to argue "whether the law [he] is alleged to have violated can reach [him] and [his] conduct in the first place." *Bescond*, 7 F.4th at 136.  The defendant's right to raise that defense cannot be conditioned on "travel" to the United States for trial. *Id*. at 136, 142.  "[T]o coerce submission to U.S. jurisdiction wholly regardless of whether the charged statute reaches individuals outside our territory" is "in tension with principles that underlie the presumption against extraterritoriality." *Id*. at 140; *see also United States* v. *Bulger*, 816 F.3d 137, 147 (1st Cir. 2016) ("[I]t would make

little sense for the trial judge here, when faced with Bulger's clear claim that he was barred from being prosecuted in the very courtroom in which he sat, to conduct a lengthy trial, only to have the jury potentially find that Bulger should not have been prosecuted in the first place.").

## II.   The Indictment Should Be Dismissed Because the Crimes Charged Do Not Apply to Cornelsen's Extraterritorial Conduct.

### A.   None of the Criminal Statutes at Issue Applies Extraterritorially.

The Supreme Court and Second Circuit have held that neither Section 10(b) of the Exchange Act nor the wire fraud statute applies extraterritorially. *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255-65 (2010) ("[T]here is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we therefore conclude that it does not."); *Bascuñán* v. *Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019) ("The mail and wire fraud statutes do not indicate an extraterritorial reach.") (citing *Eur. Cmty.* v. *RJR Nabisco, Inc.*, 764 F.3d 129, 140-41 (2d Cir. 2014), *rev'd in part on other grounds*, 579 U.S. 325 (2016)).

While *Morrison*, *Bascuñán*, and *European Community* are civil cases, "the general rule is that the presumption against extraterritoriality applies to criminal statutes, and Section 10(b) is no exception." *United States* v. *Vilar*, 729 F.3d 62, 74 (2d Cir. 2013); *see also Morrison*, 561 U.S. at 261 (presumption applies "in all cases"). "'Crimes against private individuals or their property,'" including "'frauds of all kinds,'" are "exactly the sort of statutory provision for which the presumption against extraterritoriality does apply." *Vilar*, 729 F.3d at 72, 74 (quoting *United States* v. *Bowman*, 260 U.S. 94, 98 (1922)).[4]

---

[4]   After *Morrison*, Section 929P of Dodd-Frank amended the Exchange Act to give district courts "jurisdiction" over violations satisfying a conduct-and-effects test. 15 U.S.C. § 78aa(b). That amendment has no effect on this case. *Morrison* addressed "what conduct § 10(b) prohibits," not "subject-matter jurisdiction," 561 U.S. at 254, so Section 929P does not abrogate *Morrison*. *See SEC* v. *Chi. Convention Ctr., LLC*, 961 F. Supp. 2d 905, 910-26

As for Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), which proscribes fraud in connection with a tender offer, its extraterritorial reach is perhaps a question of first impression. But that is an easy question under *Morrison* and its progeny. As with Section 10(b) and the wire fraud statute, Section 14(e) says nothing at all about applying extraterritorially.[5]  Per the presumption against extraterritoriality, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison,* 561 U.S. at 255.

And the "extraterritorial reach" of the conspiracy statute (18 U.S.C. § 371) is "coterminous with that of the underlying criminal statute." *Hoskins*, 902 F.3d at 96.  Because Sections 10(b) and 14(e) of the Exchange Act do not reach extraterritorially, the charge of conspiracy to commit these offenses does not reach extraterritorially, either.

---

(N.D. Ill. 2013) (reasoning that "plain language" of Section 929P is "purely jurisdictional" and "does not clearly express" an intention for Section 10(b) to apply extraterritorially). Whatever its effect in actions brought by the SEC, in criminal cases, the rule of lenity forbids reading Section 929P as addressing more than jurisdiction.  *See United States* v. *Davis*, 139 S. Ct. 2319, 2333 (2019) (lenity requires that "ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor"); *United States* v. *Bodmer*, 342 F. Supp. 2d 176, 189 (S.D.N.Y. 2004) (rule of lenity and requirement of fair notice prohibit imposing criminal liability on "non-resident foreign nationals" based on "ambiguous" territorial provision);  *see also United States* v. *Kaluza*, 780 F.3d 647, 669 (5th Cir. 2015) (lenity prohibited applying "seaman's manslaughter" statute to Deepwater Horizon "site leaders" because statute was ambiguous as to whether they were a covered person).  Additionally, Dodd-Frank became law on July 21, 2010, and cannot be applied to Cornelsen's prior conduct.

5    Section 14(e) is titled "Untrue statement of material fact or omission of fact with respect to tender offer," and provides, in full: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.  The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

**B.**  **The Indictment Does Not Allege a Domestic Crime.**

      **1.**  **Securities Fraud (Count 2)**

          (a)  *The Indictment Fails to Allege a Domestic Securities Transaction.*

Section 10(b) has two prongs. It applies to the "purchase or sale of [1] any security registered on a national securities exchange or [2] any security not so registered." 15 U.S.C. § 78j(b). *Morrison* established two rules, one for each prong. For the first prong, *Morrison* established a *per se* rule that Section 10(b) applies to all transactions in securities registered on a domestic exchange—regardless of whether the particular transaction is domestic or foreign. 561 U.S. at 267. As to the second prong, "any security not so registered," *Morrison* held that it applies only to domestic securities transactions. 561 U.S. at 268 & n.10 ("With regard to securities *not* registered on domestic exchanges, [Section 10(b) has an] exclusive focus on *domestic* purchases and sales . . . ." (emphasis in original)).

*Morrison*'s *per se* rule does not apply in this case. Cornelsen only purchased Burger King *options*. Indictment ¶¶ 1, 16, 20, 24, 26-27, 35(b)-(c), (i), (l)-(m). While these options were *traded* on a domestic exchange, the Indictment does not allege that they were "*registered* on a national securities exchange.*" 15 U.S.C. § 78j(b) (emphasis added). Nor could it; standardized options are *unregistered* securities.[6] As to Prado, he purchased both stock and options, but he purchased stock only in an "over-the-counter" market. Indictment ¶¶ 17, 26, 29. An over-the-counter market is not an exchange. *Stoyas* v. *Toshiba Corp.*, 896 F.3d 933, 947 (9th Cir. 2018); *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, No. 20-cv-3135 (LAK), 2021 WL

---

[6]  *See* Exemption for Standardized Options From Provisions of the Securities Act of 1933 and From the Registration Requirements of the Securities Exchange Act of 1934, 68 Fed. Reg. 188 (Jan. 2, 2003).

3863372, at *2 (S.D.N.Y. Aug. 30, 2021). The Indictment does not allege any purchase or sale, by Prado or Cornelsen, of any Burger King security registered on a domestic exchange.

Because *Morrison*'s *per se* rule does not apply, the Indictment was required to allege a domestic purchase or sale. It does not. Whether a securities transaction is domestic depends upon additional, transaction-specific facts not alleged in this Indictment. *See Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012) (relevant facts include "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money"). Because the Indictment fails to allege the facts relevant under the *Absolute Activist* test, it fails to allege a domestic transaction.[7]

        (b)    *The Alleged Violation Is Predominantly Foreign.*

Even if the Indictment alleged a domestic securities transaction, that is only a "necessary," not a "sufficient," predicate to apply Section 10(b). *Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 214-15 (2d Cir. 2014) (per curiam). Even where there is a domestic securities transaction, the facts constituting the violation can be "so predominantly

---

[7] *See Banco Safra S.A.-Cayman Islands Brach* v. *Samarco Mineracao S.A.,* 849 F. App'x 289, 294-95 (2d Cir. 2021) (affirming dismissal of complaint for failure to allege domestic transaction despite allegations that plaintiff used New York bank accounts and U.S. broker-dealers to purchase securities); *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (affirming dismissal of complaint for failure to allege domestic transaction despite allegations that a buy order was placed in the United States by a United States entity); *In re Petrobas Sec. Litig.*, 150 F. Supp. 3d 337, 341 (S.D.N.Y. 2015) (dismissing claims for failure to allege domestic transaction despite allegations that note was purchased "in the United States"); *see also In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 331-32 (S.D.N.Y. 2020) (in Commodities Exchange Act case, dismissing claims for failure to allege domestic transaction despite allegations of price-fixing communications by traders in the United States); *In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 309-10 (S.D.N.Y. 2017) (in Commodities Exchange Act case, dismissing claims for failure to allege domestic transaction despite allegations that plaintiffs sold futures and derivatives "on domestic exchanges or otherwise entered into domestic commodities transactions").

foreign" that the application of the statute is "impermissibly extraterritorial." *Id.* at 216; *see also* *Cavello Bay Reinsurance Ltd.* v. *Shubin Stein*, 986 F.3d 161 (2d Cir. 2021).

Here, the alleged violation was "predominantly" Brazilian. The source of the information (Client-1), the misappropriating fiduciary (Prado), and the alleged tippee (Cornelsen) are all Brazilian nationals. Indictment ¶¶ 5, 14; *supra*, pp. 3-4. The Indictment does not allege that any of them was present in the United States at any relevant time. To the contrary, it alleges (or the Court can find) that they were present in Brazil or Europe. *Supra*, pp. 3-5. That the fraudulent conduct occurred outside the United States "weighs heavily in favor of the conclusion that [the] claims are predominately foreign." *In re Platinum & Palladium Antitrust Litig.*, 449 F.Supp.3d 290, 331 (S.D.N.Y 2020); *see also Parkcentral*, 763 F.3d at 201, 207, 216 (emphasizing Porsche's conduct in Germany).

Given the Indictment's reliance on the misappropriation theory, the fact that Burger King's securities traded on United States exchanges is insufficient to create a predominantly domestic violation. Under the "classical theory of insider-trading liability," inapplicable here, a corporate insider "breaches a duty to, and takes advantage of, the shareholders of his corporation." *Salman* v. *United States*, 137 S. Ct. 420, 425 n.2 (2016). By contrast, under the "misappropriation theory," the tipper "breaches a duty to, and defrauds, the source of the information, as opposed to the shareholders of his corporation." *Id.* "Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation." *United States* v. *O'Hagan*, 521 U.S. 642, 655 (1997). Here, the only deception alleged in the Indictment is Prado's non-disclosure to

Client-1, a citizen of Brazil, that he planned to use Client-1's information to trade. The Indictment does not allege fraud upon a securities exchange or those trading on it.

### 2. Fraud in Connection with a Tender Offer (Count 3)

*Parkcentral*'s "predominantly foreign" test is not a special rule limited to Section 10(b). Rather, it is a general rule that follows from the presumption against extraterritoriality's first principles. *See Morrison*, 561 U.S. at 266 ("It is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." (emphasis in original)). Accordingly, the Second Circuit recently applied the same "predominantly foreign" test in *Prime International Trading, Ltd.* v. *BP plc*, 937 F.3d 94 (2d Cir. 2019), which involved provisions of the Commodity Exchange Act (CEA) that prohibit the use of manipulative or deceptive devices in connection with commodity or swap transactions. *Id.* at 101-06.

Section 14(e) is even more similar to Section 10(b) than the CEA provisions at issue in *Prime International*. Both Rule 10b-5 and Section 14(e) contain identically worded descriptions of the defendant's conduct: materially false statements or materially misleading omissions. *See* 15 U.S.C. § 78n(e); 17 C.F.R. § 240.10b-5(b). While Rule 10b-5 proscribes misstatements "in connection with" a transaction in a security registered on a domestic exchange or a domestic transaction, Section 14(e) proscribes misstatements "in connection with" a tender offer. *Compare* 17 C.F.R. § 240.10b-5(b), *with*, 15 U.S.C. § 78n(e). Thus, *Parkcentral*'s "predominantly foreign" test applies to Section 14(e).

The alleged violation of Section 14(e) is also "predominantly" foreign. In addition to the reasons discussed above, one of the elements of a violation of Rule 14e-3 is that the material

non-public information be obtained from a "person acting on behalf of the offering person." 17 C.F.R. § 240.14e-3(a)(3); *see also id.* (d)(2)(iii). Here, the Indictment alleges that person was Client-1, a Brazilian. Indictment ¶¶ 7, 13, 16, 19, 31.

### 3. Conspiracy to Commit Securities Fraud and Fraud in Connection with a Tender Offer (Count 1)

Because the alleged violations of Sections 10(b) and 14(e) of the Exchange Act are impermissibly extraterritorial, the charge of conspiracy to violate those provisions is also impermissibly extraterritorial. *See Hoskins*, 902 F.3d at 96.

### 4. Conspiracy to Commit Wire Fraud (Count 4)

#### (a) *The Indictment Fails to Allege Any Domestic Wire Communication.*

The wire fraud statute does not apply to foreign-to-foreign wire communications. Rather, to state a wire fraud offense, an indictment must allege a domestic wire communication—that is, an interstate wire or foreign-to-domestic wire. *See United States* v. *Kim*, 246 F.3d 186, 189 (2d Cir. 2001) (legislative history of amendment adding "foreign commerce" language concerned with "failed prosecution" involving telephone call "from Mexico to the United States"); *see also United States* v. *McLellan*, 959 F.3d 442, 469 (1st Cir. 2020) (wire fraud statute applies to wire communication "from one state to another or between the United States and another country").

This Indictment does not allege a domestic wire communication. It alleges four wire communications: (1) a May 17, 2010 email from Prado to Cornelsen; (2) a June 2, 2010 telephone call between Prado and Cornelsen; (3) a June 3, 2010 telephone call between Prado and Cornelsen; and (4) a September 2, 2010 email from Cornelsen to Prado. Indictment

16

¶¶ 35(a), (d), (f), (o). Each is alleged to have been made "by means of wire communication in interstate and foreign commerce." *Id.*[8]

These allegations do not suffice to allege a *domestic* wire communication. The Indictment fails to allege that either Prado or Cornelsen was present in the United States at the time of these communications; or that the communications somehow otherwise passed through wires in the United States. Indeed, as to the May 17 email, the Indictment alleges it was sent while Prado was in Brazil. *Id.* ¶¶ 14, 16, 19 (alleging that Prado travelled to Curitiba, Brazil, where Client-1 resided, in May 2010; that Prado sent the May 17 email after eating lunch with Client-1; and that the email said "call me at the Curitiba hotel").

While the Indictment does not allege Cornelsen's location at these times, it is beyond dispute that he was in Brazil on all four days. Ex. C at 71-72, 75, 111, 118-19.

> (b)     *The Indictment Fails to Allege a Domestic*
> *Wire Communication That Was "Essential."*

Even assuming that one or more of the June 2, June 3, or September 3 wire communications was domestic, the Indictment still would not be sufficient. As discussed above, the alleged fraud was essentially foreign: one Brazilian (Prado) misappropriating information from another Brazilian (Client-1) and tipping it to a third Brazilian (Cornelsen). *Supra*, pp. 3-5, 14. "[I]n order for incidental domestic wire transmissions not to haul essentially foreign allegedly fraudulent behavior into American courts, 'the use of the . . . wires must be *essential, rather than merely incidental*, to the scheme to defraud.'" *United States* v. *Napout*, 963 F.3d

---

[8]     The Indictment does refer to certain additional emails and phone calls. Indictment ¶¶ 22, 23, 25, 28. None of these is alleged to have been a wire communication in interstate or foreign commerce.

163, 179 (2d Cir. 2020) (quoting *Bascuñán*, 927 F.3d at 122) (emphasis added). "This ensures that the domestic tail not wag, as it were, the foreign dog." *Id.*[9]

The Indictment fails to allege that any of the June 2, June 3, or September 2 wire communications was "essential" to the alleged scheme to defraud. It does not allege, for example, that these communications included material, non-public information about Burger King. Quite simply, it says *nothing* about their content or significance. That is not sufficient to meet the *Bascuñán* and *Napout* standard. Nor does the nature of the alleged conspiracy suggest that the use of United States wires would be "essential" to its achievement. Client-1, Prado, and Cornelsen are all Brazilians. Nothing suggests that Prado could not have obtained information from Client-1, and communicated it Cornelsen, without using wires in the United States. The use of United States wires, if any, would have been incidental, not essential.

## III.     The Indictment Should Be Dismissed Because It Violates Due Process.

The Indictment suffers from an additional flaw: the application of these statutes to Cornelsen's foreign conduct violates his right to due process. "In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States* v. *Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011)

---

[9]   *See also, e.g.*, *Petroleos Mexicanos* v. *SK Eng'g & Constr. Co.*, 572 F. App'x 60 (2d Cir. 2014) (in civil RICO case, use of U.S. wires to obtain bank financing, to send invoices totaling $159 million, and to transfer corresponding funds insufficient to apply wire fraud statute to scheme to bribe Pemex officials); *United States* v. *Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 70-72 (S.D.N.Y. 2015) (in civil forfeiture case, use of U.S. wires "to send a kickback" to Russian tax official insufficient to apply wire fraud statute); *United States* v. *All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 103, 106 (D.D.C. 2017) (in civil forfeiture case, use of U.S. wires—electronic fund transfers that passed through U.S. banks—held insufficiently domestic to apply wire fraud statute where "a substantial amount of the scheme to defraud" did not occur in the U.S.).

(quoting *United States* v. *Yousef*, 327 F.3d 56, 111 (2d Cir. 2003)). "For non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Id.*[10]

Cornelsen is not a United States citizen, and he acted entirely abroad. The Indictment does not allege that his "aim" was to cause harm inside the United States, its citizens, or its interests. To the contrary, the only alleged "victim" of the scheme was Client-1, a Brazilian resident. *Supra*, pp. 3-5. Because the Indictment fails to allege the requisite "nexus" to the United States, it must be dismissed. *Sidorenko*, 102 F. Supp. 3d at 1132-33 (dismissing indictment because "no aim to harm the United States is alleged anywhere in this Indictment").

## IV.    The Fugitive Disentitlement Doctrine Does Not Apply.

The government may ask this Court not to reach the merits of this motion under the so-called fugitive disentitlement doctrine. That would be wrong. The fugitive disentitlement doctrine is a two-step analysis. *First*, "in order to disentitle a litigant, a court must first determine that the litigant is a fugitive." *Bescond*, 7 F.4th at 139. *Second*, "[t]he court may then exercise discretion to disentitle the fugitive—but only if doing so would serve the doctrine's objectives." *Id.* Here, both steps of the analysis independently prohibit disentitling Cornelsen.

### A.    Cornelsen Is Not a Fugitive.

The fugitive disentitlement doctrine "applies only to fugitives from justice." *Empire Blue Cross & Blue Shield* v. *Finkelstein*, 111 F.3d 278, 281 (2d Cir. 1997). A "criminal suspect" is a fugitive if he "flees, evades, or escapes arrest, prosecution, imprisonment . . . , especially by

---

[10]    As "a defendant in a U.S. criminal court," Cornelsen has a right to due process. *Bescond*, 7 F.4th at 136. He is "not a free-floating foreigner invoking the jurisdiction of our federal courts to vindicate a Constitutional right." *Id.* Rather, "[i]t is the *government* that invoked such jurisdiction when it pursued indictment." *Id.* (emphasis in original).

fleeing the jurisdiction or by hiding." *Bescond*, 7 F.4th at 139 (quoting BLACK'S LAW DICTIONARY (11th ed. 2019)) (cleaned up). In criminal cases, there are two, and only two, categories of fugitives: "traditional fugitives" and "constructive-flight fugitives." *Id.*[11]

A traditional fugitive, "having committed a crime, flees from the jurisdiction of the court where a crime was committed or departs from his usual place of abode and conceals himself within the district." *Id.* (quoting *Finkelstein*, 111 F.3d at 281) (cleaned up); *see also United States* v. *Schreiber*, 535 F. Supp. 1359, 1363 (S.D.N.Y. 1982) ("One, of course, cannot be a fugitive unless he was present in the demanding state at the time the crime was committed.").

A constructive-flight fugitive "committed crimes while in the United States but who was outside the country—for whatever reason—when she learned that her arrest was sought and who then refused to return to the United States in order to avoid prosecution." *Bescond*, 7 F.4th at 140 (quoting *Collazos* v. *United States*, 368 F.3d 190, 199 (2d Cir. 2004)) (cleaned up); *see In re Grand Jury Subpoenas*, 179 F. Supp. 2d 270, 287 (S.D.N.Y. 2001) (Chin, J.) (constructive-flight requires that defendant have been "present in the jurisdiction at the time of the alleged crime").

Mr. Cornelsen is not a fugitive under either definition. He is not traditional fugitive because he has "neither fled nor concealed h[im]self." *Bescond*, 7 F.4th at 139.[12] And he is not

---

[11] In civil forfeiture cases, there are other types of fugitives, such as those who "decline[ ] to enter . . . the United States to submit to its jurisdiction," or "otherwise evade[ ] the jurisdiction of the court." 28 U.S.C. § 2466(a)(1)(B), (C). Unless and until Congress provides otherwise, those categories do not apply in criminal cases. *Bescond*, 7 F.4th at 140.

[12] Prior to 2012, Cornelsen had a habit of seasonally travelling to Boca Raton, Florida, where he owns a vacation home. Ex. C at 8-10. That changed after the SEC, in 2012, accused him of insider trading. *See infra*, pp. 22. He was outside the United States at that time, and never returned to the United States thereafter. That is not "flight." Moreover, the criminal complaint (filed September 10, 2013) followed the SEC's accusations by approximately one year, and was not unsealed until several months later (until January 27, 2014).

a constructive-flight fugitive because he "was not in the United States while allegedly committing the charged conduct"; and because, far from "refusing to return to the United States to avoid prosecution," he "simply remains at home, as [his] home country permits [him] to do." *Id.* at 140.

In addition, a foreign defendant with a "nonfrivolous extraterritoriality claim" is not a fugitive. *Id.* "[I]f our law does not reach [Cornelsen] or [his] conduct, can it be said that [he] is in flight from it?" *Id.* at 141.

### B. Even If Mr. Cornelsen Were a Fugitive, the Court Should Exercise Its Discretion Not to Disentitle Him.

Even if Cornelsen met the definition of a fugitive, which he does not, the Court should not exercise its discretion to disentitle him unless "doing so would serve the doctrine's objectives." *Bescond*, 7 F.4th at 139.[13] Manifestly, it would not.

***This motion involves sufficient mutuality***. For eight years, the government's allegations have damaged Cornelsen's reputation, and an arrest warrant obtained by the government and served on INTERPOL (*see* Dkt. No. 4) has deprived Cornelsen of his liberty to travel outside Brazil. If the Court denies this motion, those harms will continue. That more than satisfies any need for "mutuality" in litigation. *See In re Hijazi*, 589 F.3d 401, 413-14 (7th Cir. 2009) (need for mutuality satisfied where, if motion to dismiss were denied, defendant would remain confined to Kuwait or else face arrest and extradition to the United States if he travelled).

---

[13] Those purposes are: "1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape." *Finkelstein*, 111 F.3d at 280.

And even if there were insufficient mutuality, under the circumstances, disentitlement is a "disproportionately severe response to [Cornelsen's] absence and therefore too harsh a means of ensuring mutuality in the litigation." *Bescond*, 7 F.4th at 142; *see Degen* v. *United States*, 517 U.S. 820, 828 (1996) (disentitlement "too blunt an instrument" for mere absence).

**Cornelsen is not flouting of judicial process**. There is no basis for a finding that Cornelsen is "exhibiting disrespect for U.S. law." *Bescond*, 7 F.4th at 142. Far from it, as in the *Bescond* case, "[a]ll [Cornelsen] has done is stay home," "where [his] government permits [him] to live freely." *Id.* Indeed, Cornelsen has demonstrated even more respect than Ms. Bescond. He voluntarily travelled to California to be deposed by the SEC in 2012. Ex. C. He answered every question. And he told the SEC that he intended to return to Brazil after that deposition. Ex. C at 185. Despite his strong disagreement with the SEC's decision to sue him, he settled with the SEC later in 2012, on a no-admit basis, agreeing to pay more than $5 million in disgorgement and penalties (plus non-monetary relief). Ex. D.

Cornelsen had and has no obligation, under United States or Brazilian law, to travel from Brazil to the United States to faces these charges. *See Bescond*, 7 F.4th at 135; *Hijazi*, 589 F.3d at 407-08. To expect him to do so would ask too much. If he were to appear, he would face a substantial and immediate risk of pretrial detention—regardless of whether he is later acquitted. He was 66 years old when indicted, and is 74 today. *See* Ex. C at 7-8. For the last several years, he has been battling leukemia. He has good reason to believe that pretrial detention could compromise his treatment and health.[14] In short, Cornelsen's "reasons for litigating from home are legitimate and fair." *Bescond*, 7 F.4th at 142.

---

[14] Because such evidence would only be relevant if Cornelsen were deemed a fugitive (which he is not), to protect his medical privacy, evidence of his diagnosis is not being submitted

***Entertaining this motion would not encourage flight***.  Cornelsen did not flee, so granting this motion could not encourage other defendants to flee.  And even if the government could articulate a "slight general deterrence effect" of disentitling Cornelsen, that could not "outweigh the countervailing harm to the judicial process, which seeks to resolve cases on the merits whenever possible."  *Nen Di Wu* v. *Holder*, 646 F.3d 133, 137 (2d Cir. 2011).

***The government has not been prejudiced by an escape***.  Finally, there has been no prejudice "caused by the defendant's escape."  *Bescond*, 7 F.4th at 142 (quoting *Finkelstein*, 111 F.3d at 280).  Again, Cornelsen did not "escape."  In any event, there has been no apparent prejudice, of any kind, to the government.  The alleged insider trading conspiracy began and ended in 2010.  The indictment was returned in 2015.  There is thus "no apparent need to acquire new evidence related to [Cornelsen's] period of absence."  *Id*. at 143.

In contrast, disentitlement would cause substantial prejudice to Cornelsen.  It would require him to "leave home and face arrest and detention to have any hope of securing dismissal" on his extraterritoriality arguments.  *Id*.  That "contravenes the rationales that underlie disentitlement and assigns no weight to the sovereignty of other nations."  *Id*.

---

with this motion.  But Cornelsen reserves the right to submit such evidence if it becomes relevant.  Cornelsen is also willing to provide medical records to the U.S. Attorney's Office on a confidential basis and to the Court for *in camera* review.

## Conclusion

The Indictment as to defendant Igor Cornelsen should be dismissed.


Dated:   New York, New York
        October 7, 2021

                                        PAUL, WEISS, RIFKIND,
                                          WHARTON & GARRISON LLP

                                    By:   /s/ Michael E. Gertzman
                                          Michael E. Gertzman
                                          Shane D. Avidan
                                    1285 Avenue of the Americas
                                    New York, New York 10019
                                    (212) 373-3000
                                    mgertzman@paulweiss.com
                                    savidan@paulweiss.com

                                    *Attorneys for Defendant Igor Cornelsen*