UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

                             :

UNITED STATES OF AMERICA     :

                             :

     - v. -                   :

                             :

WALDYR PRADO and         :
IGOR CORNELSEN,        :            15 Cr. 516 (JGK)

                             :

        Defendants.      :

                             :

-------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT IGOR CORNELSEN'S MOTION TO DISMISS THE INDICTMENT

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

Christine I. Magdo
Elizabeth Hanft
Assistant United States Attorneys
- Of Counsel -

TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................. 1

I.    Procedural History ..................................................................................... 1

II.   Factual Allegations .................................................................................... 2

      A.    Overview of the Insider Trading Scheme ......................................... 2

      B.    Relevant Individuals and Entities ..................................................... 2

      C.    Background to 3G's Acquisition of Burger King .............................. 3

      D.    Prado Obtains Inside Information from Client-1 ............................... 4

      E.    Prado's Duties to Firm-1 Concerning Client Information and Insider Trading ........... 4

      F.    Prado Misappropriates the MNPI and Trades ................................... 5

      G.    Prado Conveys MNPI to Cornelsen and Cornelsen's Initial Trades in Burger King ... 5

      H.    Prado and Cornelsen's Continued Trading After July 2010 ............. 6

DISCUSSION ..................................................................................................... 8

I.    Cornelsen is Disentitled From Challenging the Indictment .......................... 8

      A.    Applicable Law ............................................................................... 8

      B.    Argument ........................................................................................ 13

            1.    Unlike Bescond, Cornelsen is a fugitive under Second Circuit law. ...................... 13

            2.    Disentitling Cornelsen serves the objectives of the fugitive disentitlement doctrine.
                  16

CONCLUSION .................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Antonio-Martinez v. I.N.S.*,
   317 F.3d 1089 (9th Cir. 2003) ............................................................................. 16

*Bar-Levy v. United States Dep't of Justice*, INS,
   990 F.2d 33 (2d Cir. 1993) .................................................................................. 10

*Degen v. United States*,
   517 U.S. 820 (1996) .......................................................................................... 8, 9

*Empire Blue Cross & Blue Shield v. Finkelstein*,
   111 F.3d 278 (2d Cir. 1997) .................................................................. 8, 9, 10, 16

*Gao v. Gonzales*,
   481 F.3d 173 (2d Cir. 2007) ......................................................................... 11, 16

*Hanson v. Phillips*,
   442 F.3d 789 (2d Cir. 2006) ................................................................................. 9

*In re Grand Jury Subpoenas dated March 9, 2001*,
   179 F. Supp. 2d 270 (S.D.N.Y. 2001) ................................................................ 8, 9

*In re Hijazi*,
   589 F.3d 401 (7th Cir. 2009) .............................................................................. 15

*Molinaro v. New Jersey*,
   396 U.S. 365 (1970) .............................................................................................. 8

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010) ....................................................................................... 10, 12

*Nen Di Wu v. Holder*,
   646 F.3d 133 (2d Cir. 2011) ................................................................................. 8

*SEC v. Berger*,
   322 F.3d 187 (2d Cir. 2003) .................................................................... 10, 16, 17

*United States v. $45,940 in United States Currency*,
   739 F.2d 792 (2d Cir. 1984) ............................................................................ 9, 10

*United States v. All Funds on Deposit in Any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith*,
801 F. Supp. 984 (E.D.N.Y. 1992) ........................................................................................ 9

*United States v. Bescond*,
7 F.4th 127 (2d Cir. 2021) ........................................................................................... passim

*United States v. Blanco*,
861 F.2d 773 (2d Cir. 1988) ................................................................................................ 10

*United States v. Buck*,
13 Cr. 282 (VM), 2015 WL 195872 (S.D.N.Y. Jan. 9, 2015) ............................................. 10

*United States v. Catino*,
735 F.2d 718 (2d Cir. 1984) ............................................................................................ 9, 10

*United States v. Eng*,
951 F.2d 461 (2d Cir. 1991) .............................................................................................. 8, 9

*United States v. Persico*,
853 F.2d 134 (2d Cir. 1988) ................................................................................................ 10

*United States v. Schreiber*,
535 F. Supp. 1359 (S.D.N.Y. 1982) ................................................................................... 10

*United States v. Sindzingre*,
17 Cr. 464 (JS), 2019 WL 2290494 .................................................................................... 11

*United States v. Zedner*,
555 F.3d 68 (2d Cir. 2008) ........................................................................................... 10, 17


**Other Authorities**

Treaty Between the United States of America and the Bahamas ................................................ 14

Constitution of the Federative Republic of Brazil,
Title II, Art. 5.LI (2010) .................................................................................................. 7, 14

*Sword or Shield: Due Process & the Fugitive Disentitlement Doctrine*,
87 J. Crim. L. & Criminology 751 (1997) .............................................................................. 8

Treaty and additional protocol signed at Rio de Janeiro
January 13, 1961 and June 18, 1962, U.S.-Brazil, Art. VII ................................................... 14

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Igor Cornelsen's motion to dismiss the indictment. Cornelsen, who has refused to travel to the United States (or even leave Brazil) to answer for his criminal misconduct, should not be permitted to challenge the indictment in this case without submitting to this Court's jurisdiction. Accordingly, under the fugitive disentitlement doctrine, this Court need not reach the merits of Cornelsen's motion.[1]

## BACKGROUND

### I.     Procedural History

On September 10, 2013, Cornelsen and co-defendant Waldyr Prado were charged in criminal complaint 13 Mag. 2201 (the "Complaint" ("Compl.")).  The Complaint charged both defendants with: (i) conspiracy to commit securities fraud and to commit fraud in connection with a tender offer (Count One); (ii) substantive securities fraud (Count Two); and (iii) substantive fraud in connection with a tender offer (Count Three). On August 5, 2015, a grand jury sitting in this District returned a four-count indictment (the "Indictment" ("Indict.")), charging Cornelsen and Prado with: (i) conspiracy to commit securities fraud and to commit fraud in connection with a tender offer, in violation of 18 U.S.C. § 371 (Count One); (ii) substantive securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5 & 240.10b5-2, and 18 U.S.C. § 2 (Count Two); (iii) substantive fraud in connection with a tender offer, in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. §§ 240.14e-3(a) & 240.14e-3(d), and 18 U.S.C. § 2  (Count Three); and (iv) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count Four).

---

[1] In the event the Court disagrees, and intends to nevertheless consider the merits of Cornelsen's motion, the Government respectfully requests the opportunity to submit a response as to those issues.

## II.   Factual Allegations

### A.  Overview of the Insider Trading Scheme

Cornelsen and Prado participated in an insider trading scheme, from approximately May 2010 through September 2010, in which they used material, non-public information ("MNPI") to make and cause to be made profitable securities trades for their own benefit. (Indict. ¶ 6). Specifically, while he was a registered representative at a particular brokerage firm ("Firm-1"), Prado misappropriated MNPI from Firm-1 and from a brokerage client ("Client-1"). In breach of his duties to Firm-1 and Client-1, Prado used MNPI regarding an upcoming acquisition of Burger King to trade Burger King securities. Additionally, Prado relayed this MNPI to Cornelsen, who also used the MNPI to trade in Burger King securities. By trading on the MNPI, Prado and Cornelsen together obtained more than $1.6 million in illegal profits.

### B.  Relevant Individuals and Entities

Burger King Holdings, Inc., a Delaware corporation headquartered in Miami, Florida, was at all times relevant to the Indictment the parent of Burger King Corporation, the well-known Florida corporation that franchises and operates fast food hamburger restaurants under Burger King brand worldwide. (Compl. ¶ 9, Indict. ¶ 1). Burger King's stock was listed under the symbol "BKC" on the New York Stock Exchange ("NYSE"), which is located in New York, New York, and its options traded on various exchanges, including the NYSE Amex Equities and the International Securities Exchange ("ISE"), both located in New York, New York, and the Chicago Board Options Exchange ("CBOE"), located in Chicago, Illinois. (*Id.*)

At all relevant times, 3GCapital Partners ("3G") was a Cayman Islands exempted company and private equity firm with its main offices in New York, New York. 3G is the manager of 3G Capital Special Situations Fund II, L.P. (the "3G Fund"). (Compl. ¶ 10, Indict. ¶ 2).

From in or about 1999 through in or about May 2012, Prado was employed as a registered representative at Firm-1. (Compl. ¶ 13, Indict. ¶ 3). Client-1 was a brokerage client of Firm-1 and of Prado. From in or about June 2010 through at least in or about September 2010, Client-1's personal holdings were managed by a particular assistant ("Assistant-1"). (Compl. ¶ 26, Indict. ¶ 4).

Cornelsen was a brokerage client of Prado. Cornelsen is a Brazilian citizen who resided in the Bahamas, and is a wealthy and experienced investor, with a professional background in the Brazilian banking industry. (Compl. ¶ 14, Indict. ¶ 5). Cornelsen traded securities and made investments through his own personal holding company, Bainbridge Group, Inc. ("Bainbridge"), a British Virgin Islands limited liability corporation. (Compl. ¶ 15). Bainbridge maintained multiple U.S. brokerage accounts through which Cornelsen traded, among other things, securities listed on U.S. exchanges. (*Id.*) Cornelsen was a director of Bainbridge, was authorized to trade in Bainbridge's accounts, and placed the orders to purchase Burger King call options through certain of Bainbridge's accounts. (*Id.*)

C. Background to 3G's Acquisition of Burger King

Between approximately March 29, 2010 and August 31, 2010, 3G engaged in negotiations in an effort to acquire Burger King. 3G took steps to ensure the negotiations' confidentiality by, among other things, requiring 3G investors and advisors to sign confidentiality agreements that prohibited them from disclosing information about the proposed acquisition. (Compl. ¶¶ 17-20, Indict. ¶ 8). At the end of that period, on or about August 31, 2010, 3G proposed to complete the acquisition through a tender offer directly to Burger King stockholders at a price of $24 per share. (Compl. ¶ 19, Indict. ¶ 9).

On September 2, 2010, before the opening of trading, Burger King and 3G issued a press release announcing that 3G would acquire Burger King stock at $24 per share, or $4 billion in total

(the "Public Announcement"). (Compl. ¶ 11, 14, Indict. ¶ 10). The offer price of $24 per share represented a 46 percent premium over Burger King's share price of $16.45 on August 31, 2010. (Compl. ¶ 21).

### D. Prado Obtains Inside Information from Client-1

Prado obtained the MNPI before the Public Announcement through Client-1. Client-1 had made a capital commitment of $50 million to the 3G Fund in or about 2008, with the understanding that the 3G Fund would ultimately make a corporate acquisition. (Compl. ¶ 26, Indict. ¶ 11). In early March 2010, a 3G principal informed Client-1 that 3G was in negotiations to have the 3G Fund acquire Burger King. Client-1 signed a confidentiality agreement with 3G relating to that potential acquisition. This confidentiality agreement permitted Client-1 to share information concerning the potential transaction with his financial advisors "who ha[d] a need to receive, review or use" the information in connection with evaluating the investment. (Compl. ¶¶ 27-28, Indict. ¶ 12).

Client-1 received periodic updates of confidential information about the progress of the deal from 3G's principals between approximately March 2010 and the time of the Public Announcement on September 2, 2010. (Compl. ¶ 29, Indict. ¶ 13). In or about April or May 2010, Client-1 divulged to Prado the fact that the financing was intended for the 3G Fund's potential acquisition of Burger King. (*Id.*) Client-1 divulged this information to Prado so that Prado could assist Client-1 in evaluating how to fulfill Client-1's financing commitment. (*Id.*) Based on the professional relationship between Client-1 and Prado, Client-1 believed and expected that Prado would keep the information confidential. (*Id.*).

### E. Prado's Duties to Firm-1 Concerning Client Information and Insider Trading

Prado was prohibited from using, trading on, or disclosing to a third party any MNPI obtained from a client of Firm-1, per Firm-1's confidentiality and proprietary information policies.

In or about March 2009, and then in or about June 2010, Prado attested in writing to Firm-1 that he had access to and was in compliance with those policies. (Compl. ¶¶ 22-24, Indict. ¶ 15).

F. <u>Prado Misappropriates the MNPI and Trades</u>

Prado nevertheless breached his duties and violated those policies. On or about May 17, 2010, Prado met Client-1 for lunch. Within hours of their meeting, and in breach of his duties and responsibilities to Firm-1 and Client-1, Prado purchased 300 Burger King July 2010 call options at a strike price of $20 for $33,185. Prado purchased 200 of the 300 options through the NYSE Amex Equities. (Compl. ¶ 32, Indict. ¶ 16). On or about June 3, 2010, Prado purchased 7,000 shares of Burger King stock for approximately $135,410 through the over-the-counter market. (Compl. ¶ 35, Indict. ¶ 17). Ultimately, most of the Burger King July 2010 call options owned by Prado expired worthless on or about July 17, 2010, because the Burger King acquisition did not occur by that date. (Compl. ¶ 36, Indict. ¶ 18).

G. <u>Prado Conveys MNPI to Cornelsen and Cornelsen's Initial Trades in Burger King</u>

Not content to use the MNPI solely for his own benefit, Prado passed the tip to Cornelsen, so that Cornelsen could profit too. During the evening of on or about May 17, 2010, after his lunch with Client-1, Prado sent an email to Cornelsen which stated: "if you are around call me at the Curitiba hotel … I have some info that I cannot say over the phone … You have to hear this." Within minutes, and after the market closed, Cornelsen called Prado and they spoke for approximately ten minutes. (Compl. ¶ 40, Indict. ¶ 19). From on or about May 18, 2010 through on or about June 17, 2010, Cornelsen purchased Burger King call options and common stock. (Compl. ¶¶ 41-44, Indict. ¶ 20). These call options were purchased through multiple exchanges, including the ISE, located in New York, New York. (*Id.*) During this time, Cornelsen spoke to Prado by telephone on numerous occasions. On or about June 1 and June 2, 2010, Cornelsen e-mailed with Cornelsen's financial advisor ("Broker-1"), who worked at another firm ("Firm-2")

in New York, New York, and inquired about the market prices of Burger King stock and call options. (Compl. ¶ 42). Ultimately, the July 2010 call options purchased by Cornelsen expired worthless because Burger King's stock price did not trade at or above $20 by July 17, 2010. (Compl. ¶¶ 43-45, Indict. ¶ 21).

H. Prado and Cornelsen's Continued Trading After July 2010

But both defendants continued to trade based on the MNPI, as evidenced in part by their explicit email correspondence. On or about August 16, 2010, Prado spoke to Client-1 by telephone for approximately 30 seconds. The following day, on or about August 17, 2010, Prado spoke to Assistant-1 by telephone for approximately six minutes. (Compl. ¶ 46, Indict. ¶ 22). On or about August 18, 2010, Cornelsen sent Prado an email asking, "[i]s the sandwich deal going to happen," to which Prado replied, "it's going to happen." (Compl. ¶ 47, Indict. ¶ 23). On the same day, Cornelsen sent Prado an email asking again whether the "sandwich deal" was going to happen, and Prado replied that it was a "sure thing." (*Id.*) On or about August 19, 2010, Cornelsen purchased 1,400 Burger King October 2010 call options with a strike price of $17.50 for $98,735 on the ISE, and 206 Burger King October 2010 call options with a strike price of $19 for $7,467.50. (Compl. ¶ 49, Indict. ¶ 24).

Between approximately August 23, 2010 and August 26, 2010, Prado and Cornelsen communicated with each other by telephone several times, and Prado and Assistant-1 communicated with each other by telephone several times. (Compl. ¶ 50, Indict. ¶ 25). On or about August 25, 2010, Prado purchased 13,000 shares of Burger King stock for approximately $227,000 through the over-the-counter market, and 100 Burger King January 2011 call options with a strike price of $20 for $9,560 through the NYSE Amex Equities. (Compl. ¶ 50, Indict. ¶ 26). On or about August 26, 2010, and on or about August 27, 2010, Cornelsen purchased 1,794 Burger King

October 2010 call options with a strike price of $19 for approximately $91,400. Of these call options, 281 were purchased through the ISE. (Compl. ¶ 50, Indict. ¶ 27).

From approximately late August 2010 through September 2, 2010, prior to the Public Announcement, Prado had frequent telephone contact with Assistant-1, and on one occasion, directly with Client-1. (Compl. ¶ 50, Indict. ¶ 28). On or about September 1, 2010, Prado purchased 9,000 shares of Burger King stock for approximately $165,263 through the over-the-counter market. (Indict. ¶ 29). On September 2, 2010, following the Public Announcement, Prado sold his Burger King stock and options positions for a total profit of at least approximately $175,000, and Cornelsen sold his options for a total profit of over approximately $1.68 million, and a net profit (including the expired July 2010 options) of approximately $1.4 million. (Compl. ¶ 53, Indict. ¶ 30).

As noted, the Indictment was returned in this case on August 5, 2015. But Cornelsen has not faced the charges. He currently resides in Brazil, which will not extradite him, as a Brazilian citizen, for his conduct. *See* Constitution of the Federative Republic of Brazil, Title II, Art. 5.LI (2010) ("[N]o Brazilian shall be extradited, except the naturalized ones in the case of a common crime committed before naturalization, or in the case . . . of narcotics and related drug[] [conduct]"); Treaty and additional protocol signed at Rio de Janeiro January 13, 1961 and June 18, 1962, U.S.-Brazil, Art. VII ("There is no obligation upon the requested State to grant the extradition of a person who is a national of the requested State"). As discussed further below, and in contrast to his past behavior, which involved significant travel to the United States and elsewhere, Cornelsen has not traveled outside of Brazil since he was charged. Despite his knowledge of the pending charges, Cornelsen has not surrendered to United States authorities. He has not been arraigned, nor submitted to this Court's jurisdiction in any way.

**DISCUSSION**

**Cornelsen is Disentitled From Challenging the Indictment**

This Court should decline to consider Cornelsen's motion at this time. Even after the Second Circuit's decision in *United States v. Bescond*, 7 F.4th 127 (2d Cir. 2021), Cornelsen is a fugitive. A decision against him would not be enforceable by this Court. Moreover, a decision on his motion would impose no penalty for his deliberate flouting of the judicial process; it would also promote perverse incentives to flee or evade justice and would exacerbate the prejudice to the Government engendered by Cornelsen's refusal to submit to the Court's jurisdiction.

A. <u>Applicable Law</u>

The fugitive disentitlement doctrine is based on the longstanding principle that "'the fugitive from justice may not seek relief from the judicial system whose authority he or she evades.'" *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d 270, 285-86 (S.D.N.Y. 2001) (Chin, J.) (quoting Martha B. Stolley, *Sword or Shield: Due Process & the Fugitive Disentitlement Doctrine*, 87 J. Crim. L. & Criminology 751, 752 (1997)). It is "grounded on the impropriety of permitting a fugitive to pursue a claim in federal court where he might accrue a benefit, while at the same time avoiding an action of the same court that might sanction him." *United States v. Eng*, 951 F.2d 461, 465 (2d Cir. 1991), *abrogated on other grounds by Degen v. United States*, 517 U.S. 820 (1996). A court may therefore "decline to entertain the claims of a defendant who is a fugitive from justice." *Bescond*, 7 F.4th at 132 (citing *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970); *Nen Di Wu v. Holder*, 646 F.3d 133, 135 & n.2 (2d Cir. 2011)); *see also Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2d Cir. 1997) ("This Court—

as well as other Courts of Appeals—has adopted the fugitive from justice rule, also known as the fugitive disentitlement doctrine"; collecting cases).

The doctrine, which stems from courts' "inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities," *Degen*, 517 U.S. at 823, is an equitable one that may be invoked at the court's discretion. *See Hanson v. Phillips*, 442 F.3d 789, 795 (2d Cir. 2006). In determining whether to exercise its discretion to apply the doctrine, a court must first determine whether the defendant is a fugitive. *Bescond*, 7 F.4th at 139 (citing *Finkelstein*, 111 F.3d at 281).

There are two categories of fugitives: "(1) traditional fugitives and (2) constructive-flight fugitives." *Bescond*, 7 F.4th at 139. When a defendant "actively resists extradition, or refuses to appear at his arraignment, he has constructively fled the United States and thus is a fugitive." *Eng*, 951 F.2d at 466.

> The intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending. This is true whether the defendant leaves the jurisdiction intending to avoid prosecution, or, having learned of charges while legally outside the jurisdiction, "constructively flees" by deciding not to return.

*United States v. $45,940 in United States Currency*, 739 F.2d 792, 796 (2d Cir. 1984) (quoting *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984)). A defendant can be a fugitive "'even when he does not 'flee' but is simply found outside the jurisdiction.'" *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d at 287 (quoting *United States v. All Funds on Deposit in Any Accounts Maintained at Merrill Lynch, Pierce, Fenner & Smith*, 801 F. Supp. 984, 998 (E.D.N.Y. 1992); collecting cases, but suggesting that those circumstances require that the individual have been "present in the jurisdiction at the time of the alleged crime," learn that he is wanted by the authorities "while outside the jurisdiction," and "then fail[] to return to the

jurisdiction to face the charges"). *See also United States v. Buck*, 13 Cr. 282 (VM), 2015 WL 195872, at *1 (S.D.N.Y. Jan. 9, 2015) ("A defendant who knowingly fails to appear for an arraignment is a fugitive. . . . A defendant is a fugitive if he physically exits the jurisdiction with the purpose of avoiding prosecution, or if, having learned of the charges while legally outside the jurisdiction, [he] constructively flees by deciding not to return.") (citing *$45,940 in United States Currency*, 739 F.2d at 796; *Catino*, 735 F.2d at 718; *United States v. Schreiber*, 535 F. Supp. 1359 (S.D.N.Y. 1982)). [2] Boiled down to its essence, "[f]ugitivity implies some action by [a defendant] to distance herself from the United States or frustrate arrest." *Bescond*, 7 F.4th at 139.

After determining whether a defendant qualifies as a fugitive, the court considers whether disentitling the fugitive would serve the objectives of the fugitive disentitlement doctrine. *Id.* (citing *Finkelstein*, 111 F.3d at 280). Those objectives are: "(1) assuring the enforceability of any decision that may be rendered against the fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice and promoting the efficient operation of the courts; and (4) avoiding prejudice to the other side caused by the defendant's escape." *Id.* at 141-42 (citing *Finkelstein*, 111 F.3d at 280); *see also United States v. Zedner*, 555 F.3d 68, 77 (2d Cir. 2008); *Bar-Levy v. United States Dep't of Justice*, *INS*, 990 F.2d 33, 35 (2d Cir. 1993) (quoting *United States v. Persico*, 853 F.2d 134, 137 (2d Cir. 1988)). Any one of these justifications can serve as a basis for applying the doctrine. *See SEC v. Berger*, 322 F.3d 187, 191 (2d Cir. 2003), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ("In the past, we advanced four *independent* grounds for disentitling fugitives" (emphasis added); noting that *Degen*

---

[2] The Second Circuit has similarly defined fugitivity in the context of a defendant's claim that her speedy trial rights were violated: "A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges." *United States v. Blanco*, 861 F.2d 773, 779 (2d Cir. 1988).

indicated that the first and fourth justifications are "the most persuasive"); *cf. Gao v. Gonzales*, 481 F.3d 173, 176 (2d Cir. 2007) ("[A]ny one of these rationales provides a sufficient basis . . . to dismiss the appeal.").

In *Bescond*, the Second Circuit reversed a decision of the district court that applied the fugitive disentitlement doctrine to deny Bescond's motion to dismiss an indictment.[3] The indictment charged Bescond with violating the Commodity Exchange Act and conspiracy to do so for her conduct in a scheme to manipulate the United States Dollar London Interbank Offered Rate ("LIBOR") from abroad. Concluding that there was appellate jurisdiction under the collateral order doctrine, the Second Circuit held that the district court had erred both in classifying Bescond as a fugitive and in applying the fugitive disentitlement doctrine in her case.

As to her status as a fugitive, the Second Circuit held that Bescond – who lived in France, was "never here,"[4] and had virtually no connection to the United States – was not a fugitive because she had taken no "action . . . to distance herself from the United States or frustrate arrest." 7 F.4th at 139, 142. Bescond's "presence abroad [was] unrelated to the American prosecution." *Id.* at 141. Bescond did not qualify as a constructive-flight fugitive, according to the Second Circuit, because she was not "refusing to return to the United States to avoid prosecution." *Id.* at 140.[5] And

---

[3] The Government has petitioned for rehearing *en banc* in *Bescond*. *See United States v. Bescond*, 19-1698, Dkt. 100-102. This Court may therefore deem it prudent to hold the pending motion in abeyance until the Second Circuit's decision on that petition and on any rehearing that may result.

[4] The district court's opinion states that Bescond "traveled to the United States in 2008, 2009, 2012, and 2014," outside of the time period charged in the indictment. *United States v. Sindzingre*, 17 Cr. 464 (JS), 2019 WL 2290494, at *6 n.4.  But the Second Circuit decision is based on the premise that Bescond was "never" in the United States.  *Bescond*, 7 F.4th at 142.

[5] Cornelsen's memorandum of law incorrectly asserts that *Bescond* also held that "a foreign defendant with a 'nonfrivolous extraterritoriality claim' is not a fugitive." Def. Mem. at 21 (citing *Bescond*, 7 F.4th at 140). That is a vast overstatement of the *Bescond* Court's dictum that "it is telling that Bescond raises a nonfrivolous extraterritoriality claim." 7 F.4th at 140.

even if Bescond were properly classified as a fugitive, the Second Circuit held, the district court had abused its discretion in applying the doctrine for similar reasons: Because Bescond had no other reason to travel to the United States, disentitlement was too harsh a means of assuring the enforceability of the court's decisions; Bescond was not flouting the judicial process, but simply "stay[ing] home"; Bescond's behavior would not incentivize other fugitives to fail to submit to a court's jurisdiction; and the Government was not prejudiced specifically by Bescond's absence, the objectives of the fugitive disentitlement doctrine did not favor applying it to Bescond's case. *Id.* at 142-43. The Court noted that its holding was limited and should not be cast in "broad terms," and that "[a] different result may obtain if a person's presence abroad is any part covert or suspect: a hideout, sanctuary, or escape from the reach of law." *Id.* at 138 n.6, 141. Chief Judge Livingston dissented on the ground that the Court lacked jurisdiction to hear Bescond's appeal, noting the circuit split created by the Court's decision. *Id.* at 143-52. She also deemed the majority's approach to the fugitive disentitlement unsound. *Id.* at 143. Chief Judge Livingston presciently noted that the majority's decision left open the question of how the doctrine would apply to a person who "regularly visits—even owns property in the United States—but is not alleged to have himself committed any act here in connection with the crime[.]" *Id.* at 146.[6]

---

[6] Chief Judge Livingston's dissent also noted that *Bescond* left open whether a defendant who commits a crime in the United States from abroad – for example, a cybercrime – "remain[s] at home abroad." *Bescond*, 7 F.4th at 146 (Livingston, C.J., dissenting). The Court need not reach Cornelsen's extraterritoriality arguments for the reasons explained herein, but the Government does not concede that Cornelsen's conduct was extraterritorial. Even his options purchases – let alone his purchase of common stock – satisfy *Morrison v. National Australia Bank*'s test for either prong of Section 10(b) of the Securities Exchange Act. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267-68 (2010).

B. Argument

Cornelsen is precisely the person envisioned by Chief Judge Livingston, and the *Bescond* decision does not dictate the same outcome here.

      *1.  Unlike Bescond, Cornelsen is a fugitive under Second Circuit law.*

Unlike Bescond, Cornelsen is a fugitive. He has taken "action . . . to distance [him]self from the United States or frustrate arrest." *Id.* at 139. As discussed in greater detail below, to this day, Cornelsen owns a home in Boca Raton, Florida, and prior to being criminally charged, Cornelsen regularly spent long periods of time in the United States, remaining here for months at a time. For example, in his deposition by the United States Securities and Exchange Commission ("SEC"), Cornelsen explained that:

- he had come to the United States "[e]very year since 2000 . . . when [he] purchased th[e] house";

- he tried to "limit" the amount of time he spent in the United States to "119 days a year," because if he stayed "longer than 360 days in three years on a revolving basis," he would owe income tax;

- some years, he stayed "shorter than that," and in such cases, the next year, he would "stay a little bit longer."

Declaration of Michael E. Gertzman ("Gertzman Decl.") (Dkt. 13), Exhibit C at 9-10. And travel records corroborate that, for years leading up to 2012, Cornelsen spent extended stretches— literally months at a time—in the United States. *See* Exhibit A (detailing Cornelsen's travel history between approximately 1992 and his most recent travel to the United States in 2012).

What is more, Cornelsen was living primarily in the Bahamas at the time of his SEC deposition, *see* Gertzman Decl. Exhibit C at 8 ("I had resided in Brazil until 2005. Since then, I'm a resident of the Bahamas."; Q: "You are a permanent resident – as far as where you call home is in the Bahamas?" A: "Yes.") – a country that would extradite a resident like Cornelsen to the United States, unlike Brazil, which would not extradite him, as a citizen. *Compare Treaty Between*

*the United States of America and the Bahamas* 2, 5, *available at* https://www.state.gov/wp-content/uploads/2019/05/9-922-Bahamas-Extradition-Treaty.pdf (noting that the "Contracting States agree to extradite to each other . . . persons whom the authorities in the Requesting State have charged with or found guilty of an extraditable offense," which is an offense "punishable under the laws in both Contracting States by deprivation of liberty for a period of more than one year or by a more severe penalty"; "extradition shall not be refused on the ground that the fugitive is a citizen or national of the Requested State") *with* Constitution of the Federative Republic of Brazil, Title II, Art. 5.LI (2010) ("[N]o Brazilian shall be extradited, except the naturalized ones in the case of a common crime committed before naturalization, or in the case . . . of narcotics and related drug[] [conduct]"); Treaty and additional protocol signed at Rio de Janeiro January 13, 1961 and June 18, 1962, U.S.-Brazil, Art. VII ("There is no obligation upon the requested State to grant the extradition of a person who is a national of the requested State.").

But since 2012, Cornelsen has ceased to travel to the United States, the Bahamas, or even to leave Brazil, in an obvious effort to avoid being arrested in the United States (or arrested elsewhere and extradited to the United States). It cannot be said that Cornelsen's "presence abroad is unrelated to the American prosecution." *Bescond*, 7 F.4th at 141. To the contrary, it is precisely because he has been charged in the United States that Cornelsen has ceased traveling. *Cf.* Memorandum of Law in Support of Defendant Igor Cornelsen's Motion to Dismiss the Indictment ("Def. Mem." (Dkt. 12)) at 20 n.12 (conceding that "[p]rior to 2012, Cornelsen had a habit of seasonally travelling to Boca Raton, Florida, where he owns a vacation home. That changed after the SEC, in 2012, accused him of insider trading."). Unlike Bescond, then, Cornelsen *is* "refusing to return to the United States to avoid prosecution." *Bescond*, 7 F.4th at 140. Bescond either never traveled to the United States or at most made a few trips before the time frame of the charged

crime; Cornelsen regularly traveled to the United States, and continued to do so after the conduct for which he was charged in this case – until he was charged by the SEC.

Cornelsen is also easily distinguishable from Bescond because he owns property in the United States. For many years Cornelsen has owned, and to this day continues to own, a lavish home in Boca Raton, Florida. *See* Def. Mem. at 20 n.12; Exhibit B (property records). In addition, his Mercedes-Benz car is currently registered in Florida in his name, having been recently renewed (presumably by his wife, who appears to have been traveling here until March 2020, when the COVID-19 pandemic began, *see* Exhibit C (detailing travel history for Eliana Munk from approximately 2010 until most recent travel into United States in March 2020)). *See* Exhibit D (records from Florida Driver and Vehicle Information Database, showing Cornelsen's registration as currently active until 10/04/2023). Although Cornelsen's ownership of real and personal property in the United States is relegated to a footnote in his memorandum of law, Def. Mem. at 21, it is another important distinguishing factor. The *Bescond* Court emphasized, in both its fugitivity determination and its disentitlement analysis, the fact that Bescond did not own any property in the United States. 7 F.4th at 140 (quoting *In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009) (defendant who had "never been in the country, . . . never set foot in Illinois, and . . . own[ed] no property in the United States" not a fugitive)); 142 (there existed "no reason" for Bescond to travel to the United States, because the Government had "not shown that she has residence, immigration status, job, or family in this country."). The opposite is true of Cornelsen. He owns substantial property in the United States and has reason to travel here, as he did before his indictment. His reason for not doing so is, indisputably, to avoid the court's jurisdiction.

The *Bescond* Court made clear, in concluding that Bescond's remaining in France did not render her a fugitive, that "[a] different result may obtain if a person's presence abroad is in any

part covert or suspect: a hideout, sanctuary, or escape from the reach of law." *Id.* at 141. Cornelsen's presence in Brazil may not be covert, but it is at least "in part . . . suspect"; he remains in Brazil as a "sanctuary" and an "escape from the reach of law." *Bescond* therefore compels a different result here – that Cornelsen is a fugitive.

### 2. *Disentitling Cornelsen serves the objectives of the fugitive disentitlement doctrine.*

Disentitling Cornelsen would also serve the four objectives of the doctrine, any one of which can independently provide a basis for applying the doctrine. *See Bescond*, 7 F.4th at 139 (citing *Finkelstein*, 111 F.3d at 280); *Berger*, 322 F.3d at 191, *abrogated on other grounds by Morrison*, 561 U.S. 247. First, it would assure the enforceability of any judgment rendered against Cornelsen. *See Bescond*, 7 F.4th at 141 (citing *Finkelstein*, 111 F.3d at 280). In *Bescond*, the Court viewed disentitlement as "too harsh a means of ensuring mutuality in the litigation," *id.* at 142, in light of Bescond's particular circumstances – specifically, because Bescond had "no reason" to travel to the United States" and no "residence, immigration status, job, or family in this country." *Id.* As discussed above, that is not true of Cornelsen. Disentitling a defendant with valuable property in the United States, who previously spent months at a time living here, and whose wife, Eliana Munk, continues to travel here regularly, *see* Exhibit C, is, in contrast, not "disproportionately severe." *Bescond*, 7 F.4th at 142. It is the only means of avoiding the "'heads I win, tails you'll never find me'" posture that the disentitlement doctrine guards against. *See id.* (quoting *Gao*, 481 F.3d at 177; *Antonio-Martinez v. I.N.S.*, 317 F.3d 1089, 1093 (9th Cir. 2003)). There is no mutuality where, as here, a ruling in Cornelsen's favor on the motion to dismiss would dispose of the case, and a ruling against Cornelsen would have no adverse effect on him, instead permitting him to maintain the status quo. The first justification – one of the two "most persuasive,"

*see Berger,* 322 F.3d at 192 – thus counsels in favor of applying the doctrine and disentitling Cornelsen.

Second, applying the doctrine here would rightly impose a penalty for Cornelsen's flouting the judicial process. *See Bescond*, 7 F.4th at 141. Cornelsen has known for years about the charges against him. He has remained in Brazil to avoid submitting to United States jurisdiction. That Cornelsen sat for a deposition by the SEC years ago and subsequently paid over $5 million in disgorgement and penalties, *see* Def. Mem. at 22, does not undercut the argument that he is flouting the United States' *criminal* judicial process. It merely demonstrates that Cornelsen understands how to comply with the judicial process, but has chosen to do so selectively. Nor are Cornelsen's age or medical condition relevant to this prong of the analysis. *See* Def. Mem. at 22. The fact that Cornelsen is battling leukemia, and his advanced age, are appropriate considerations for the Court in determining bail or detention (specifically, as they relate to risk of flight and danger to the community) and in fashioning a sentence pursuant to 18 U.S.C. § 3553(a). They are not relevant to whether Cornelsen is "flouting the judicial process," nor to any of the reasons for applying the fugitive disentitlement doctrine. *See Bescond*, 7 F.4th at 142, *passim*; *see also Zedner*, 555 F. 3d at 74-75, 78-80 (applying fugitive disentitlement doctrine despite defendant's argument that his failure to return to the United States was in part the result of mental illness).

Third, allowing Cornelsen to challenge the Indictment while remaining abroad would incentivize the sort of behavior Cornelsen has exhibited here in evading justice and would damage the "efficient operation of the courts." *Bescond*, 7 F.4th at 141-42. While "given Bescond's circumstances, there exists no cohort of fugitives who would perceive an adjudication of her motions as inducement or inspiration to flee the jurisdiction of our courts," *id.* at 142, there are surely others, like Cornelsen, who have committed United States crimes while physically

remaining outside the United States, but have other ties to the United States and reasons to travel here. An adjudication on the merits here would signal to those defendants that leaving the United States and remaining abroad will only redound to their benefit. And it would severely hamper courts' progress in working through their busy criminal dockets.

Fourth, and finally, Cornelsen's fugitive status works considerable prejudice against the Government. *See id.* at 142. As time goes by, memories fade and evidence grows stale. The Government's inability to present its case against someone who used to spend months at a time in the United States but now refuses to travel here is no minor inconvenience. Instead, it is prejudice caused directly "by the defendant's escape." 7 F.4th at 142 (internal quotation marks and citation omitted). And any past or future efforts expended to apprehend the defendant further prejudice the Government.

In short, Cornelsen's case is easily distinguished from Bescond's. *Bescond* did not prescribe the outcome where a defendant "regularly visits" or "owns property in the United States." But the outcome is obvious under the existing case law: Cornelsen is a fugitive and each of the relevant factors weighs in favor of applying the fugitive disentitlement doctrine and declining to consider his motion on the merits.

**CONCLUSION**

Cornelsen is a fugitive from justice who committed insider trading and reaped an enormous benefit. This Court should decline to consider his motion until he submits to its jurisdiction.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Christine I. Magdo / Elizabeth Hanft
Assistant United States Attorneys
Tel.: (212) 637-2297 / 2334

Dated: November 18, 2021
New York, New York