UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA          15 Cr. 516 (JGK)

    - against -                OPINION AND ORDER

IGOR CORNELSON,
                  Defendant.

---

JOHN G. KOELTL, District Judge:

On August 5, 2015, Igor Cornelson was charged in an Indictment with (1) conspiracy to commit securities fraud and fraud in connection with a tender offer in violation of 18 U.S.C. § 371; (2) securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5 & 240.10b5-2, and 18 U.S.C. § 2; (3) fraud in connection with a tender offer in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. §§ 240.14e-3(a) & 240.14e-3(d), and 18 U.S.C. § 2; and (4) conspiracy in violation of 18 U.S.C. § 1349 to commit wire fraud in violation of 18 U.S.C. § 1343. See ECF No. 6. Each of the four counts in the Indictment charged that the crimes occurred from at least in or about May 2010 through in or about September 2010.

Mr. Cornelson now moves to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12. ECF No. 11. The defendant argues, among other things, that the crimes charged do not apply to Mr. Cornelson's extraterritorial conduct, and that the application of the criminal statutes to Mr. Cornelson's extraterritorial conduct violates his right to due process. See

1

id. In opposition, the Government urges the Court to apply the fugitive disentitlement doctrine and decline to consider the merits of Mr. Cornelson's motion. For the reasons that follow, the Court finds that Mr. Cornelson is not a fugitive, and that disentitlement is unwarranted.

## I.

### A. The Indictment

Mr. Cornelson is a Brazilian citizen and an experienced investor with a professional background in the Brazilian banking industry. Indictment ¶ 5, ECF No. 6. At all relevant times, Waldyr Prado was Mr. Cornelson's investment broker. Id. Client-1, who resided in Brazil, was also Mr. Prado's client. Id. ¶¶ 4, 14.

Sometime in 2008, Client-1 made a capital commitment of $50 million to the 3G Capital Special Situations Fund II, L.P. (the "3G Fund"), on the understanding that the 3G Fund would at some point thereafter acquire a company. Id. ¶ 11. At all relevant times, the 3G Fund was managed by 3G Capital Partners ("3G"), a Cayman Islands private equity firm with offices in New York. Id. ¶ 2.

From on or about March 29, 2010, to on or about August 31, 2010, 3G engaged in negotiations to acquire Burger King Holdings Inc., a Delaware corporation headquartered in Florida (together with its subsidiary, Burger King Corporation, "Burger King").

2

Id. ¶¶ 1, 8. Burger King's stock is listed on the New York Stock Exchange (the "NYSE"), and its options are traded on various exchanges, including the NYSE Amex Equities and the International Securities Exchange (the "ISE"), all of which are located in New York. Id. ¶ 1.

In March or April 2010, while the negotiations between 3G and Burger King were ongoing, a 3G principal informed Client-1 that 3G was engaged in negotiations to have the 3G Fund acquire Burger King. See id. ¶ 12. Client-1 signed a confidentiality agreement with 3G relating to this information, which permitted Client-1 to share information concerning the potential transaction with his financial advisors "who have a need to receive, review or use" the information in connection with Client-1's investments. Id.[1] In or about April or May 2010, as he was permitted to do pursuant to this agreement, Client-1 divulged the news of the potential 3G-Burger King acquisition to Mr. Prado. See id. ¶ 13.

On or about May 7, 2010, Mr. Prado met Client-1 for lunch. Id. ¶ 16. On or about May 17, 2010, Mr. Prado sent Mr. Cornelson an email in which Mr. Prado stated, "[I]f you are around call me at the Curitiba hotel . . . I have some info that I cannot say over the phone . . . You have to hear this." Id. ¶ 19 (ellipses

---

[1] Unless otherwise noted, this Opinion and Order omits all alterations, citations, and internal quotation marks in quoted text.

3

in original). Within minutes, Mr. Cornelson called Mr. Prado, and the two spoke for approximately ten minutes. Id. From on or about May 18, 2010, and through on or about June 17, 2010, Mr. Cornelson purchased Burger King call options and common stock. Id. ¶ 20. These call options were purchased through multiple exchanges, including the ISE. Id.; see also id. ¶ 35(c), (e). By July 17, 2010, these call options expired as worthless because Burger King did not trade at or above $20 by that time. See id. ¶ 21.

On or about August 18, 2010, Mr. Cornelson emailed Mr. Prado asking whether "the sandwich deal [was] going to happen." Id. ¶ 23. Mr. Prado replied, "[I]t's going to happen." Id. On the same day, Mr. Cornelson asked Mr. Prado again whether the "sandwich deal" was happening, to which Mr. Prado replied that the deal was a "sure thing." Id. On or about August 19, 2010, Mr. Cornelson purchased 1,400 October 2010 call options for Burger King with a strike price of $17.50 for $98,735 on the ISE, and 206 October 2010 call options for Burger King with a strike price of $19 for $7,467.50. Id. ¶ 24; see also id. ¶ 35(i)-(j). On or about August 26, 2010, and on or about August 27, 2010, Mr. Cornelson purchased 1,794 additional October 2010 call options for Burger King with a strike price of $19 for approximately $91,400. Id. ¶ 27; see also id. ¶ 35(m). Of these

4

latter call options, 281 were purchased through the ISE. Id. ¶ 27.

On or about August 31, 2010, 3G proposed to complete the acquisition of Burger King through a tender offer to Burger King shareholders at a price of $24 per share. Id. ¶ 9. On September 2, 2010, 3G and Burger King publicly announced this transaction in a press release. Id. ¶ 10.

The same day that news of the 3G-Burger King acquisition was released, Mr. Cornelson sold his Burger King options for a total profit of over $1.68 million, and a net profit of approximately $1.4 million, after discounting Mr. Cornelson's losses from the expired July 2010 options. Id. ¶ 30. Mr. Prado, who had simultaneously been purchasing his own stock and options in Burger King, made a total profit of at least $175,000. Id.; see, e.g., id. ¶¶ 16-17, 26, 29.

### B. Facts External to the Indictment

In May 2012, Mr. Cornelson voluntarily traveled to California to be deposed by the Securities Exchange Commission (the "SEC") as part of an investigation relating to 3G's acquisition of Burger King. See Gertzman Decl. Ex. C, ECF No. 13-3. In that deposition, Mr. Cornelson told the SEC that he was abroad at all times relevant to the eventual Indictment. See id. at 71-72, 75, 118-19. Mr. Cornelson testified that he was in Brazil at the time that he first purchased the Burger King stock

5

and call options, and that he was in Europe at the time of his later purchases, as well as when he sold the options. See id. Travel logs provided by the Government on this motion corroborate that Mr. Cornelson was not in the United States at these times. See Hanft Decl. Ex. A, ECF No. 22-1.

In his SEC deposition, Mr. Cornelson also testified that he permanently resided in the Bahamas at that time, and that he had permanently resided in Brazil prior to 2005. Gertzman Decl. Ex. C, at 8. Mr. Cornelson also noted that he had homes in both Brazil and Boca Raton, Florida. Id. Mr. Cornelson explained that he had been traveling to the United States for pleasure every year since 2000, when he purchased his vacation home in Boca Raton, and that he would typically stay in Florida for around 119 days a year. Id. at 9-10. At the end of the SEC deposition, Mr. Cornelson stated that he was "go[ing] back to Brazil." Id. at 185.

A few days after the SEC deposition, on May 9, 2012, Mr. Cornelson left the United States from Miami International Airport, and landed in Brazil at Guarulhos International Airport, using his own passport. See Hanft Decl. Ex. A. This marked Mr. Cornelson's last trip to the United States. See id.

On November 30, 2012, the SEC filed a complaint against Mr. Cornelson for insider trading based on the same general facts as the Indictment. See SEC v. Cornelson, No. 12-cv-8712 (S.D.N.Y

6

filed Nov. 30, 2012). On December 11, 2012, Mr. Cornelson settled with the SEC on a no-admit basis, agreeing to pay more than $5 million in disgorgement and penalties. SEC v. Cornelson, No. 12-cv-8712, ECF No. 7.

On September 10, 2013, a sealed criminal complaint against Mr. Prado and Mr. Cornelson was filed, and warrants were issued for their arrests. ECF Nos. 1, 2. On September 11, 2013, a Magistrate Judge authorized the International Criminal Police Organization ("INTERPOL") to be served with the complaint and the arrest warrants, in order for INTERPOL to assist in the arrests of Mr. Prado and Mr. Cornelson. See ECF No. 4.

On January 27, 2014, the complaint against Mr. Prado and Mr. Cornelson was unsealed. ECF No. 5. On August 5, 2015, the Indictment against them was filed, ECF No. 6, and arrest warrants were again issued, ECF Nos. 7, 8.

On October 7, 2021 — nearly eight years after the complaint was unsealed, and over six years after the Indictment was filed — Mr. Cornelson's attorneys made their first appearances in this action. ECF Nos. 9, 10. On the same date, Mr. Cornelson — through counsel — moved to dismiss the Indictment. ECF No. 11.

It is undisputed that Mr. Cornelson is currently 74 years old, that he is battling leukemia, and that he has been residing in Brazil since at least 2015. See Mem. in Supp. of Mot. to

7

Dismiss 22, ECF No. 12; Gertzman Decl. Ex. C, at 7-8; see also Opp. to Mot. to Dismiss 7, 17, ECF No. 21.

## II.

The Government argues that the Court should decline to consider the merits of Mr. Cornelson's motion pursuant to the fugitive disentitlement doctrine. This argument is unpersuasive in light of the court of appeals' recent amended decision in United States v. Bescond, 24 F.4th 759 (2d Cir. 2021).

Under the common law doctrine of fugitive disentitlement, the Court "may decline to entertain the claims of a defendant who is a fugitive from justice." Id. at 764. Application of the fugitive disentitlement doctrine requires a two-step analysis. See id. at 771. First, the Court must determine that the defendant is a fugitive under one of the two exclusive common law meanings of the term: the traditional fugitive, or the constructive-flight fugitive.[2] Id. Second, the Court must determine whether disentitling the defendant would "serve the doctrine's objectives." Id. If both criteria are met, the Court,

---

[2] Some courts have accepted a third definition of fugitive that arises from the civil forfeiture context. See 28 U.S.C. § 2466(a). That definition includes as a fugitive any person who "after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution — (A) purposely leaves the jurisdiction of the United States; (B) declines to enter or reenter the United States to submit to its jurisdiction; or (C) otherwise evades the jurisdiction of the court in which a criminal case in pending against the person." Id. However, the court of appeals in Bescond expressly refused to extend this statutory category beyond the civil forfeiture context. See Bescond, 24 F.4th at 772-73. And because this case — like Bescond — is not a civil forfeiture case, this more expansive definition is inapplicable.

8

in its discretion, may disentitle the fugitive. Id. The Court considers each step in turn.

Ultimately, Mr. Cornelson cannot be considered a fugitive, and, in any event, disentitling him from raising his objections to the Indictment would not serve the objectives of the fugitive disentitlement doctrine.

**A.**

Mr. Cornelson does not meet either definition of a fugitive. First, Mr. Cornelson is not a traditional fugitive. "A traditional fugitive is a person who, having committed a crime, flees from the jurisdiction of the court where a crime was committed or departs from his usual place of abode and conceals himself within the district." Id. Mr. Cornelson plainly does not so qualify. It is undisputed that Mr. Cornelson was not in the United States at the time of the acts alleged in the Indictment, and that he has not been in the United States since May 2012, more than three years prior to his Indictment. It is also undisputed that, far from concealing himself, Mr. Cornelson volunteered to the SEC that he would be leaving the United States, left the United States from a lawful port of departure using a valid passport, and has been living openly in Brazil. These are not the actions of a traditional fugitive. Because he did not commit the alleged crimes in the United States, he did not flee from the United States, and he did not otherwise

9

conceal himself, Mr. Cornelson does not meet the definition of a traditional fugitive. See id.

Second, and for substantially similar reasons, Mr. Cornelson is not a constructive-flight fugitive. A constructive-flight fugitive is "a person who allegedly committed crimes while in the United States but who was outside the country — for whatever reason — when [he] learned that [his] arrest was sought and who then refused to return to the United States in order to avoid prosecution." See id. at 772. Mr. Cornelson's actions do not fit this definition, either. It is not alleged that Mr. Cornelson committed the crimes alleged in the Indictment while he was in the United States. Just as in Bescond, this is not a case in which the defendant refuses to return to the United States to avoid prosecution. See id. Mr. Cornelson stopped traveling to the United States more than three years prior to being notified that his arrest was being sought. In the time after his arrest was openly sought, Mr. Cornelson "simply remain[ed] at home," as his home country, Brazil — a country that protects its citizens from extradition to the United States — allows him to do. See id.; see also id. at 767 (recognizing that, because the home country of the defendant had a non-extradition policy, the defendant "has no obligation to appear in the United States" "as far as [the] home country is

10

concerned"). On these facts, Mr. Cornelson does not fit the definition of a constructive-flight fugitive. See id. at 772.

The Government's attempts to distinguish this case from Bescond are without merit. The Government argues that the Court should treat Mr. Cornelson differently from the defendant in Bescond because Mr. Cornelson owns a vacation home in Florida, and because, prior to 2012, Mr. Cornelson traveled to the United States at least once per year, often for extended periods of time. Thus, the Government argues, Mr. Cornelson had reason to enter the United States, and his failure to do so constitutes affirmative action to distance himself from the United States and to frustrate arrest, rendering him a fugitive. But the Government fails to explain why Mr. Cornelson's actions make a difference under Bescond. Mr. Cornelson's actions do not change the facts that Mr. Cornelson committed the alleged crimes abroad, did not flee from the United States, did not conceal himself, and had no obligation to enter the United States to face arrest, and that he therefore does not meet either common law definition of a fugitive. The Government presents no cogent contrary argument; the Government fails even to clarify which category of fugitive — traditional or constructive-flight — into which it believes Mr. Cornelson falls.[3]

---

[3] While the Government points out that the defendant owns a vacation home in Florida, the Government does not explain why that makes a difference under the definition of either a traditional or constructive-flight fugitive.

11

The Government also argues that Mr. Cornelson's decision to live in Brazil, instead of the Bahamas, following his last departure from the United States in 2012, and to cease traveling outside of Brazil altogether, should render Mr. Cornelson a fugitive. But the Government does not explain why this would qualify Mr. Cornelson as a traditional or constructive-flight fugitive. Mr. Cornelson is a Brazilian citizen, and he is entitled to reside there and remain there; the Bescond court was clear that the fugitive disentitlement doctrine should not be used to penalize defendants for "staying home." See Bescond, 24 F.4th at 767, 772-73. Nor is Mr. Cornelson's presence abroad "in any part covert or suspect." See id. at 773. Having been transparent about his plans to return to Brazil, and living there openly, it cannot be said that Mr. Cornelson is in a "hideout, sanctuary, or escape from the reach of law." See id. And while the Government infers bad faith from Mr. Cornelson's decision to return and remain in Brazil after May 2012, bad faith does not necessarily follow. Mr. Cornelson is 74 years old and is battling leukemia. The Government has put forth no evidence substantiating its allegations of bad faith.

Finally, it is "telling" that Mr. Cornelson raises a "nonfrivolous exterritoriality claim" in favor of dismissing the Indictment. See id. at 772. As the court of appeals explained in Bescond, "[l]abeling a foreign defendant a fugitive can be

12

enough to coerce submission to U.S. jurisdiction wholly regardless of whether the charged statute reaches individuals outside our territory. . . . And if our law does not reach [the defendant] or [his] conduct, can it be said that [he] is in flight from it?" Id. at 772-73.[4]

For all of these reasons, Mr. Cornelson is not a fugitive under either definition of the term, and the fugitive disentitlement doctrine is inapplicable.

### B.

In any event, disentitlement would be improper in this case because disentitlement would not serve the purposes of the fugitive disentitlement doctrine. These purposes are (1) "assuring the enforceability of any decision that may be rendered against the fugitive"; (2) "imposing a penalty for flouting the judicial process"; (3) "discouraging flights from justice and promoting the efficient operation of the courts"; and (4) "avoiding prejudice to the other side caused by the defendant's escape." Id. at 773-74.

First, disentitling Mr. Cornelson does not substantially advance the enforceability of any decision that may be rendered against him. Courts have used this factor to analyze whether disentitlement is an appropriate means of ensuring mutuality in

---

[4] The Court expresses no view as to the merits of Mr. Cornelson's extraterritoriality claim.

the litigation. See id. at 774. The idea behind mutuality is that "litigation is a two-way street," and that, if the defendant "wants the United States to be bound by a decision dismissing the [I]ndictment, he should be similarly willing to bear the consequences of a decision upholding it." See In re Hijazi, 589 F.3d 401, 413 (7th Cir. 2009). The paradigmatic case in which mutuality is absent is where the defendant flees to "seize an unfair advantage" or to "game the system." See Bescond, 24 F.4th at 774. But this is not the case with Mr. Cornelson. Mr. Cornelson faces significant adverse consequences if he loses on his motion to dismiss. See Hijazi, 589 F.3d at 413. Such a decision would make it "very risky" for him to leave Brazil given INTERPOL's "long arm." See id. "Naturally he could never travel to the United States, because the Department of Justice could place a border watch for him (if it has not already done so)." See id. And a successor government in Brazil "could change its mind about cooperating with the United States." See id. Disentitlement is "too blunt an instrument" to redress the supposed indignity resulting from the defendant's absence in this case. See Degen v. United States, 517 U.S. 820, 828 (1996). Disentitlement would bar Mr. Cornelson's challenge to the extraterritoriality of the securities statutes and the wire fraud statute — "that is, whether the law [he] is alleged to have violated can reach [him] and [his] conduct in the first

14

place." See Bescond, 24 F.4th at 768. And as the Supreme Court has counseled, "the sanction of disentitlement is most severe and so could disserve the dignitary purposes for which it is invoked. The dignity of a court derives from the respect accorded its judgments. That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits." Degen, 517 U.S. at 828. On the whole, this first factor does not support disentitlement.

Second, disentitlement is not needed to punish Mr. Cornelson for flouting the judicial process. Whether Mr. Cornelson can be said to be flouting the judicial process, "there is no basis for a finding that [Mr. Cornelson] is exhibiting disrespect for U.S. law." See Bescond, 24 F.4th at 774. "All [Mr. Cornelson] has done is stay home, . . . where [his] government permits [him] to live freely. [His] reasons for litigating from home are legitimate and fair." See id. The Government has put forth no evidence to the contrary. This factor therefore does not support disentitling Mr. Cornelson.

Third, disentitling Mr. Cornelson does not discourage flights from justice or otherwise promote the efficient operation of the courts. "[T]here exists no cohort of fugitives who would perceive an adjudication of [Mr. Cornelson's] motion[] as inducement or inspiration to flee the jurisdiction of our courts." See id. Mr. Cornelson was not in the United States

15

during the commission of his alleged crimes, when the complaint against him was unsealed, or when he was indicted; he was involved in generally legitimate activity; his charged conduct affected the United States — allegedly — only in a roundabout way; he did not act for a criminal organization; and his home country protects him from extradition. See id. While there might be a slight deterrence effect to disentitling Mr. Cornelson, there are serious questions as to "whether a slight general deterrence effect can outweigh the countervailing harm to the judicial process, which seeks to resolve cases on the merits whenever possible." Id. at 774. This factor thus does not weigh in favor of disentitlement.

Finally, disentitling Mr. Cornelson is not needed to avoid prejudice to the Government. The Government "has no apparent need to acquire new evidence related to [Mr. Cornelson's] period of absence." See id. at 775. Additionally, while the Government argues that Mr. Cornelson's fugitive status works considerable prejudice against the Government because "memories fade and evidence grows stale," Opp. to Mot. to Dismiss 18, this concern is less persuasive in a case like this, where the Indictment was filed about five years after the charged conduct. See Bescond, 24 F.4th at 775 ("Concern that existing evidence would grow stale may arise in some cases; but here, it is odd, given that by the time the indictment was filed, about six to seven years

16

had already elapsed since the charged conduct."). The Government's argument that it is prejudiced by its "inability to present its case" is equally unavailing. Opp. to Mot. to Dismiss 18. The Government has presented no evidence of that prejudice. Indeed, the court in Bescond rejected the Government's similar argument that it was prejudiced by its inability to "present evidence at trial." Bescond, 24 F.4th at 774. The same result is required here.

Moreover, there is countervailing prejudice to Mr. Cornelson. Here, as in Bescond,

> [d]isentitlement enables the [G]overnment to coerce [the defendant's] presence in court by imposing financial, reputational, and family hardship regardless of [the defendant's] guilt or innocence, and regardless of whether the [I]ndictment charges violations of a statute that applies extraterritorially. So long as the [G]overnment surmounts the low threshold of securing an [I]ndictment, any soul on the planet may be deemed a fugitive, and disentitlement would then bar a challenge to extraterritoriality from abroad, requiring the foreigner to leave home and face arrest and detention to have any hope of securing dismissal. Such a result contravenes the rationales that underly disentitlement and assigns no weight to the sovereignty of other nations.

See id. at 775.

In sum, the discretionary factors weigh strongly against disentitlement in this case, and the Court will not apply the fugitive disentitlement doctrine to Mr. Cornelson.


had already elapsed since the charged conduct."). The Government's argument that it is prejudiced by its "inability to present its case" is equally unavailing. Opp. to Mot. to Dismiss 18. The Government has presented no evidence of that prejudice. Indeed, the court in Bescond rejected the Government's similar argument that it was prejudiced by its inability to "present evidence at trial." Bescond, 24 F.4th at 774. The same result is required here.

Moreover, there is countervailing prejudice to Mr. Cornelson. Here, as in Bescond,

> [d]isentitlement enables the [G]overnment to coerce [the defendant's] presence in court by imposing financial, reputational, and family hardship regardless of [the defendant's] guilt or innocence, and regardless of whether the [I]ndictment charges violations of a statute that applies extraterritorially. So long as the [G]overnment surmounts the low threshold of securing an [I]ndictment, any soul on the planet may be deemed a fugitive, and disentitlement would then bar a challenge to extraterritoriality from abroad, requiring the foreigner to leave home and face arrest and detention to have any hope of securing dismissal. Such a result contravenes the rationales that underly disentitlement and assigns no weight to the sovereignty of other nations.

See id. at 775.

In sum, the discretionary factors weigh strongly against disentitlement in this case, and the Court will not apply the fugitive disentitlement doctrine to Mr. Cornelson.

III.

Finding the fugitive disentitlement doctrine inapplicable in this case, the Court must reach the merits of the defendant's motion. However, the Government did not respond to the merits of these arguments, having only opposed the motion to dismiss on the grounds that the fugitive disentitlement doctrine applied.

The Government should respond to the defendant's arguments on the merits by **April 22, 2022.** The defendant may reply by **May 6, 2022.**

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not addressed above, the arguments are either moot or without merit.

For the foregoing reasons, the Court declines to find that Mr. Cornelson is a fugitive under the fugitive disentitlement doctrine. The Court will reach the merits of the defendant's claims once fully briefed in accordance with the schedule set forth above.

**SO ORDERED.**

Dated:   New York, New York
         March 31, 2022

_____
John G. Koeltl
United States District Judge