UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                                :

UNITED STATES OF AMERICA        :
                                :

     - v. -                    :
                                :

WALDYR PRADO and         :
IGOR CORNELSEN,         :                 15 Cr. 516 (JGK)
                                :

       Defendants.         :

                                :
--------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM OF LAW IN FURTHER OPPOSITION TO DEFENDANT IGOR CORNELSEN'S MOTION TO DISMISS THE INDICTMENT

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

Elizabeth Hanft
Assistant United States Attorney
- Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 1

    I.    Facts ............................................................................................................................ 1

    II.    Procedural History ..................................................................................................... 4

DISCUSSION ...................................................................................................................... 5

    I.    Applicable Law ........................................................................................................ 5

        A.    Motions to Dismiss ............................................................................................ 5

        B.    Extraterritoriality and Section 10(b) (Counts One and Two) ........................... 7

    II.    The Indictment Alleges Domestic Crimes with Sufficient Specificity ........................... 8

        A.    Counts One through Three .................................................................................. 9

            1.    *Morrison* Prong 1 .................................................................................... 9

            2.    *Morrison* Prong 2 .................................................................................. 12

        B.    Count Four ........................................................................................................ 17

    III.    The Indictment Does Not Violate Due Process ............................................................. 20

CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) .......... 5, 8, 12, 13

*Bascunan v. Elsaca*, 927 F.3d 108 (2d Cir. 2019) .................................................. 17, 18

*Elliott Assocs. v. Porsche Automobiles,* 759 F. Supp. 2d 469 (S.D.N.Y. 2010) ........................ 10

*Giunta v. Dingman*, 893 F.3d 73 (2d Cir. 2018) ........................................ 12, 13, 15, 16

*Hamling v. United States*, 418 U.S. 87 (1974) ...................................................................... 6

*In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 20 Civ. 3135 (LAK), 2021
    WL 3863372 (S.D.N.Y. Aug. 30, 2021) ....................................................................... 11

*McNabb v. United States*, 318 U.S. 332 (1942) .................................................................... 7

*Morrison v. National Australia Bank Limited*, 561 U.S. 247 (2010) .................................. 5, 8, 11

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198
    (2d Cir. 2014) ...................................................................................................... 8, 15, 16

*RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016) ....................................... 7, 17

*SEC v. Compania Internacional Financiera*, 11 Civ. 4904 (DLC), 2011 WL
    3251813 (S.D.N.Y. July 29, 2011) ...................................................................... 10, 11

*SEC v. Maillard*, 13 Civ. 5299 (VEC), 2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014) ............... 10

*SEC v. Sabrdaran*, 14 Civ. 4825 (JSC), 2015 WL 901352 (N.D. Cal. March 2, 2015) ......... 10, 11

*SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011) .............................................................. 10

*Stoyas v. Toshiba Corporation*, 896 F.3d 933 (9th Cir. 2018) ............................................ 11

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ....................................... 21, 22

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ........................................................ 7

*United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013) ........................................................... 22

*United States v. Artuso*, 618 F.2d 192 (2d Cir. 1980) .......................................................... 7

*United States v. Bastian*, 770 F.3d 212 (2d Cir. 2014) ....................................................... 20

*United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) .................................................. 19

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ....................................................... 6

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ................................................... 6

*United States v. Driver*, 692 F. App'x 448 (9th Cir. 2017) (summary order),
    *cert. denied*, 138 S. Ct. 1304 (2018) ..................................................................... 17

*United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006) ........................................................ 20

*United States v. Garlick*, 240 F.3d 789 (9th Cir. 2001) ....................................................... 17

*United States v. Hayes*, 118 F. Supp. 3d 620 (S.D.N.Y. 2015) ........................................... 21

*United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018) .......................................................... 7

*United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012) ................................................... 17

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) .................................. 21, 22

*United States v. Napout*, 963 F.3d 163 (2d Cir. 2020) .................................................. 18, 19

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) ......................................................... 13

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ......................................................... 13

*United States v. Roy*, 783 F.3d 418 (2d Cir. 2015) ............................................................ 19

*United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015) .................................. 21

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ........................................................ 6

*United States v. Velastegui*, 199 F.3d 590 n.2 (2d Cir. 1999) .................................................. 6, 13

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) .................................................................. 7, 14

*United States v. Wey*, 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .................. 6

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in further opposition to defendant Igor Cornelsen's motion to dismiss the indictment, and in response to the Court's opinion and order, dated March 31, 2022, directing the Government to respond to Cornelsen's merits arguments. (Dkt. 29). Cornelsen's arguments that the indictment in this case fails to state an offense and lacks sufficient nexus to the United States are wholly without merit. The indictment properly alleges domestic offenses, with ample specificity, and it violates neither the presumption against extraterritoriality nor due process. This Court should deny Cornelsen's motion.

## BACKGROUND

### I. Facts

The factual allegations are laid out more fully in the Government's prior opposition memorandum, dated November 18, 2021. (Dkt. 21). In brief, Cornelsen and co-defendant Waldyr Prado participated in an insider trading scheme, from approximately May 2010 through September 2010, in which they used material, non-public information to make and cause to be made profitable securities trades for their own benefit. (Indictment ¶ 6). Prado, who was a registered representative at a brokerage firm ("Firm-1"), learned material, non-public information from a client ("Client-1") about an upcoming acquisition. (Indictment ¶¶ 4, 7). In addition to trading based on that material, non-public information for himself, Prado tipped Cornelsen, one of his brokerage clients. (Indictment ¶¶ 5, 7, 19, 23). Cornelsen, too, traded on the material, non-public information. (Indictment ¶¶ 7, 20, 24, 27. 35). Cornelsen obtained a total profit of more than approximately $1.68 million, and a net profit of approximately $1.4 million, by trading on the material non-public information. (Indictment ¶ 30).

Despite Cornelsen's efforts to paint the scheme as "predominantly foreign," it was not. The acquisition that was the subject of the material, non-public information was domestic: 3GCapital Partners ("3G"), a private equity firm with its main offices in New York, New York, acquired Burger King Holdings, Inc., a Delaware corporation headquartered in Miami, Florida. (Indictment ¶¶ 1, 2, 8-10). Burger King Holdings, Inc. was the parent of Burger King Corporation, a Florida corporation. (Indictment ¶ 1). Burger King's stock was listed on a domestic exchange– the New York Stock Exchange ("NYSE"), located in New York, New York. (*Id.*). Burger King's options traded on various exchanges, including domestic ones—such as the NYSE Amex Equities and International Securities Exchange ("ISE"), both located in New York, New York. (*Id.*).

Cornelsen's and Prado's trades were also domestic. As part of the offense conduct, Prado purchased Burger King options through the NYSE Amex Equities and Burger King common stock through the over-the-counter market. (Indictment ¶¶ 16,17, 26, 29, 35(b), 35(g), 35(k), 35(l), 35(n)). Cornelsen purchased Burger King call options[1] through exchanges that included the ISE, located in New York, New York (Indictment ¶¶ 20, 24, 27, 35(c), 35(e), 35(i), 35(m)), and through an account with a brokerage firm located in New York, New York. (Indictment ¶¶ 35(e), 35(i)). Cornelsen and Prado used the facilities of national securities exchanges in order to commit their offenses, trading on the basis of material, non-public information concerning domestic companies.

Cornelsen traded securities and made investments through his own personal holding company, Bainbridge Group, Inc. ("Bainbridge"), a British Virgin Islands limited liability corporation. (Complaint 13 Mag. 2201 (the "Complaint") ¶ 15). Bainbridge maintained multiple

---

[1] The Indictment alleges that Cornelsen also purchased "common stock." (Indictment ¶ 20). Undersigned Government counsel, who was not assigned to the case at the time the Indictment was returned, has thus far been unable to verify that allegation, and the Government therefore does not intend to rely on it for the purposes of opposing the defendant's motion.

U.S. brokerage accounts through which Cornelsen traded, among other things, securities listed on U.S. exchanges. (*Id.*). Cornelsen was a director of Bainbridge, was authorized to trade in Bainbridge's accounts, and placed the orders to purchase Burger King call options through certain of Bainbridge's accounts. (*Id.*).

Following public announcement of the merger, Prado sold his Burger King stock and options positions for a total profit of at least approximately $175,000, and Cornelsen sold his Burger King options for a total profit of over approximately $1.68 million, and a net profit (including expired July 2010 options) of approximately $1.4 million. (Complaint ¶ 53; Indictment ¶ 30).

Prado resided in Miami during the time period relevant to the Indictment, although he traveled to Brazil in March, May, and August 2010. (Complaint ¶ 31). On the dates Prado purchased common stock in Burger King—June 3, August 25, and September 1, *see* Indictment ¶¶ 17, 26, 29—he was in the United States and made calls to Cornelsen from a landline at Firm-1.[2] At a meeting in Miami, Florida on or about August 10, 2012, Prado told a witness that he planned to tell the U.S. Securities and Exchange Commission that he traded in Burger King securities due to a newspaper article he had read. (Complaint ¶ 58). Cornelsen is also no stranger to the United States. He owns a home in Boca Raton, Florida, and, prior to being criminally charged, he regularly spent long periods of time in the United States, remaining here for months

---

[2] Those phone records were filed by the U.S. Securities and Exchange Commission in its case against Prado, and are attached hereto as Exhibit A. *See* 12 Civ. 7094 (WHP), Dkt. 9-7 (Exhibit 7) (excerpt of phone records reflecting calls between Prado and Cornelsen, including calls on those particular dates). Having requested that the Court consider some of these phone records and attaching excerpts of them to his own motion, *see* Memorandum of Law In Support of Defendant Igor Cornelsen's Motion to Dismiss the Indictment at 4 n.2; Declaration of Michael E. Gertzman (Dkt. 13), Exhibit B, Cornelsen cannot be heard to complain that the Court should ignore them where they redound to his detriment.

at a time and staying approximately "119 days a year" to avoid tax liability. (Declaration of Michael E. Gertzman (Dkt. 13), Exhibit C at 9-10).

## II.      Procedural History

On September 10, 2013, Cornelsen and Prado were charged in the Complaint with: (i) conspiracy to commit securities fraud and to commit fraud in connection with a tender offer; (ii) substantive securities fraud; and (iii) substantive fraud in connection with a tender offer. (Complaint). On August 5, 2015, a grand jury sitting in this District returned a four-count indictment (the "Indictment"), charging Cornelsen and Prado with: (i) conspiracy to commit securities fraud and to commit fraud in connection with a tender offer, in violation of 18 U.S.C. § 371 (Count One); (ii) substantive securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5 & 240.10b5-2, and 18 U.S.C. § 2 (Count Two); (iii) substantive fraud in connection with a tender offer, in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. §§ 240.14e-3(a) & 240.14e-3(d), and 18 U.S.C. § 2 (Count Three); and (iv) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count Four).

Cornelsen currently resides in Brazil, which will not extradite him, and has not submitted to this Court's jurisdiction, despite his knowledge of the pending charges. Cornelsen has not been presented or arraigned. Nevertheless, on October 7, 2021, Cornelsen moved to dismiss the Indictment. (Dkt. 11, 12 ("Memorandum of Law In Support of Defendant Igor Cornelsen's Motion to Dismiss the Indictment" ("Def. Mem."))). The Government opposed that motion on November 18, 2021, on the ground that Cornelsen, as a fugitive, was disentitled from challenging the Indictment, and that the Court should therefore decline to consider the motion on the merits. (Dkt. 21). On March 31, 2022, this Court disagreed, finding that Cornelsen was not a fugitive and that disentitlement was not warranted, and ordered the Government to respond to Cornelsen's motion on the merits. (Dkt. 29).

**DISCUSSION**

Cornelsen argues that the Indictment fails to allege domestic offenses. He is wrong. It alleges several—by both members of the charged conspiracy, Prado and Cornelsen. The conduct is not "predominantly foreign," nor does the Indictment raise any due process concerns. Cornelsen's arguments misapprehend criminal pleading standards, elide important language in the relevant statutes, and ignore critical facts and apposite case law. They should be rejected.

*Morrison v. National Australia Bank Limited*, 561 U.S. 247 (2010), upon which Cornelsen heavily relies, compels such a result. Cornelsen's repeated refrain that he is a foreign national who was not physically inside the United States at the time of the charged offenses ignores the central holding of *Morrison* and its progeny: that it is neither the "place where the deception originated" nor the location of the individuals involved that determines whether Section 10(b) of the Securities Exchange Act of 1934 reaches certain conduct. *Morrison*, 561 U.S. at 266; *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68-70 (2d Cir. 2012) ("[A] party's residency or citizenship is irrelevant to the location of a given transaction"; "[T]he transactional test announced in *Morrison* does not require that each defendant alleged to be involved in a fraudulent scheme engage in conduct in the United States."). Rather, "Section 10(b) reaches the use of a manipulative or deceptive device . . . in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Morrison*, 562 U.S. at 273. Both were present in this case.

## I.     Applicable Law

### A. Motions to Dismiss

Federal Rule of Criminal Procedure 7(c)(1) requires, *inter alia*, that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient if it "first, contains the elements

of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). The Second Circuit has held that to satisfy the pleading requirements of Rule 7(c)(1), "an indictment need do little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Dawkins*, 999 F.3d 767, 779 (2d Cir. 2021) (internal quotation marks and citation omitted).

"The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (internal quotation marks and citation omitted). "When the charges in an indictment have stated the elements of the offense and provided even minimal protection against double jeopardy, this court has repeatedly refused, in the absence of any showing of prejudice, to dismiss charges for lack of specificity." *Stringer*, 730 F.3d at 124 (internal quotation marks and citation omitted). The Court may take into account the fact that "[t]he government … provided [the defendant] with the criminal complaint, which outlined his crimes in detail" in determining that the defendant was "sufficiently informed to defend against the charges and to be protected against the risk of double jeopardy (for which the trial record provides further protection)." *Id.*

"When considering a motion to dismiss, the [c]ourt must treat the indictment's allegations as true." *United States v. Wey*, 15 Cr. 611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017) (citing *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999)). A court should not look beyond the face of the indictment and draw inferences as to proof to be adduced at trial, for "the

sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998).

Finally, although the court has "supervisory authority over the administration of criminal justice," *McNabb v. United States*, 318 U.S. 332, 341 (1942), the Second Circuit has clearly held that "[a] district court does not have the power to dismiss an indictment that is legally sufficient simply because it deems the dismissal to be in the interest of justice." *United States v. Artuso*, 618 F.2d 192, 196 (2d Cir. 1980) (citation omitted).

### B. Extraterritoriality and Section 10(b) (Counts One[3] and Two)

In keeping with the presumption against extraterritoriality, which is a canon of statutory construction, *see RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016), *Morrison* held that Section 10(b) of the Securities Exchange Act is applicable "only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. at 263; *see also id.* at 266 ("[T]he focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.' . . . [I]t is . . . only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.") (citing 15 U.S.C. § 78j(b)). Although *Morrison* was a civil case, it applies to Section 10(b) criminal liability, too. *United States v. Vilar*, 729 F.3d 62, 67, 74, 98 (2d Cir. 2013).

---

[3] "[T]he extraterritorial reach of an ancillary offense like . . . conspiracy is coterminous with that of the underlying criminal statute," *United States v. Hoskins*, 902 F.3d 69, 96 (2d Cir. 2018) (internal quotation marks and citation omitted). Accordingly, the same extraterritoriality analysis applies to Counts One and Two.

As to the first prong, so long as the conduct occurs *in connection with* a transaction in securities registered on a domestic exchange, Section 10(b) applies. *See Morrison*, 561 U.S. at 263. (Indeed, Cornelsen refers to *Morrison*'s having established a "per se" rule if the first prong is satisfied. (Def. Mem. at 12)). As to the second prong, regarding conduct that occurs in connection with the purchase or sale of "any security not so registered," "the [statute's] exclusive focus [is] on *domestic* purchases and sales." *Morrison*, 561 U.S. at 268 (emphasis in original). A transaction in unlisted securities is domestic and satisfies *Morrison*'s second prong "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Absolute Activist*, 677 F.3d at 69. Irrevocable liability, in turn, is present when "the purchaser incurred irrevocable liability within the United States to take and pay for a security, or . . . the seller incurred irrevocable liability within the United States to deliver a security." *Id.* at 68. The Second Circuit has further held that a domestic transaction relating to securities not listed on domestic exchanges is necessary, but not sufficient, for the application of Section 10(b)—in addition, the claims must not be "so predominantly foreign as to be impermissibly extraterritorial." *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014). But the *Parkcentral* Court noted that its conclusion "depend[ed] in some part on the particular character of the unusual security at issue" in that case (securities-based swap agreements relating to the stock of a German corporation, where the amount of gain and loss depended on prices of that corporation's stock recorded only on foreign exchanges) and "express[ed] no view whether [it] would have reached the same result if the suit were based on different transactions." *Id.* at 201-02.

## II. The Indictment Alleges Domestic Crimes with Sufficient Specificity

### A. Counts One through Three

The securities fraud (and therefore conspiracy) charges in the Indictment satisfy either prong of the *Morrison* analysis. While in possession of the material non-public information, Cornelsen purchased call options in Burger King securities as follows:

- On or about May 18 and May 19, 2010, Cornelsen purchased 2,850 Burger King July 2010 call options through multiple exchanges, including the ISE. (Indictment ¶ 35(c)).

- On or about June 2, 2010, Cornelsen purchased 1,000 Burger King July 2010 call options through an account with a brokerage firm located in New York, New York. (Indictment ¶ 35(e)).

- On or about August 19, 2010, Cornelsen purchased 1,400 Burger King October 2010 call options with a strike price of $17.50 for $98,735 on the ISE through an account with a brokerage firm located in New York, New York, and 206 Burger King October 2010 call options with a strike price of $19 for $7,467.50. (Indictment ¶¶ 24, 35(i), 35(j)).

- On or about August 26, 2010, and on or about August 27, 2010, Cornelsen purchased 1,794 Burger King October 2010 call options with a strike price of $19 for approximately $91,400, 281 of which he purchased through the ISE. (Indictment ¶ 27, 35(m)).

#### 1. *Morrison Prong 1*

Cornelsen's purchases occurred "in connection with a transaction in securities registered on a domestic exchange." Burger King securities were traded on the NYSE, a domestic exchange. Cornelsen cites no case law—indeed, he provides no basis other than his own *ipse dixit*, *see* Def. Mem. at 12—holding that trading in options in a security registered on a domestic exchange is anything less than conduct "in connection with a transaction in securities registered on a domestic exchange," let alone doing so on a domestic options exchange. It is not.

Cornelsen's argument to the contrary omits critical language—"in connection with"—from Section 10(b) and from *Morrison* and ignores a line of case law that grapples with the same underlying concept. Specifically, several courts have held that insider trading in financial

instruments referenced to an underlying domestically listed security satisfies *Morrison*'s first prong. *See, e.g.*, *SEC v. Compania Internacional Financiera*, 11 Civ. 4904 (DLC), 2011 WL 3251813 (S.D.N.Y. July 29, 2011) (contracts-for-difference ("CFDs") satisfied *Morrison*'s first prong because the CFDs triggered a corresponding purchase or sale on the NYSE; *Morrison* "never state[d] that a defendant must itself trade in securities listed on domestic exchanges," and although the defendant "trad[ed] CFDs in London that were tied to transactions on the NYSE in . . . domestic securities, this does not negate the fact that its alleged deceptive conduct involved securities listed on a domestic exchange"); *SEC v. Maillard*, 13 Civ. 5299 (VEC), 2014 WL 1660024, at *3 (S.D.N.Y. Apr. 23, 2014) (same; noting that although defendant did not himself purchase a security listed on an American exchange, the fraudulent scheme involved his purchasing CFDs abroad that directly caused the purchase of underlying securities traded on NYSE, and rejecting a "crabbed reading of *Morrison*"); *SEC v. Sabrdaran*, 14 Civ. 4825 (JSC), 2015 WL 901352 (N.D. Cal. March 2, 2015); *cf. SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011) (foreign trading of a security-based swap agreement that referenced a domestic security to be purchased or sold by the broker of the swap agreement satisfied Section 10(b)'s "in connection with" requirement, regardless of whether the defendant in question himself purchased or sold the securities); *Elliott Assocs. v. Porsche Automobiles*, 759 F. Supp. 2d 469, 475-76 (S.D.N.Y. 2010) (finding that domestic trading of swap agreement referencing a stock listed on a foreign exchange was equivalent to the purchase of the foreign shares of that company for purposes of a *Morrison* analysis, and therefore was not covered by Section 10(b)). The call options here were referenced to a domestically listed security; Cornelsen's (and Prado's) trading options in Burger King securities undoubtedly occurred "in connection with" transactions in Burger King securities, even if Cornelsen did not purchase the underlying domestically listed security himself. *See Compania*

*Internacional Financiera*, 2011 WL 3251813; *Maillard*, 2014 WL 1660024, at *3; *Sabrdaran*, 2015 WL 901352.

In any event, Prado—Cornelsen's co-conspirator—purchased Burger King common stock on several occasions while in possession of the material, non-public information. (Indictment ¶¶ 17, 26, 29, 35(g), 35(k), 35(n)). Prado's acts meet *Morrison*'s first prong, by its plain terms, since it involves a purchase of a security listed on a domestic exchange. That the security was purchased in the "over-the-counter" market is of no moment, despite Cornelsen's claims to the contrary. Those claims rely entirely on one in-Circuit district court opinion and a Ninth Circuit decision. *See* Def. Mem. at 12-13 (citing *Stoyas v. Toshiba Corporation*, 896 F.3d 933, 947 (9th Cir. 2018); *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 20 Civ. 3135 (LAK), 2021 WL 3863372, at *2 (S.D.N.Y. Aug. 30, 2021)). But those cases are inapposite: neither dealt with an underlying security that was "listed on an American stock exchange," *Morrison*, 561 U.S. at 273, like Burger King was here. *Stoyas* involved Toshiba American Depository Receipts ("ADRs") purchased in the over-the-counter market that referenced Toshiba common stock listed on the *Tokyo* Stock Exchange. *Stoyas*, 896 F.3d at 937-38. That the *Stoyas* Court stated in dictum that "the over-the-counter market on which Toshiba ADRs trade is . . . . not an 'exchange,'" *id.* at 945, is irrelevant here, where Prado purchased common stock in a security registered on the NYSE (albeit in a transaction that took place in the over-the-counter market). Similarly, *In re iAnthus* involved securities listed on the *Canadian* Stock Exchange that were purchased over the counter in the United States. *In re iAnthus*, 2021 WL 3863372, at *1. Judge Kaplan held that the over-the-counter market was not an "exchange," but critical to his decision (and a fact the plaintiffs in that

case conceded) was that the Canadian Stock Exchange "is not 'domestic.'" *Id.* at *3.[4] The NYSE is. Neither *Stoyas* nor *In re iAnthus* hold that purchase on the over-the-counter market of a domestically listed security removes a transaction from *Morrison*'s first prong.

### 2. *Morrison Prong 2*

Even if the conduct at issue here did not satisfy *Morrison*'s first prong, it easily satisfies the second. Cornelsen engaged in deceptive conduct in connection with "domestic transactions," registered or not, when he purchased thousands of Burger King call options on the International Securities Exchange, which is located in New York, New York, on multiple occasions. Prado did so when he purchased Burger King call options on the NYSE Amex Equities, and he necessarily did so when he purchased Burger King common stock, including from within the United States.

Both defendants' purchases constitute "domestic transactions" in securities under *Morrison* pursuant to the test set forth by *Absolute Activist*. The allegations "giv[e] rise to the plausible inference that irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist*, 677 F.3d at 68-69. Call options were "purchased" on the ISE or, in Prado's case, on the NYSE Amex Equities—in other words, options contracts were matched, cleared, and settled in the United States. A seller "incurred irrevocable liability within the United States to deliver a security." *Id.* at 68; *see also Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) ("Irrevocable liability, for section 10(b) purposes, attaches when the parties become bound to effectuate the transaction, that is, when the parties obligated themselves to perform what they had agreed to

---

[4] Notably, Cornelsen omits from his brief that the Second Circuit expressly "took no position" on the question whether trading *any* securities on the over-the-counter market may be sufficient to satisfy the first prong of *Morrison*. *Absolute Activist*, 677 F.3d at 66 n.3 (remarking, prior to *Stoyas*, that "the SEC has successfully argued that the first prong of *Morrison* is satisfied because the case involve[d] securities traded on the over-the-counter securities market, not securities sold on foreign exchanges") (citing *SEC v. Ficeto*, 839 F. Supp. 2d 1101, 1112 (C.D. Cal. 2011)).

perform even if the formal performance of their agreement is to be after a lapse of time." (internal quotation marks and citations omitted)).  As a result, irrevocable liability was incurred *and* title was transferred in the United States—either of which satisfies *Absolute Activist*.  And of course, when Prado purchased Burger King common stock from within the United States on June 3, August 25, and September 1, he "incurred irrevocable liability" here and title was transferred here.

Cornelsen attempts to confuse the straightforward classification of his options purchases as domestic transactions by claiming that the Court must look to "additional, transaction-specific facts not alleged in the Indictment."  *See* Def. Mem. at 13, n.7 (citing only civil cases).  But in a criminal case, on a pretrial motion to dismiss, "the facts alleged by the government must be taken as true," *Velastegui*, 199 F.3d at 592 n. 2, and an indictment must be read "to include facts which are necessarily implied by the specific allegations made."  *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007) (internal quotation marks and citation omitted).  It is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to present at trial."  *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009) (citation omitted).  Moreover, even in the civil context, further inquiry is necessary only where, as in *Absolute Activist*, "[t]he sole allegation that affirmatively states that the transactions took place in the United States does so in a conclusory fashion." *Absolute Activist*, 677 F.3d at 70 ("[T]he mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions."), and where it is not otherwise apparent that irrevocable liability was incurred or title was transferred in the United States.  *Id.*; *see also Giunta*, 893 F.3d at 79 (additional transaction-specific facts are considered to aid courts in determining whether irrevocable liability was incurred within the United States). Here, by contrast, the Indictment describes the domestic transactions in great detail: the number of

call options, their strike price and expiration date, and the date and location of the purchases are all specified. That is more than adequate to allege "domestic transactions" pursuant to which liability was incurred and title was transferred within the United States.

Notably, the Second Circuit in *Absolute Activist* explicitly rejected two of the primary arguments that Cornelsen advances. First, the *Absolute Activist* Court held that a "domestic transaction" can involve non-U.S. citizens residing abroad. *Id.* at 69 ("[A] purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States." (internal quotation marks and citation omitted)). Second, the Court rejected the argument that it was "necessary to determine whether each individual defendant engaged in at least some conduct in the United States." *Id.* Instead, the Court held that "the transactional test announced in *Morrison* does not require that each defendant alleged to be involved in a fraudulent scheme engage in conduct in the United States." *Id.*

> Accordingly, rather than looking to the identity of the parties, the type of security at issue, or whether each individual defendant engaged in conduct within the United States, we hold that a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States.

*Id.*; *see also Vilar*, 729 F.3d at 77-78, 78 n.12 (where victims entered into agreements in United States, Government had proven fraud in connection with "domestic transactions" under *Morrison*'s second prong, even though purchases and sales of relevant securities were in most cases "deliberately and carefully structured to occur outside the United States"). Cornelsen's heavy reliance on the fact that he "is a foreign national, who is not alleged to have stepped foot in the United States during the alleged insider-trading conspiracy," Def. Mem. at 1, is misplaced.

Nor are the violations alleged "predominantly foreign" under *Parkcentral*, as Cornelsen argues. *Parkcentral* made clear that a domestic transaction in a security is a necessary element of a Section 10(b) claim regarding a security not listed on a domestic exchange, but it is "not necessarily sufficient" to render the application of Section 10(b) domestic. *Parkcentral*, 763 F.3d at 216. "In certain cases, the facts may be so predominantly foreign as to render the application of section 10(b) impermissibly extraterritorial." *Giunta*, 893 F.3d at 82 (explaining the holding of *Parkcentral*). *Parkcentral* recognized that whether a particular invocation of Section 10(b) is appropriately domestic is a fact-intensive inquiry, and it did not "purport to proffer a test that will reliably" make that determination. *Parkcentral*, 763 F.3d at 217. Instead, "courts must carefully make their way with careful attention to the facts of each case and to combinations of facts that have proved determinative in prior cases." *Id.*

The facts of this case leave no doubt: the conduct at issue is not predominantly foreign. Cornelsen and Prado learned material non-public information regarding the acquisition of Burger King, a Delaware corporation, by 3G, a company headquartered in New York. Prado, while living in the United States, purchased Burger King common stock. Burger King's stock was listed on the NYSE, located in New York, New York. Cornelsen purchased Burger King options, which traded on various exchanges located in New York, New York, including the NYSE Amex Equities and the International Securities Exchange. Thousands of the Burger King call options that Cornelsen purchased while in possession of material, non-public information were purchased on the ISE, and many of those were purchased through a United States brokerage account. Cornelsen communicated with his broker, located in New York, New York, regarding his purchase of Burger King options. A far cry from *Parkcentral*, where "the complaints concern[ed] statements made primarily in Germany with respect to stock in a German company traded only on exchanges in

15

Europe," Prado's and Cornelsen's insider trading conduct was not predominantly foreign. *Parkcentral*, 763 F.3d at 216.

The Second Circuit's decision in *Giunta*, 893 F.3d at 73, is instructive. In that case, the Court rejected the argument that the "foreign components present in [the] dispute render[ed] the claims impermissibly extraterritorial," *id.* at 82, despite finding that:

> [Defendant] is a permanent resident of the Bahamas; the venture involved development and operation of restaurants, bars, and hotels in the Bahamas; the entities were incorporated in the Bahamas by a Bahamian lawyer; witnesses and the books and records are in the Bahamas; and a United States court cannot direct Dingman or Out West to issue shares to Gordon in contravention of Bahamian regulations.

*Id.* (internal quotation marks and citation omitted). Weighing against the foreign aspects of the transactions were the facts that "[t]he Agreement was entered into in New York; Dingman continued to press Gordon for further investments in New York; Dingman and Gordon were both U.S. citizens; the wire transfers originated from New York; and the confirmation letters were sent to New York." *Id.*

Perhaps most fundamentally, if Cornelsen's and Prado's unlawful insider trading in Burger King options were not sanctionable in the United States, they would likely escape liability in *any* jurisdiction. It is highly implausible that Brazil would pursue charges against individuals who purchased options or common stock in a United States company, on a United States exchange, using United States brokerage accounts, based on inside information that the company would be acquired by another company headquartered in the United States.

## B. Count Four[5]

As to Count Four, which alleges wire fraud conspiracy, the analysis is even simpler. The "focus" of the wire fraud statute is the use of wires in furtherance of a scheme to defraud:

> There are three "essential elements" to mail or wire fraud: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) *use of the mails or wires to further the scheme*." These elements make clear that the regulated conduct is not merely a "scheme to defraud," but more precisely *the use of the mail or wires in furtherance of a scheme to defraud.*

*Bascunan v. Elsaca*, 927 F.3d 108, 121–22 (2d Cir. 2019) (citations omitted; emphasis in original); *accord United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001) ("[T]he focus of the mail and wire fraud statutes is upon the misuse of the instrumentality of communication."); *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012) ("In a mail or wire fraud prosecution, the mailing or wire transmission itself—*i.e.*, misuse of the mail or wire—has consistently been viewed as the *actus reus* that is punishable by federal law."); *United States v. Driver*, 692 F. App'x 448, 449 (9th Cir. 2017) (summary order), *cert. denied*, 138 S. Ct. 1304 (2018) (holding that in the context of applying the presumption against extraterritoriality, the conduct the wire fraud statute seeks to regulate is not "the scheme to defraud," but "the misuse of the instrumentality of communication."). In accordance with its focus on the "use of the wires to further the scheme," the Second Circuit has held that "a claim predicated on mail or wire fraud involves sufficient domestic conduct when (1) the defendant used domestic mail or wires in furtherance of a scheme to defraud, and (2) the use of the mail or wires was a core component of the scheme to defraud."

---

[5] The charge in Count Three of fraud in connection with a tender offer is based on the same conduct as the securities fraud offenses charged in Counts One and Two, and has the same "focus." *See RJR Nabisco*, 579 U.S. at 336 (if a statute is not extraterritorial, a court examines the statute's "focus" to determine whether a particular case involves a domestic application of the statute). Accordingly, for the reasons set forth above, that charge, too, adequately alleges domestic transactions and is therefore not impermissibly extraterritorial.

*Bascunan*, 927 F.3d at 122. "[I]n order for incidental domestic wire transmissions not to haul essentially foreign allegedly fraudulent behavior into American courts, 'the use of the . . . wires must be essential, rather than merely incidental, to the scheme to defraud.'" *United States v. Napout*, 963 F.3d 163, 179 (2d Cir. 2020) (quoting *Bascunan*, 927 F.3d at 122). But the Second Circuit has explicitly rejected the argument animating Cornselsen's motion that, because he was not present in the United States during his commission of the crimes, he cannot face wire fraud charges in the United States: "We make clear today [that] while a defendant's location is relevant to whether the regulated conduct was domestic, the mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States." *Bascunan*, 927 F.3d at 123.

In this case, both defendants (co-conspirators in the wire fraud conspiracy charged in Count Four) used domestic wires in furtherance of the scheme, and that use was a core component of the scheme to defraud. For example, whenever Cornelsen purchased call options through the ISE, he used domestic wires essential to the scheme. Whenever Prado purchased call options through the NYSE Amex Equities, he used domestic wires essential to the scheme. The same is true of Prado's purchases of common stock from within the United States—and of his phone calls to Cornelsen from the United States. *See supra* at 3 n.2. What is more, as noted, Cornelsen purchased call options through an account with a brokerage firm located in New York, New York, on at least two occasions. (Indictment ¶¶ 35(e), 35(i)). Because, as Cornelsen repeatedly asserts, he was not in the United States at that time, his communication instructing his brokerage firm to purchase the options necessarily involved the use of wires to and from the Southern District of New York. And his communications to his New York broker to place his trades, and the broker's

subsequent wire communications to effectuate those trades, [6] were plainly "essential, rather than merely incidental, to the scheme to defraud." *Napout*, 963 F.3d at 179 (internal quotation marks and citation omitted).

Cornelsen's arguments regarding the wire fraud charge—that two particular cited emails and two telephone calls do not allege a domestic wire communication that was essential to the scheme, Def. Br. at 16-18—proceed from the flawed premise that alleging those particular communications somehow binds the Government. But "proof of an overt act is not a required element for a conspiracy conviction under 18 U.S.C. § 1349." *United States v. Roy*, 783 F.3d 418, 421 (2d Cir. 2015). Accordingly, the Government is not required in the Indictment to allege *any* overt acts in furtherance of the wire fraud conspiracy. And it is certainly not wedded only to the particular phone calls and emails which the Indictment alleges were made "by means of wire communications in interstate and foreign commerce," as Cornelsen suggests, *see* Def. Br. at 17. *See United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012) (where indictment charged defendant with enticement of a minor in violation of a statute applying only to certain acts conducted "using

---

[6] That Cornelsen's broker, acting upon Cornelsen's instructions (rather than Cornelsen himself) purchased Burger King options does not alter the analysis.

> The statutory language of § 1343 makes one guilty of wire fraud if he "transmits or causes to be transmitted," and we have found that one causes a wire transmission when he acts with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen. Thus, it makes no difference that [the defendant] did not himself send the wires. The jury, having heard evidence that [the defendant] knew the fraudulent invoices he approved were being paid by a New York bank, found that the causation element had been satisfied in this case, and we see no reason to disagree.

*United States v. Kim*, 246 F.3d 186, 190 (2d Cir. 2001). Cornelsen, a sophisticated and wealthy investor, knew that his brokerage account and his broker were located in New York, and that his broker would use domestic wires to place his options trades.

the mail or any facility or means of interstate or foreign commerce," Government was not required to prove defendant's use of the "Internet as a facility of interstate commerce" even though it was specified in the "to wit" clause); *see also United States v. Bastian*, 770 F.3d 212, 221 (2d Cir. 2014) ("[W]e have never suggested that a 'to wit' clause binds the government to prove the exact facts specified in a criminal indictment"); *United States v. Dupre*, 462 F.3d 131, 141 (2d Cir. 2006) (particular wire transfer identified in the Indictment did not need to be proven at trial, where "abundant evidence of domestic and international wire transfers" was introduced). Count Four alleges that the object of the conspiracy was that the defendants, in furtherance of their scheme to defraud, "would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing" their scheme and artifice. (Indictment ¶ 43). That is sufficient to plead a wire fraud conspiracy, and the domestic wires detailed above supplement the allegation, providing several examples of essential domestic wires that the defendants used in furtherance of the offense.[7]

Count Four sufficiently alleges domestic wires essential to the scheme to defraud.

## III.    The Indictment Does Not Violate Due Process

Finally, the Indictment's charges against Cornelsen do not violate due process because they lack a sufficient nexus to the United States. First, the Indictment does not seek to apply statutes to Cornelsen extraterritorially, but instead to domestic transactions. "[C]ourts faced with a

---

[7] A similar faulty premise surrounds Cornelsen's argument that the Indictment, which Cornelsen concedes in certain cases need only "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," fails to state the "place" of the crime. Def. Mem. at 7. As required, the statutory allegations in each of the four counts charged specify that the offense took place "in the Southern District of New York and elsewhere." (Indictment ¶¶ 32 (Count One), 37 (Count Two), 39 (Count Three), 41 (Count Four)).

territorial offense . . . do not need to conduct a 'nexus' inquiry." [8]  *United States v. Hayes*, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) (holding no due process violation where defendant took action entirely from abroad to falsify LIBOR submissions).  In any event, for all the reasons discussed above, there is more than a "sufficient nexus between [Cornelsen] and the United States" such that his prosecution in this case is not "arbitrary or fundamentally unfair."  *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (internal quotation marks and citation omitted). "Courts have found a sufficient nexus to exist based upon factors such as the defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States."  *United States v. Mostafa*, 965 F. Supp. 2d 451, 459 (S.D.N.Y. 2013) (internal quotation marks and citation omitted); *see Hayes*, 118 F. Supp. 3d at 628-29 ("Since Darin allegedly conspired to manipulate the LIBOR using United States wires, and since Darin was likely aware that his conduct would affect financial markets in the United States, his prosecution by United States authorities was not fundamentally unfair."; sufficient "nexus" to the United States alleged because Darin, "using United States wires, caused the publication of the manipulated interest rate information in New York, New York" and because Darin's co-conspirator "had ample connections to the United States" (internal quotation marks and citation omitted)). Cornelsen, too, used United States wires; was aware that his conduct would affect financial markets in the United States; and had in Prado a co-conspirator with even more extensive connections to the United States.  Although one context in which a sufficient nexus exists

---

[8] *United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015), which Cornelsen cites in connection with the due process analysis, *see* Def. Mem. at 19, is therefore inapposite.  In *Sidorenko*, the Court held that the Government sought to apply the charged statute extraterritorially, and that, "in the Ninth Circuit, in order to apply extraterritorially a federal criminal statute to a defendant consistent with due process, there must be a sufficient nexus between the defendant and the United States."  *Id.* at 1132.  Here, the Government charges domestic applications of the charged statutes, as discussed above.

is when "[f]or non-citizens acting entirely abroad[,] . . . the aim of th[eir] activity is to cause harm inside the United States or to U.S. citizens or interests," *Al Kassar*, 660 F.3d at 118; Def. Mem. at 19, that is not required. *See Mostafa*, 965 F. Supp. 2d at 459 ("specific intent to harm Americans is not what the law requires"); *United States v. Ali*, 718 F.3d 929, 946 (D.C. Cir. 2013) (*Al Kassar* "only tells us when such a nexus *exists*, not when it is absent.") (emphasis in original). Cornelsen's nexus to the United States amply satisfies the due process requirements. There is nothing arbitrary or fundamentally unfair about his prosecution for insider trading and related crimes in the United States, even if he committed the crimes while residing outside the United States.

## CONCLUSION

Cornelsen earned approximately $1.5 million dollars by trading on misappropriated material, non-public information surrounding a United States acquisition, of a United States corporation whose stock traded on a United States exchange. He did so using United States exchanges and United States accounts. He should face prosecution in the United States.

Cornelsen's motion to dismiss should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Elizabeth Hanft
Assistant United States Attorney
Tel.: (212) 637-2334

Dated: April 22, 2022
New York, New York