**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

WALDYR PRADO AND
IGOR CORNELSEN,

                          Defendants.

**DEFENDANT IGOR
CORNELSEN'S REPLY TO
THE GOVERNMENT'S
FURTHER OPPOSITION TO
HIS MOTION TO DISMISS
THE INDICTMENT**

No. 15 Cr. 516

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   Michael E. Gertzman
   Shane D. Avidan
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
mgertzman@paulweiss.com
savidan@paulweiss.com

*Attorneys for Defendant Igor Cornelsen*

# Table of Contents

Introduction ............................................................................................................. 1

Argument ................................................................................................................. 2

I.       Legal Standard ............................................................................................ 2

II.      The Exchange Act Charges Are Defective (Counts 1–3). .......................... 3

         A.      The Indictment Is Defective Under *Morrison*'s Two-Prong Test. ........................ 4

                 1.      The Mere Listing of Burger King Stock on the NYSE,
                         Absent a Relevant Transaction There, Does Not Satisfy
                         *Morrison*'s First Prong ................................................................ 5

                 2.      Prado's Over-the-Counter Purchases of Burger King
                         Stock Do Not Satisfy *Morrison*'s First Prong .............................. 7

                 3.      The Indictment Fails to State an Offense Under
                         *Morrison*'s Second Prong or the *Absolute Activist* Test. ........................... 8

                         (a)      The Indictment Is Defective Under the *Absolute Activist* Test. ....... 8

                         (b)      Cornelsen Lacked Fair Notice of the Government's
                                  Purported Application of the *Absolute Activist* Test. .................... 10

         B.      The Alleged Exchange Act Violation Is Predominantly Foreign. ........................ 13

III.     The Wire Fraud Conspiracy Charge Is Defective (Count 4). ........................... 15

IV.      The Indictment Fails to Allege Aim to Cause Harm
         Inside the United States, as Due Process Requires. ......................................... 16

Conclusion ............................................................................................................. 18

## Table of Authorities

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd.* v. *Ficeto*,
    677 F.3d 60 (2d Cir. 2012)..............................................................................4, 8, 10, 11

*Anderson* v. *Binance*,
    2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) .........................................................10

*Chadbourne & Parke LLP* v. *Troice*,
    571 U.S. 377 (2014)...................................................................................................6

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014).......................................................................................7

*Elliott Assocs.* v. *Porsche Automobil Holding SE*,
    759 F. Supp. 2d 469 (S.D.N.Y. 2010).......................................................................6

*Giunta* v. *Dingman*,
    893 F.3d 73 (2d Cir. 2018).......................................................................................14

*Hamling* v. *United States*,
    418 U.S. 87 (1974).....................................................................................................2

*In re Petrobras Sec. Litig.*,
    150 F. Supp. 3d 337 (S.D.N.Y. 2015)........................................................................9

*In re Petrobras Securities*,
    862 F.3d 250 (2d Cir. 2017).......................................................................7, 9, 10, 12

*Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*,
    547 U.S. 71 (2006).....................................................................................................6

*Morrison* v. *National Australia Bank Ltd.*,
    561 U.S. 247 (2010).........................................................................................1, 4, 9, 11

*Parkcentral Global Hub Ltd.* v. *Porsche Automobil Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) (per curiam).............................................................1, 12

*Plumbers' Union Loc. No. 12 Pension Fund* v. *Swiss Reinsurance Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010).....................................................................10

*SEC* v. *Compania Internacional Financiera*,
    2011 WL 3251813 (S.D.N.Y. July 29, 2011) ...........................................................6

*SEC* v. *Maillard*,
    2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014)........................................................5

*SEC* v. *Sabrdaran*,
    2015 WL 901352 (N.D. Cal. Mar. 2, 2015)......................................................6

*SEC* v. *Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011)..............................................................6

*United States* v. *Al Kassar*,
    660 F.3d 108 (2d Cir. 2011).........................................................................18

*United States* v. *Bescond*,
    24 F.4th 759 (2d Cir. 2021) ....................................................................1, 3

*United States* v. *Bodmer*,
    342 F. Supp. 2d 176 (S.D.N.Y. 2004).........................................................11

*United States* v. *Dupre*,
    462 F.3d 131 (2d Cir. 2006).........................................................................16

*United States* v. *Lanier*,
    520 U.S. 259 (1997)....................................................................................11

*United States* v. *LaSpina*,
    299 F.3d 165 (2d Cir. 2002)...........................................................................3

*United States* v. *Matthews*,
    787 F.2d 38 (2d Cir. 1986).....................................................................11, 12

*United States* v. *Napout*,
    963 F.3d 163 (2d Cir. 2020).............................................................1, 15, 16

*United States* v. *Perlaza*,
    439 F.3d 1149 (9th Cir. 2006) .....................................................................17

*United States* v. *Pirro*,
    212 F.3d 86 (2d Cir. 2000)......................................................................3, 16

*United States* v. *Reifler*,
    446 F.3d 65 (2d Cir. 2006)...........................................................................15

*United States* v. *Reitmeyer*,
    356 F.3d 1313 (10th Cir. 2004) .....................................................................3

*United States* v. *Roy*,
    783 F.3d 418 (2d Cir. 2015).........................................................................16

*United States* v. *Sattar*,
  272 F. Supp. 2d 348 (S.D.N.Y. 2003)......................................................12

*United States* v. *Vilar*,
  729 F.3d 62 (2d Cir. 2013)...................................................................13

*Upton* v. *SEC*,
  75 F.3d 92 (2d Cir. 1996).....................................................................11

**Statutes**

15 U.S.C. § 78bb......................................................................................6

15 U.S.C. § 78j...................................................................................4, 6, 7

18 U.S.C. § 1349.....................................................................................16

**Introduction**

*United States* v. *Bescond*, 24 F.4th 759 (2d Cir. 2021), recognized a "due process right" to make a pretrial "challenge to . . . extraterritoriality" that cannot be conditioned on "travel[ ] to the United States." *Id.* at 767–68. In its prior order, this Court held that the "Government's attempts to distinguish this case from *Bescond* are without merit," rejected application of the fugitive disentitlement doctrine, and ordered the government to "respond to the defendant's arguments on the merits." Dkt. No. 29 at 11, 18.

The government's supplemental response (Dkt. No. 30 ("Opp'n")) confirms that the Indictment is defective because it fails to state an offense and lacks specificity. It fails to allege that the criminal statutes at issue apply to the predominantly Brazil-based misappropriation scheme alleged. As the Court found in its prior order, the "charged conduct affected the United States—allegedly—only in a roundabout way." Dkt. No. 29 at 16.

It is undisputed that none of the relevant statutes applies extraterritorially, and that, in order to prove a domestic application, the government must satisfy—with respect to the three Exchange Act counts—both the two-prong test of *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247 (2010), and the predominantly foreign test of *Parkcentral Global Hub Ltd.* v. *Porsche Automobil Holdings SE*, 763 F.3d 198 (2d Cir. 2014) (per curiam), as well as—with respect to the wire fraud conspiracy count—the "essential" wire test of *United States* v. *Napout*, 963 F.3d 163 (2d Cir. 2020). Opp'n 7–8, 18; Dkt. No. 24 ("Mot.") at 10–18. In each case, these are "implied" elements, arising from the presumption against extraterritoriality, that the Indictment must allege in addition to tracking the statutory language. Mot. 8.

The government's arguments as to *Morrison*, *Parkcentral*, and *Napout* are foreclosed by governing law and improperly rely on facts not alleged within the Indictment's four corners.

Thus, these defects are properly addressed by pretrial motion.  The government's expansive theories also run afoul of the fundamental due process principles of fair notice and the need for a substantial "nexus" between the defendant and the United States.  Mot. 18–19.

As to Cornelsen, the Indictment should be dismissed.

## Argument

### I.    Legal Standard

The government's statement of the legal standard governing this motion (Opp'n 5–7) is incomplete in several respects.

*First*, the general rule that an indictment "need do little more than . . . track the language of the statute," Opp'n 6 (quoting *United States* v. *Dawkins*, 999 F.3d 767, 779 (2d Cir. 2021)), is subject to an exception where an "element of the offense is implicit in the statute."  Mot. 8 (quoting *United States* v. *Pirro*, 212 F.3d 86, 93 (2d Cir. 2000)).  An element is implied, and must be alleged separately, if it is not set forth in the statute "fully, directly, and expressly, without any uncertainty or ambiguity."  *Hamling* v. *United States*, 418 U.S. 87, 117 (1974).  The government does not dispute this exception or its applicability here.  The two-pronged test of *Morrison*, the *Parkcentral* predominantly foreign test, and *Napout*'s requirement of an essential wire are all implied elements.  Mot. 12–15, 17–18.

*Second*, the principles that dismissal is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights," Opp'n 6 (quoting *United States* v. *De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)), that dismissal for "lack of specificity" is disfavored absent a "showing of prejudice," *id.* (quoting *United States* v. *Stringer*, 730 F.3d 120, 124 (2d Cir. 2013)), and that an indictment includes allegations "necessarily implied," *id.* at 13 (quoting *United States* v. *Rigas*, 490 F.3d 208, 229 (2d Cir. 2007)), are all harmless error

rules applicable to post-conviction objections.  This pretrial motion is "entitled to a more exacting review."  Mot. 8 (quoting *Pirro*, 212 F.3d at 92).  At this stage, the Court should consider the "actual words . . . used in the indictment" and decline to "infer" a missing, specific allegation from a "more general term."  *Pirro*, 212 F.3d at 94–95; *cf. United States* v. *LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) ("Because St. Germain first raised the issue in a post-trial motion, we read the superseding indictment liberally.").  Moreover, this motion does implicate a fundamental right, *Bescond*, 24 F.4th at 767–68, and involves significant ongoing "prejudice" to Cornelsen, Dkt. No. 29 at 17.

      *Third*, the parties agree that the Court "should not look beyond the face of the indictment" when deciding whether the Indictment fails to state an offense or lacks specificity. Opp'n 6; *see also* Mot. 6–8 (stating standard under Fed. R. Crim. P. 12(b)(3)(B)(iii), (v)).  Thus, the government cannot show that the Indictment states an offense, or states it with specificity, by relying on purported facts or evidence beyond the face of the Indictment.  *See United States* v. *Reitmeyer*, 356 F.3d 1313, 1319 n.5 (10th Cir. 2004) (affirming dismissal of indictment and rejecting government's reliance on affidavits because "[a]n indictment should be tested solely on the basis of the allegations made on its face").

## II.    The Exchange Act Charges Are Defective (Counts 1–3).

      The parties agree that the relevant Exchange Act provisions do not apply extraterritorially, Mot. 10–11; Opp'n 7; that the government must satisfy both *Morrison*'s two-prong test and *Parkcentral*'s predominantly foreign test, Mot. 12–15; Opp'n 7–8; and that the same extraterritoriality analysis for section 10(b) will also govern the Exchange Act conspiracy and section 14(e) counts, Mot. 15–16; Opp'n 7 n.3, 17 n.5.

The Exchange Act charges are defective and should be dismissed because the government's arguments that it can satisfy the *Morrison* and *Parkcentral* tests are contrary to law and rely upon purported facts not alleged in the Indictment.

### A.     The Indictment Is Defective Under *Morrison*'s Two-Prong Test.

To try to rescue the Indictment under *Morrison*, the government offers three roundabout theories: two theories under *Morrison*'s first prong, and one theory under *Morrison*'s second prong.  Opp'n 9–14.  None of these theories saves the Indictment from dismissal.

As explained in the motion, *Morrison* parsed the text of section 10(b) into two prongs, which refer to fraud "in connection with the purchase or sale of [1] any security registered on a national securities exchange or [2] any security not so registered."  15 U.S.C. § 78j(b); Mot. 12. *Morrison* created a per se rule for the first prong: section 10(b) applies to all transactions "on a national securities exchange" in a "registered" security, regardless of whether the particular transaction is foreign or domestic.  *Morrison*, 561 U.S. at 266.  But, in light of the presumption against extraterritoriality, *Morrison* narrowed the second prong to reach only securities transactions that are "domestic."  *Id.* at 268 & n.10.  In *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60 (2d Cir. 2012), the Second Circuit construed *Morrison*'s second prong as requiring either that "irrevocable liability" is incurred in the United States or that title is transferred in the United States.  *Id.* at 68; Mot. 13.

As to the first prong, both of the government's theories elide part of *Morrison*'s straightforward test.  The first lacks a transaction that is connected to the fraud, and the second lacks a transaction on a national securities exchange.

As to the second prong, the Indictment is silent on the ultimate issues of irrevocable liability and transfer of title, and on the various underlying facts that are relevant to those issues.

The government's attempt in its brief to cobble together facts that purportedly "imply" these conclusions is contrary to law and to the principle of fair notice.

> **1.     The Mere Listing of Burger King Stock on the NYSE, Absent a Relevant Transaction There, Does Not Satisfy *Morrison*'s First Prong.**

The government leads with the theory that *Morrison*'s first prong is satisfied because Burger King options were "referenced to" Burger King stock, which was listed on the New York Stock Exchange ("NYSE").  Opp'n 9–11.  As a result, Prado and Cornelsen's options purchases purportedly "occurred 'in connection with'" unspecified transactions in Burger King stock.  *Id.* This theory is defective because it purports to connect *one transaction to another transaction*,[1] while section 10(b) requires a connection between *the fraud and a transaction*.  The Indictment's sole reference to the NYSE is the bare fact that Burger King stock was listed there.  Indictment ¶ 1.  There is no allegation of any transaction in Burger King stock on the NYSE, much less one that was "in connection with" the alleged fraud.

In support of this argument, the government cites several civil cases that all involved a fact pattern similar to each other that is not present here.  Each of these cases found the "in connection with" element satisfied where defendant's purchase of a financial instrument directly caused defendant's counterparty to make a corresponding purchase.[2]  *Maillard* and *Compania Internacional Financieria* both involved contracts for difference (CFDs), which "trigger[ ] corresponding purchases" on a U.S. exchange, *Maillard*, 2014 WL 1660024, at *2, in "identical

---

[1]     *See* Opp'n 9 ("Cornelsen's purchases occurred 'in connection with a transaction in securities registered on a domestic exchange.'"); *id.* at 10 ("Cornelsen's (and Prado's) trading options in Burger King securities undoubtedly occurred 'in connection with' transactions in Burger King securities . . . .").

[2]     Opp'n 10 (citing *SEC* v. *Maillard*, 2014 WL 1660024, at *3 (S.D.N.Y. Apr. 23, 2014); *SEC* v. *Compania Internacional Financiera,* 2011 WL 3251813, at *4, 6 (S.D.N.Y. July 29, 2011); *SEC* v. *Sabrdaran*, 2015 WL 901352, at *11 (N.D. Cal. Mar. 2, 2015); *SEC* v. *Wyly*, 788 F. Supp. 2d 92, 120 (S.D.N.Y. 2011); *Elliott Assocs.* v. *Porsche Automobil Holding SE*, 759 F. Supp. 2d 469, 475-76 (S.D.N.Y. 2010)).

matched transactions," *Compania Internacional Financieria,* 2011 WL 3251813, at *3. *Sabrdaran* involved spread bets, which were "hedged by the broker's purchase of underlying securities on domestic exchanges." 2015 WL 901352, at *11. And *Wyly* and *Elliott Associates* both involved swap agreements that "explicitly required the purchase of stock" by the counterparty. *Wyly*, 788 F. Supp. 2d at 120; *Elliott Assocs.*, 759 F. Supp. 2d at 476.[3]

Nothing like that is alleged here. The Indictment does not allege any transaction, by anyone, in Burger King stock on the NYSE. The mere listing of Burger King stock on the NYSE is not enough. Section 10(b) requires a "connection" between the fraud and a transaction, and its first prong requires a connection between the fraud and a transaction on a "national securities exchange" in a "registered" security. 15 U.S.C. § 78j.

Moreover, subsequent to most of the cases cited by the government, the Supreme Court clarified the meaning of "in connection with." "A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Chadbourne & Parke LLP* v. *Troice*, 571 U.S. 377, 387 (2014).[4] Here, the alleged deception was Prado's non-disclosure to Client-1 of his misappropriation. Mot. 3–4, 14–15. The Indictment does not allege that was material to anyone's decision to trade Burger King stock on the NYSE (or anything else).

---

[3] Tellingly, in *Parkcentral*, the Second Circuit affirmed the dismissal in *Elliott Associates* on the ground that the alleged violation was predominantly foreign. *See infra* Part I.B.

[4] *Troice* applied a provision of the Securities Litigation Uniform Standards Act (SLUSA) that prohibits a covered class action "based upon the statutory or common law of any State" alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). *Troice* held that SLUSA's "in connection with" clause should be read "in light of and consistent with the underlying regulatory statutes," including section 10(b). 571 U.S. at 387-89; *see also Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U.S. 71, 85-86 (2006) (Congress "imported the key phrase—'in connection with the purchase or sale'" from 10(b) into SLUSA, so the phrase has the same meaning in both).

For these reasons, the government cannot rely on the mere listing of Burger King stock on the NYSE to satisfy *Morrison*'s first prong.

### 2.   Prado's Over-the-Counter Purchases of Burger King Stock Do Not Satisfy *Morrison*'s First Prong.

The government next argues that *Morrison*'s first prong is satisfied by Prado's purchases of Burger King stock in the over-the-counter market.  Opp'n 11–12; *see* Indictment ¶¶ 17, 26, 29, 35(g), (k), (n).  The government does *not* argue that the over-the-counter market is a "national securities exchange" (15 U.S.C. § 78j).  *See* Mot. 12–13 (citing cases that hold it is not).  Rather, according to the government, *Morrison*'s first prong applies to any "purchase of a security *listed* on a domestic exchange," even if that purchase actually occurs "on the over-the-counter market."  Opp'n 11–12 (emphasis added).  In other words, because Burger King stock was listed on the NYSE, any purchase of Burger King stock, anywhere, would be swept up by *Morrison*'s per se rule.  The government cites no precedent for that expansive position.

As with the government's first theory, this theory is also defective as a matter of law.  Section 10(b)'s first prong requires *both* that the security be "registered" *and* that the transaction occur "on a national securities exchange."  15 U.S.C. § 78j.  *Morrison*'s per se rule requires both predicate elements.  The government's listing theory improperly elides the latter requirement.

In *City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014), the Second Circuit rejected the "listing theory" that would extend *Morrison*'s first prong to transactions in registered shares not occurring on a domestic exchange "simply because those shares are also listed on a domestic exchange."  *Id.* at 176, 181–82.  *In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017), cited *City of Pontiac* as "holding that mere *listing* on a domestic exchange is not sufficient to establish domesticity if the relevant securities transaction

7

did not *occur* on a domestic exchange." *Id.* at 262 (emphasis in original). For that reason, in

*Petrobras*, the Second Circuit "assume[d] that a purchase of Petrobras ADS qualifies under

*Morrison*'s first prong *as long as the transaction occurs on the NYSE, a 'domestic exchange*.'"

*Id.* (emphasis added); *see also id.* at 262 n.13 (quoting district court's holding that "[m]ere

listing, without trading, is insufficient to satisfy *Morrison*'s first prong").

Thus, the Indictment does not satisfy *Morrison*'s first prong and does not fall within

*Morrison*'s per se rule.

### 3. The Indictment Fails to State an Offense Under *Morrison*'s Second Prong or the *Absolute Activist* Test.

The government's third-choice argument is that the Indictment satisfies *Morrison*'s

second prong via the domestic transaction test of *Absolute Activist*. Opp'n 12–14. That test

requires that "irrevocable liability" was incurred or that "title was transferred" in the United

States. *Absolute Activist*, 677 F.3d at 67; Mot. 13. The Indictment does not contain those

phrases and does not allege either fact. Instead, the government says they were "implied."

Opp'n 13. That is not the proper standard, *supra*, pp. 2–3, and those facts were not implied.

Further, the government's novel argument deprives Cornelsen of fair notice.

#### (a) The Indictment Is Defective Under the *Absolute Activist* Test.

The government asserts, without explanation, that the incurrence of irrevocable liability

and the transfer of title in the United States were both "implied" by the allegations that Prado and

Cornelsen purchased options via the ISE and NYSE Amex Equities exchanges. Opp'n 12–13.

The government says these allegations are equivalent to an allegation that "options contracts

were matched, cleared, and settled in the United States." *Id.* at 12. They are not equivalent. The

Indictment alleges that options were "purchased . . . through" or "purchased . . . on" the ISE and

NYSE Amex Equities exchanges.  Indictment ¶ 35(b), (c), (e), (i), (l), (m).  That does not establish where irrevocable liability was incurred or where title was transferred.

Even if the Indictment alleged what the government's brief claims it says, the government cites no authority holding that matching, clearing, or settlement through a U.S. exchange is sufficient to establish a domestic transaction under *Morrison*'s second prong or the *Absolute Activist* test.  Indeed, the Second Circuit has already held that the use of the services of the Depository Trust Company (DTC) is insufficient.[5]

In order to find *Absolute Activist*'s requisites implied, the Court would need to create a new per se rule: that any transaction in an unregistered, exchange-traded security is always covered by *Morrison*'s second prong.  The government cites no authority for that novel theory, and it is not supported by section 10(b)'s text or structure.  If all transactions on U.S. exchanges were domestic transactions covered by *Morrison*'s second prong, then *Morrison*'s second prong would become wholly inclusive of its first prong, and its first prong would become superfluous.  *See Morrison*, 561 U.S. at 268 & n.10 (rejecting interpretation that "makes nonsense of the phrase" by giving it a meaning that "if intended, would surely have been expressed by the simpler phrase 'all purchases and sales of securities'").  The fundamental premise of *Morrison*'s first prong is that *not all* transactions on U.S. exchanges are domestic transactions—hence the need for the first prong's per se rule.

---

[5]     *Petrobras*, 862 F.3d at 272 n.24 ("As did the district court, we reject Plaintiff's argument that a securities transaction is 'domestic' under *Morrison* and *Absolute Activist* if it settles through the DTC."); *see In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 342 (S.D.N.Y. 2015) ("The mechanics of DTC settlement are actions needed to carry out transactions, but they involve neither the substantive indicia of a contractual commitment necessary to satisfy *Absolute Activist*'s first prong nor the formal weight of a transfer of title necessary for its second. . . . [T]he entire thrust of *Morrison* and its progeny would be rendered nugatory if all DTC-settled transactions necessarily fell under the reach of the federal securities laws.").

The other peripheral allegations cited by the government add nothing.  The allegations of the dates of the trades and "the number of call options, their strike price and expiration date" (Opp'n 13–14) go to what was traded and when, not to where irrevocable liability was incurred or title was transferred.  Nor are Cornelsen's use of a U.S. brokerage for some of his trades (Opp'n 9 (citing Indictment ¶ 35(e), (i)) or Prado's purported physical presence in Florida (Opp'n 3 & n.2, 13) significant.  Under established law, neither fact is sufficient to establish a domestic transaction.[6]  The government cites no case to the contrary.  Moreover, Prado's physical presence—the only fact cited by the government that is related to his over-the-counter trades—is not alleged in the Indictment and cannot be considered.  *Supra*, p. 3.  Nor does the government's statutory allegation that the offense occurred in this District "and elsewhere" (Indictment ¶¶ 32, 37, 39) speak to this issue.

Because the Indictment fails to satisfy either of *Morrison*'s two prongs, all three Exchange Act counts should be dismissed.

### (b)   Cornelsen Lacked Fair Notice of the Government's Purported Application of the *Absolute Activist* Test.

The government's purported application of the *Absolute Activist* test is also impermissible because due process and the rule of lenity require "fair notice" to a "person of ordinary intelligence" that "his contemplated conduct is forbidden."  *United States* v. *Matthews*, 787 F.2d 38, 49 (2d Cir. 1986); *see also Upton* v. *SEC*, 75 F.3d 92, 98 (2d Cir. 1996).  The need

---

[6]   *Petrobras*, 862 F.3d at 262 ("The location or residency of the buyer, seller, or broker will not necessarily establish the situs of the transaction."); *Absolute Activist*, 677 F.3d at 62, 71 (allegation that transactions were "brokered through a U.S. broker-dealer" were insufficient); *Anderson* v. *Binance*, 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022) (plaintiffs' transactions on Binance "cannot qualify as domestic" under *Absolute Activist* despite allegation that they "bought tokens while located in the U.S."); *Plumbers' Union Loc. No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010) (Koeltl, J.) (finding insufficient allegations that plaintiff was "a U.S. resident," "made the decision to invest in the U.S.," "suffered harm in the U.S.," and "placed" "orders" in the U.S.).

for fair notice extends not only to the issue of what conduct is prohibited, but also to the territorial reach of the prohibition.  Mot. 10 n.4 (citing *United States* v. *Bodmer*, 342 F. Supp. 2d 176, 189 (S.D.N.Y. 2004), and other cases).  The issue is appropriately decided by pretrial motion.  *Id.* at 9 (citing *United States* v. *Sattar*, 272 F. Supp. 2d 348, 358–60 (S.D.N.Y. 2003) (Koeltl, J.)); *Bodmer*, 342 F. Supp. 2d 176.

In light of the vagueness of the relevant doctrine in this area, it remains questionable, even today, whether *Absolute Activist* and its progeny provide fair notice for the government's theory in this case.  But Cornelsen certainly lacked fair notice of the government's theory 12 years ago, during the alleged conspiracy period of May through September 2010.  *See United States* v. *Lanier*, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope").

For years, many courts have observed that *Morrison*'s second prong is unclear.  In *Morrison* itself, Justice Stevens warned that the question of what "domestic contacts are sufficient to trigger application of § 10(b) . . . does not admit of an easy answer."  561 U.S. at 281 (Stevens, J., concurring).  In *Absolute Activist*, the Second Circuit noted that *Morrison* provided "little guidance as to what constitutes a domestic purchase or sale."  677 F.3d at 67. *Absolute Activist*'s "irrevocable liability" test defines the point in time at which geographic facts should be assessed, *id.* at 68, but *Absolute Activist* does not establish any framework to weigh competing facts that point to different places.

In *Parkcentral*, the Second Circuit again acknowledged that there is no "'bright-line' test," and indeed, no "test that will reliably determine when a particular invocation of § 10(b) will be deemed appropriately domestic or impermissibly extraterritorial."  763 F.3d at 217.

11

*Parkcentral* predicted that "eventually," a "series of judicial opinions may collectively result in one or more such standards" that might identify certain "combinations of facts" sufficient to satisfy the *Absolute Activist* test.  *Id.*  And in *Petrobras*, the Second Circuit found the problem of applying *Absolute Activist* to absent class members sufficiently complex to preclude the predominance required for class certification.  862 F.3d 250.  Those are not acceptable characteristics of a legal doctrine that may be the basis for criminal liability.

Even if there were some "core" of criminal cases in which *Absolute Activist* could fairly be applied, Cornelsen had no fair notice of the government's purported application of *Absolute Activist* to the facts of this particular case.  *See Sattar*, 272 F. Supp. 2d at 358–60 (dismissing counts based on as-applied vagueness challenge, even though material support statute may provide adequate notice in "hard core" cases).  The government cites no case that has held that any of the facts it cites are sufficient for liability under *Absolute Activist*.  Indeed, there is significant contrary authority.  *Supra*, pp. 8–10.  And this entire doctrine was developed years after the primary conduct.  This sort of ad hoc, case-by-case development of the *Absolute Activist* test may be fair game in civil cases, but not in a criminal case.  *See Matthews*, 787 F.2d at 47 (in criminal cases, liability under SEC Rule 14a-9 must be limited to those disclosures expressly required by Schedule 14A, even though, in civil cases, Schedule 14A "sets only minimum disclosure standards" and other disclosures are sometimes required).[7]

---

[7]     Tellingly, the government cites only one criminal case that applied the *Absolute Activist* test: *United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013).  Opp'n 7, 14.  *Vilar* arose from a trial that occurred before *Morrison*, with no extraterritoriality objection having been made in the district court.  Thus, the Second Circuit reviewed the issue for plain error only.  729 F.3d at 79.  Even on appeal, a fair notice objection was not advanced.

### B. The Alleged Exchange Act Violation Is Predominantly Foreign.

Even if the Indictment satisfied either of *Morrison*'s two prongs, which it does not, the government admits that it must also satisfy *Parkcentral*'s "predominantly foreign" test. Mot. 13; Opp'n 8. That too is an implied element that must be alleged in addition to the statutory text. *See* Mot. 8. The parties' nationalities and the location of the alleged fraudulent conduct are relevant—and, indeed, central—to *Parkcentral*'s predominantly foreign test. Mot. 14; *see* Opp'n 5, 14 (criticizing the motion's references to these facts).

As shown in the motion, the alleged violation is predominantly foreign because the alleged victim (Client-1), misappropriating fiduciary (Prado), and tippee (Cornelsen) are all Brazilian nationals who were physically outside the United States at the most important times. Mot. 13–15. That conclusion is underscored by the fact that this case falls entirely outside the "classical theory" of insider trading, and instead relies upon the "misappropriation theory"— a distinction that the government's supplemental brief never addresses. *Id.* at 14–15. As the Court's prior opinion observed, the "charged conduct affected the United States—allegedly— only in a roundabout way." Dkt. No. 29 at 16.

In urging that the violation is not predominantly foreign, the government relies on peripheral facts that do not tip the balance. Opp'n 15–16. In addition to the allegations about the U.S. options exchanges and the U.S. brokerage firm (discussed *supra*, pp. 9–10), the government adds that: Burger King was incorporated in Delaware and listed on the NYSE; the tender offeror, 3G, was headquartered in New York; and that Prado was "living in the United States." *Id.* at 15. The last of these facts was not alleged in the Indictment.

These facts are not significant in light of the misappropriation theory advanced in the Indictment. The location of the exchanges and of Burger King might be relevant in a "classical"

insider trading case.  In such a case, information would be misappropriated from Burger King, by fiduciaries of Burger King and its shareholders, and defendants would owe a duty of disclosure to their trading counterparties on the exchanges.  Mot. 14–15.  Here, Prado owed a fiduciary duty to Client-1 and allegedly misappropriated information from Client-1—not Burger King.  *Id.*  And Prado allegedly owed a duty of disclosure to Client-1—not contemporaneous traders.  *Id.*  Likewise, the location of 3G might be relevant if Prado owed it a fiduciary duty, and had misappropriated the information from it, rather from Client-1 as alleged.  Mot. 3–4.

Similarly, Prado's purported presence in the United States at certain times—in addition to not being alleged in the Indictment—would not tip the balance.  Prado is not alleged to have been in the United States (but rather was in Brazil to meet Client-1) at the critical times, including the times of the two tips alleged; and Cornelsen and Client-1 are never alleged to have set foot in the United States during the alleged conspiracy period.  Mot. 4–5, 18.

*Giunta* v. *Dingman*, 893 F.3d 73 (2d Cir. 2018) (Opp'n 12–13, 15–16), is the inverse of this case.  There, plaintiff and defendant were both U.S. citizens, and all of the fraudulent conduct—including in-person meetings to solicit the investment—occurred in New York.  893 F.3d at 76–77 & n.2, 82.  "The only foreign component present in the formation of the Agreement was the eventual registration of the shares" in the Bahamas.  *Id.* at 82–83.  Just as the Bahamian location of the business (a restaurant) was insignificant in *Giunta*, *id.* at 82, the fact that Burger King and its restaurants are located in the United States is insignificant in this case.

At a minimum, the application of *Parkcentral*'s predominantly foreign test raises additional issues of fair notice.  *See supra*, pp. 11–12.

14

### III.     The Wire Fraud Conspiracy Charge Is Defective (Count 4).

The final count of wire fraud conspiracy is also defective for a similar reason: the Indictment fails to allege the implied element of an "essential" domestic wire communication. Mot. 16–18 (citing *United States* v. *Napout*, 963 F.3d 163, 179 (2d Cir. 2020)).  The Indictment alleges only three specific wires, and fails to allege that any was interstate (or foreign-to-domestic) or essential.  *Id.*  The government admits that it must prove an "essential" wire.  Opp'n 18.[8]  An essential wire is not an element in every wire fraud conspiracy case, but rather an additional, implied element required when the "fraudulent behavior" is "essentially foreign." Mot. 17–18 (quoting *Napout*, 963 F.3d at 179).

The government purports to satisfy this implied element with facts not alleged in the Indictment: Prado's location on three days (Opp'n 3) and purported additional wire communications made to effectuate the trades (Opp'n 18–19).  These extrinsic facts cannot be considered.  *See supra*, p. 3.  Nor do they establish an "essential" wire, Mot. 18 & n.9, which is a more demanding standard than the ordinary furtherance standard.  *See United States* v. *Reifler*, 446 F.3d 65, 95 (2d Cir. 2006) (to prove furtherance element, a wire need not be "essential," only "incident to an essential part of the scheme, . . . or a step in the plot").  The core conduct of alleged misappropriation did not involve U.S. wires.  Prado met with Client-1 in person in

---

[8]     *Napout* held that the wire fraud statute's "focus" is "not merely a 'scheme to defraud,' but more precisely the use of the . . . wires in furtherance of a scheme to defraud."  963 F.3d at 179 (quoting *Bascuñán* v. *Elsaca*, 927 F.3d 108 (2d Cir. 2019)).  In other words, the focus is both the scheme and the wires.  The government's argument, based on out-of-circuit cases, that the focus is only the wires, is foreclosed by *Napout*.  *See* Opp'n 17 (citing *United States* v. *Garlick*, 240 F.3d 789, 792 (9th Cir. 2001); *United States* v. *Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012); *United States* v. *Driver*, 692 F. App'x 448, 449 (9th Cir. 2017)).  In any event, this dispute is academic because the government admits that it must prove an essential wire.

Brazil, and Prado's two alleged tips to Cornelsen were allegedly communicated through foreign-to-foreign wires (Brazil to Brazil, and Brazil to Europe).  Mot. 4–5, 18.[9]

The government next attempts to excuse itself from pleading an essential wire, for two reasons.  Opp'n 19–20.  Both are wrong.  First, the government cites *United States* v. *Roy*, 783 F.3d 418 (2d Cir. 2015), which holds that 18 U.S.C. § 1349 does not require proof of an overt act.  Opp'n 19.  But *Napout*, which postdates *Roy*, involved charges under the same statute, and clarifies that proof of an essential wire is required when the fraudulent behavior is essentially foreign.  *Roy* merely underscores the point that *Napout* creates an additional, implied element.

Next, the government cites *United States* v. *Dupre*, 462 F.3d 131, 141 (2d Cir. 2006), which affirmed a conviction even though the wires proved at trial were different from the wire alleged in the indictment.  Opp'n 20.  The government also cites two other variance cases to like effect.  *Id.* at 19–20.  That the government might be permitted (absent prejudice) a variance from a sufficient indictment does not excuse the separate and distinct requirement of a sufficient indictment.  Moreover, *Dupre* involved the harmless error review applicable to a post-conviction objection, not the "more exacting" review required here.  *Pirro*, 212 F.3d at 92.

## IV.     The Indictment Fails to Allege Aim to Cause Harm Inside the United States, as Due Process Requires.

Because Cornelsen was a "non-citizen[ ] acting entirely abroad," the Indictment was required to allege his "aim . . . to cause harm inside the United States or to U.S. citizens or interests."  Mot. 18–19 (quoting *United States* v. *Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011);

---

[9]     In *Napout*, an honest services wire fraud case involving bribery, "U.S. wires provided a—or the—key means of paying the[ ] bribes."  963 F.3d at 181.

*United States* v. *Sidorenko*, 102 F. Supp. 3d 1124, 1127–32 (N.D. Cal. 2015)).  The Government does not argue that the Indictment alleges this.  Instead, troublingly, it denies the requirement.

    *First*, the government argues that there is no "need to conduct a 'nexus inquiry'" when the criminal statute at issue has no extraterritorial effect.  Opp'n 20–21 (citing *United States* v. *Hayes*, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015)).  Like *Bescond*, *Hayes* involves wire fraud and Commodity Exchange Act charges arising from the LIBOR scandal.  *Hayes* is not binding on this Court, and is dubious authority in light of *Bescond*.  *Hayes* is contrary to *Bescond* both because it applied the fugitive disentitlement and because it found that no due process right was implicated.

    The need for a "nexus" arises from the defendant's status as a foreign national acting abroad. The same due process and comity interests are implicated regardless of whether, under U.S. principles of statutory interpretation, the crime involves an extraterritorial application of a statute or a domestic application of a statute with no extraterritorial application.  The nexus doctrine "serves the same purpose as the 'minimum contacts' test in personal jurisdiction," and is a "preliminary determination totally distinct from the crime itself and must be considered before any United States court" applies U.S. law to the defendant.  *United States* v. *Perlaza*, 439 F.3d 1149, 1168 (9th Cir. 2006) (quoting *United States* v. *Moreno-Morillo*, 334 F.3d 819, 830 n.8 (9th Cir. 2003)).  To allow U.S. statutory law to pretermit that nexus inquiry improperly inverts the order of analysis.

    Finally, the government asserts that aim to harm is sufficient, but not necessary, for a nexus. Opp'n 21–22 (citing *United States* v. *Ali*, 718 F.3d 929, 946 (D.C. Cir. 2013); *United States* v. *Mostafa*, 965 F. Supp. 2d 451, 459 (S.D.N.Y. 2013)).  Again, the cases cited by the government are not binding on this Court.  In *Al Kassar*, the Second Circuit stated clearly that, "[f]or non-citizens acting entirely abroad, a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests."  660 F.3d at 118.  That reads

naturally as a complete statement of a rule.  *Al Kassar* gives no indication that any other showing would be an acceptable substitute for an aim to harm.  *Sidorenko*, which granted a motion to dismiss for lack of an allegation of aim to harm, necessarily found that aim to harm was required.

In particular, the circumstances that the government's brief cites here—that Cornelsen "used United States wires; was aware that his conduct would affect financial markets in the United States; and had in Prado a co-conspirator with even more extensive connections to the United States" (Opp'n 21)—are no substitute for the requisite allegation of aim to harm.  These purported effects on the United States are "roundabout" and do not go to the central act of misappropriation by Prado from Client-1.  Dkt. No. 29 at 16.

### Conclusion

For the reasons set forth above, we respectfully submit that, as to Cornelsen, the Indictment should be dismissed.

Dated:   New York, New York
            May 6, 2022

> PAUL, WEISS, RIFKIND,
>    WHARTON & GARRISON LLP
>
> By:  /s/ *Michael E. Gertzman*
>       Michael E. Gertzman
>       Shane D. Avidan
> 1285 Avenue of the Americas
> New York, New York 10019-6064
> (212) 373-3000
> mgertzman@paulweiss.com
> savidan@paulweiss.com
>
> *Attorneys for Defendant Igor Cornelsen*