UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

         - against -

IGOR CORNELSON,

                 **Defendant.**

15 Cr. 516 (JGK)

MEMORANDUM OPINION AND
ORDER

---

**JOHN G. KOELTL, District Judge:**

On August 5, 2015, Igor Cornelsen and Waldyr Prado were charged in an Indictment with (1) conspiracy to commit securities fraud and fraud in connection with a tender offer in violation of 18 U.S.C. § 371; (2) securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. §§ 240.10b-5 & 240.10b5-2, and 18 U.S.C. § 2; (3) fraud in connection with a tender offer in violation of 15 U.S.C. §§ 78n(e) & 78ff, 17 C.F.R. §§ 240.14e-3(a) & 240.14e-3(d), and 18 U.S.C. § 2 (together with counts (1)-(2), the "Securities Fraud Counts"); and (4) conspiracy in violation of 18 U.S.C. § 1349 to commit wire fraud in violation of 18 U.S.C. § 1343 (the "Wire Fraud Count").[1] See ECF No. 6. Each of the Counts in the Indictment charged that the crimes occurred from at least in or about May 2010 through in or about September 2010.

---

[1] The Indictment referred to Cornelsen as Cornelson in the caption, and the Court's prior opinion used that spelling. However, because the parties now appear consistently to refer to the defendant as Cornelsen, the Court adopts that spelling.

On October 7, 2021, Cornelsen moved to dismiss the
Indictment pursuant to Federal Rule of Criminal Procedure 12.
ECF No. 11. The Government initially opposed the motion solely
on the grounds that the Court should decline to consider the
merits of Cornelsen's motion under the fugitive disentitlement
doctrine. ECF No. 21. However, on March 31, 2022, the Court
rejected the Government's argument, finding that Cornelsen is
not a fugitive, and that disentitlement was in any event
unwarranted. United States v. Cornelson (Cornelson I), 2022 WL
970075 (S.D.N.Y. Mar. 31, 2022). The Court directed the
Government to respond to the merits of Cornelsen's motion to
dismiss. Id. On June 17, 2022, after the motion was fully
briefed, the Court heard oral argument on the motion.

For the reasons that follow, Cornelsen's motion to dismiss
the Indictment is **denied.**

## I.

The following facts are taken from the Indictment and are
accepted as true for the purposes of this motion to dismiss. See
United States v. Velastegui, 199 F.3d 590, 592 n.2 (2d Cir.
1999).[2]

---

[2] Unless otherwise noted, this Memorandum Opinion & Order omits all
alterations, citations, footnotes, and internal quotation marks in quoted
text. Additionally, consistent with the Indictment, all dates listed in this
Memorandum Opinion & Order are approximate.

Cornelsen is a Brazilian citizen and an experienced investor with a professional background in the Brazilian banking industry. Indictment ¶ 5, ECF No. 6. At all relevant times, Prado, a registered representative at a brokerage firm ("Firm-1"), was Cornelsen's investment broker. Id. ¶¶ 3, 5. Client-1, who resided in Brazil, was also Prado's client. Id. ¶¶ 4, 14.

Sometime in 2008, Client-1 made a capital commitment of $50 million to the 3G Capital Special Situations Fund II, L.P. (the "3G Fund"), on the understanding that the 3G Fund would at some point thereafter acquire a company. Id. ¶ 11. At all relevant times, the 3G Fund was managed by 3G Capital Partners ("3G"), a Cayman Islands private equity firm with offices in New York, New York. Id. ¶ 2.

From March 29, 2010, to August 31, 2010, 3G engaged in negotiations to acquire Burger King Holdings Inc., a Delaware corporation headquartered in Miami, Florida (together with its subsidiary, Burger King Corporation, "Burger King"). Id. ¶¶ 1, 8. Burger King's stock is listed on the New York Stock Exchange (the "NYSE"), which is located in New York, New York, and its options are traded on various exchanges, including the NYSE Amex Equities and the International Securities Exchange (the "ISE"), both of which are located in New York, New York. Id. ¶ 1.

In March or April 2010, while the negotiations between 3G and Burger King were ongoing, a 3G principal informed Client-1

that 3G was engaged in negotiations to have the 3G Fund acquire Burger King. See id. ¶ 12. Client-1 signed a confidentiality agreement with 3G relating to this information, which permitted Client-1 to share information concerning the potential transaction with his financial advisors "who have a need to receive, review or use" the information in connection with Client-1's investments. Id. In April or May 2010, as he was permitted to do pursuant to this agreement, Client-1 divulged the news of the potential 3G-Burger King transaction to Prado. See id. ¶ 13. Based on his professional relationship with Prado, Client-1 believed and expected that Prado would keep this information confidential. Id. Prado had also attested in writing to Firm-1 that he was in compliance with Firm-1's confidentiality and proprietary information policies, which prohibited any employee from using, trading on, or disclosing to a third party any material nonpublic information obtained from a Firm-1 client. Id. ¶ 15.

On May 17, 2010, Prado met Client-1 for lunch. Id. ¶ 16. Within hours of the meeting, and in breach of his duties and responsibilities to Firm-1 and Client-1, Prado purchased 300 July 2010 call options for Burger King at a strike price of $20 for $33,185. Id. Prado purchased 200 of these options through the NYSE Amex Equities. Id.

Later that evening, Prado sent Cornelsen an email in which Prado stated, "[I]f you are around call me at the Curitiba hotel [in Curitiba, Brazil] . . . I have some info that I cannot say over the phone . . . You have to hear this." Id. ¶ 19 (ellipses in original). Within minutes, Cornelsen called Prado, and the two spoke for approximately ten minutes. Id. Over the next few days, on May 18 and 19, 2010, Cornelsen purchased 2,850 July 2010 call options for Burger King through various exchanges, including the ISE located in New York, New York. Id. ¶¶ 20, 35(c).

On June 2, 2010, Prado called Cornelsen by means of wire communication in interstate and foreign commerce, which call lasted approximately nine minutes. Id. ¶ 35(d). On that same day, Cornelsen purchased 1,000 July 2010 call options for Burger King through an account with a brokerage firm located in New York, New York. Id. ¶ 35(e). On June 3, 2010, Prado made another telephone call to Cornelsen by means of wire communication in interstate and foreign commerce, which lasted approximately 14 minutes. Id. ¶ 35(f). On the same day, Prado also purchased 7,000 shares of Burger King stock for approximately $135,410 through the over-the-counter market. Id. ¶ 17.

By July 17, 2010, the call options purchased by Prado and Cornelsen had expired as worthless because Burger King did not trade at or above $20 by that time. See id. ¶ 21.

On August 18, 2010, Cornelsen emailed Prado by means of wire communication in interstate and foreign commerce asking whether "the sandwich deal [was] going to happen." Id. ¶ 23; see id. ¶ 35(h). Prado replied, "[I]t's going to happen." Id. ¶ 23. On the same day, Cornelsen emailed Prado again asking whether the "sandwich deal" was happening, to which Prado replied that the deal was a "sure thing." Id. The next day, Cornelsen purchased 1,400 October 2010 call options for Burger King with a strike price of $17.50 for $98,735 on the ISE in New York, New York, through an account with a brokerage firm in New York, New York, and 206 October 2010 call options for Burger King with a strike price of $19 for $7,467.50 through another brokerage firm. Id. ¶ 24; see id. ¶ 35(i)-(j).

Between August 23 and 26, 2010, Cornelsen and Prado communicated by telephone several times. Id. ¶ 25. On August 25, 2010, Prado purchased 13,000 shares of Burger King common stock for approximately $227,000 through the over-the-counter market, and 100 January 2011 call options for Burger King with a strike price of $20 for $9,560 through the NYSE Amex Equities. Id. ¶¶ 26, 35(k)-(l).

On August 26 and 27, 2010, Cornelsen purchased 1,794 additional October 2010 call options for Burger King with a strike price of $19 for approximately $91,400. Id. ¶¶ 27, 35(m).

Of these latter call options, Cornelsen purchased 281 through the ISE. Id.

On August 31, 2010, 3G proposed to complete the acquisition of Burger King through a tender offer to Burger King shareholders at a price of $24 per share. Id. ¶ 9. The next day, Prado purchased 9,000 additional shares of Burger King common stock for approximately $165,263 through the over-the-counter market. Id. ¶ 29.

On September 2, 2010, 3G and Burger King publicly announced their transaction in a press release. Id. ¶ 10. The same day, Cornelsen sent Prado an email by means of wire communication in interstate and foreign commerce. Id. ¶ 35(o). Also on the same day, following the public announcement of the 3G-Burger King transaction, Cornelsen sold his Burger King options for a total profit of over $1.68 million, and a net profit of approximately $1.4 million after discounting his losses from the expired July 2010 options. Id. ¶ 30. Prado, too, sold his Burger King stock and options positions for a total profit of at least approximately $175,000. Id.

## II.

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment is sufficient if it contains the

elements of the offense charged and fairly informs a defendant
of the charges against him. See United States v. Alfonso, 143
F.3d 772, 776 (2d Cir. 1998). Accordingly, "an indictment need
do little more than track the language of the statute charged
and state the time and place (in approximate terms) of the
alleged crime." United States v. Stavroulakis, 952 F.2d 686, 693
(2d Cir. 1992). "A defendant faces a high standard in seeking to
dismiss an indictment." United States v. Taveras, 504 F. Supp.
3d 272, 277 (S.D.N.Y. 2020).

The Second Circuit Court of Appeals has noted that "an
indictment must be read to include facts which are necessarily
implied by the specific allegations made." Stavroulakis, 952
F.2d at 693; see also United States v. Sattar, 314 F. Supp. 2d
279, 303 (S.D.N.Y. 2004), aff'd sub nom. United States v.
Stewart, 590 F.3d 93 (2d Cir. 2009). However, when "one element
of the offense is implicit in the statute, rather than explicit,
and the indictment tracks the language of the statute and fails
to allege the implicit element explicitly, the indictment fails
to allege an offense." United States v. Foley, 73 F.3d 484, 488
(2d Cir. 1996).

Due process additionally requires that a criminal statute
provide a person of ordinary intelligence fair notice of what is
prohibited. United States v. Williams, 553 U.S. 285, 304 (2008).
"Due process is not, however, violated simply because the issue

is a matter of first impression." Ponnapula v. Spitzer, 297 F.3d
172, 183 (2d Cir. 2002).

### III.

Cornelsen moves to dismiss the Indictment on two principal
grounds. First, Cornelsen argues that the Indictment is
defective because (1) the Securities Fraud Counts do not satisfy
either test set forth by the Supreme Court in Morrison v.
National Australia Bank Ltd., 561 U.S. 247 (2010), and its
progeny, and (2) the Wire Fraud Count fails to allege an
"essential" domestic wire communication. Second, Cornelsen
argues that the Indictment violates Cornelsen's right to due
process because no "jurisdictional nexus" exists between him and
the United States. These arguments are unpersuasive.

### A.

#### 1. Securities Fraud Counts

The Indictment charges Cornelsen with violations of
sections 10(b) and 14(e) of the Securities Exchange Act of 1934
(the "Exchange Act"), and with conspiracy to violate these
statutes. The parties agree that the extraterritoriality
analysis is the same for each of the Securities Fraud Counts.

In Morrison, the Supreme Court held that "Section 10(b) [of
the Exchange Act] reaches the use of a manipulative or deceptive
device or contrivance only in connection with the purchase or
sale of a security listed on an American stock exchange, and the

purchase or sale of any other security in the United States."
Id. at 273. Put differently, a defendant may be convicted of
securities fraud only if he has "engaged in fraud in connection
with (1) a security listed on a U.S. exchange, or (2) a security
purchased or sold in the United States." United States v. Vilar,
729 F.3d 62, 67 (2d Cir. 2013). Morrison's first prong is
satisfied where a defendant commits securities fraud in
connection with a security that is registered on a domestic
exchange, regardless of whether the transaction is orchestrated
abroad. See Morrison, 561 U.S. at 266.[3] However, to satisfy
Morrison's second prong, the transaction itself must be
domestic. Id. at 268. In Absolute Activist Value Master Fund
Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012), the Second Circuit
Court of Appeals held that transactions are domestic "if
irrevocable liability is incurred or title passes within the
United States." Id. at 67. In deciding whether these criteria
are met, courts may consider "facts concerning the formation of
the contracts, the placement of purchase orders, the passing of
title, or the exchange of money." Id. at 70. In Parkcentral
Global Hub Ltd. v. Porsche Automobile Holdings SE, 763 F.3d 198

---

[3] In City of Pontiac Policemen's & Firemen's Retirement System v. UBS
AG, 752 F.3d 173 (2d Cir. 2014), the Second Circuit Court of Appeals
clarified Morrison's first prong: "Morrison does not support the application
of § 10(b) of the Exchange Act to claims by a foreign purchaser of foreign-
issued shares on a foreign exchange simply because those shares are also
listed on a domestic exchange." Id. at 181.

(2d Cir. 2014), the Court of Appeals added that, to satisfy
Morrison's second prong, the allegations must also not be "so
predominantly foreign as to be impermissibly extraterritorial."
Id. at 216.

In this case, the Government has three theories as to why
the Securities Fraud Counts survive under Morrison. First, the
Government argues that, because the securities underlying the
call options purchased by Cornelsen — the Burger King stock —
are registered on a domestic exchange — the NYSE — Morrison's
first prong is satisfied. Second, the Government argues that
Prado's purchase of Burger King common stock on the over-the-
counter market satisfies Morrison's first prong, and that
because Prado and Cornelsen were co-conspirators, Prado's
conduct can be used to satisfy Morrison. Finally, the Government
argues that Cornelsen's purchase of Burger King call options on
the ISE in New York, New York, satisfies Morrison's second
prong. The last theory is most persuasive, and is sufficient to
defeat Cornelsen's motion to dismiss.

The Indictment in this case alleges that Cornelsen
purchased Burger King call options on the ISE on at least three
separate occasions. The Indictment also alleges that the ISE is
located in New York, New York. The Indictment therefore alleges
that the call options at issue were purchased within the United
States. This, in turn, necessarily means that the contracts for

11

those options were formed, the title to those options passed, and the purchasers of those options incurred irrevocable liability, all in the United States. See United States v. Georgiou, 777 F.3d 125, 136 (3d Cir. 2015) (finding that, because "some of the relevant transactions required the involvement of a purchaser or seller working with a market maker and committing to a transaction in the United States, incurring irrevocable liability in the United States, or passing title in the United States," the defendant had engaged in "domestic transactions" within the meaning of Morrison); United States v. Martoma, No. 12-cr-973, 2013 WL 6632676, at *4-5 (S.D.N.Y. Dec. 17, 2013) (finding that alleged transactions in American Depository Receipts that were bought and sold on the NYSE were "domestic transactions" for purposes of Morrison's second prong, because "liability was incurred, and title was transferred, within the United States"). Under these circumstances, the second prong of Morrison is plainly satisfied. See id. at *5. Indeed, Cornelsen's purchase of call options on a New York-based options exchange — even though he was not physically located in the United States — is precisely the sort of transaction the Supreme Court appeared to envision when it explained the scope of the second prong as capturing "purchase[s] or sale[s] . . .

made in the United States," regardless of "the place where the
deception originated." <u>Morrison</u>, 561 U.S. at 266-70.[4]

Cornelsen argues that the Indictment does not sufficiently
establish that irrevocable liability was incurred in the United
States or that title was transferred in the United States,
because it does not explicitly state those words. But while
"precision and proper notice to the defendant cannot be
sacrificed for the sake of brevity," it is well settled that,
when reviewing an indictment, "common sense must control, and

---

[4] At oral argument, Cornelsen's counsel pointed to two cases — <u>Prime
International Trading, Ltd. v. BP P.L.C.</u>, 937 F.3d 94 (2d Cir. 2019), and the
district court case that <u>Prime International</u> affirmed, <u>In re North Sea Brent
Crude Oil Futures Litigation</u>, 256 F. Supp. 3d 298, 309 (S.D.N.Y. 2017) — as
undermining this argument. But those cases are not to the contrary. Both
cases assumed, but did not decide, that the relevant transactions were
"domestic" for purposes of <u>Morrison</u>'s second prong and dismissed the claims
on the basis of <u>Parkcentral</u>. <u>See Prime Int'l</u>, 937 F.3d at 105 ("[W]e assume
without deciding that Plaintiffs' trades on NYMEX and ICE Futures Europe
constituted 'domestic transactions' . . . ."); <u>Brent Crude Oil</u>, 256 F. Supp.
3d at 309 & n.5.
   Nor are the cases involving the use of the services of the Depository
Trust Company ("DTC") — <u>In re Petrobras Securities Litigation</u> (<u>Petrobas I</u>),
150 F. Supp. 3d 337 (S.D.N.Y. 2015), and <u>In re Petrobras Securities</u> (<u>Petrobas
II</u>), 862 F.3d 250 (2d Cir. 2017) — cited to in Cornelsen's briefs,
dispositive. The DTC was "created to hold securities for its participants and
to facilitate the clearance and settlement of securities transactions between
participants through electronic book-entry changes to accounts of its
participants." <u>Petrobas I</u>, 150 F. Supp. 3d at 342. However, unlike
transactions on the ISE, the "mechanics of DTC settlement are actions needed
to carry out transactions, but they involve neither the substantive indicia
of a contractual commitment necessary to satisfy <u>Absolute Activist</u>'s first
prong nor the formal weight of a transfer of title necessary for its second."
<u>Id.</u> Indeed, <u>Petrobas I</u> carefully distinguished (1) transactions whose
domestic link for purposes of <u>Morrison</u>'s second prong was based on settlement
through the DTC from (2) transactions that were effected on a domestic
exchange: "[T]he entire thrust of <u>Morrison</u> and its progeny would be rendered
nugatory if all DTC-settled transactions necessarily fell under the reach of
the federal securities laws. The laws would reach most transactions, not
because they occurred on a domestic exchange but because they settled through
the DTC. This result cannot be squared with the plain language and careful
reasoning of <u>Morrison</u> and <u>Absolute Activist</u>." <u>Id.</u>

. . . an indictment must be read to include facts which are necessarily implied by the specific allegations made." Stavroulakis, 952 F.2d at 693. And in this case, it is common sense to infer from the various allegations in the Indictment detailing Cornelsen's purchases of call options on the ISE in New York, New York, that title to those options passed in the United States. Cornelsen cites no case to the contrary. To the extent that Cornelsen argues that the Government is subject to a heightened standard when drafting an indictment in a novel area of law, that argument is rejected. "[I]t is immaterial that there is no litigated fact pattern precisely in point," so long as the language of the statute provides notice. United States v. Kinzler, 55 F.3d 70, 74 (2d Cir. 1995). And Cornelsen does not argue that a person of ordinary intelligence would not know that it is illegal to trade on material nonpublic information in the United States. In all, the language in the Indictment is sufficient fairly to inform Cornelsen of the charges against him, and is sufficient to establish that Cornelsen was party to a domestic transaction when he purchased call options on the ISE in New York City.

Having found that the Indictment alleges a "domestic transaction" within the meaning of Morrison's second prong, it is necessary to consider Parkcentral's requirement that claims not be "so predominantly foreign as to be impermissibly

extraterritorial." Parkcentral, 763 F.3d at 216. The facts of the Parkcentral case are nothing like the facts alleged in the Indictment in this case. In Parkcentral, the plaintiff-investors claimed that they were defrauded into making swap agreements pegged to the price of a German company's shares, which traded on European stock exchanges, based on alleged misstatements by another German corporation and its executives that were made primarily in Germany. See id. at 207-08. A review of the facts alleged in the Indictment makes plain that Parkcentral does not apply here. The allegations in this case are predominantly domestic. The Indictment centers around options for an American company — Burger King — subject to a tender offer by a company with offices in the United States — 3G — which options were purchased through an options exchange located in the United States — the ISE. Cornelsen also at times used a brokerage account located in New York to purchase these options. These facts are a far cry from those of Parkcentral, which concerned "statements made primarily in Germany with respect to stock in a German company traded only on exchanges in Europe." Id. at 216. Cornelsen's counsel conceded at the oral argument of this motion that counsel knew of no similar case in which Parkcentral foreclosed prosecution of a case with allegations similar to those the Indictment alleges against Cornelsen. See Tr. 15:13-14; see also Giunta v. Dingman, 893 F.3d 73, 82 (2d Cir. 2018)

(rejecting application of Parkcentral's rule even though, among other things, the primary defendant was a permanent resident of the Bahamas, the venture involved establishments in the Bahamas, the holding company was incorporated in the Bahamas, and key evidence was located in the Bahamas).

Accordingly, Cornelsen's motion to dismiss the Securities Fraud Counts, to the extent it is based on the argument that the Securities Fraud Counts are an impermissible extraterritorial application of the United States securities laws in violation of Morrison and its progeny, is **denied.**

### 2. Wire Fraud Count

The Indictment also charges Cornelsen with conspiracy to commit wire fraud.

Courts generally find that indictments sufficiently allege wire fraud where they track the language of the wire fraud statute, and where they set forth approximate details about the alleged scheme to defraud. See, e.g., United States v. Almaleh, No. 17-cr-25, 2022 WL 602069, at *2, *5-6 (S.D.N.Y. Feb. 28, 2022). Cornelsen does not appear to dispute that the Indictment includes these general elements. Instead, Cornelsen argues that indictments that involve activity abroad — such that extraterritoriality concerns might be raised — are subject to a heightened pleading standard. In particular, he argues that such indictments must detail the specific wires that the Government

relies on to render the activity sufficiently "domestic," and that the Indictment fails to do so. In making this argument, Cornelsen relies on the holding of the Second Circuit Court of Appeals in United States v. Napout, 963 F.3d 163 (2d Cir. 2020), that, "in order for incidental domestic wire transmissions not to haul essentially foreign allegedly fraudulent behavior into American courts," courts must ensure that (1) "the use of the wires in furtherance of the schemes to defraud occurred in the United States," and (2) "the use of the wires was essential, rather than merely incidental, to [the defendants'] scheme to defraud." Id. at 179-80.

As a threshold matter, Napout involved an appeal from a criminal conviction, and therefore opined only as to the elements that the Government was required to prove at trial. See id. at 168. Napout did not discuss any heightened pleading requirements for indictments. And Cornelsen's counsel conceded at oral argument that counsel knew of no case that imposed such a requirement. See Tr. 18:20-21; 21:2-5.

In any event, the Indictment sufficiently alleges the essential use of the domestic wires. The Indictment alleges that Cornelsen purchased call options through the ISE in New York, New York, and that at least some of the call options were purchased through Cornelsen's brokerage firm, also located in New York, New York. Because Cornelsen was not located in New

York at any of the relevant times — as he repeatedly highlights on this motion — his purchases on the ISE and his communications with his brokerage firm necessarily involved the use of wires to and from New York. Because these wires are plainly essential to the broader scheme to defraud, any additional requirements created by Napout are satisfied.

To the extent that Cornelsen argues that Napout requires the Government to come forward with additional details as to why a case does not present extraterritoriality concerns where such a concern is raised, the Government has done exactly that on this motion: the Government has provided a long list of phone records reflecting additional domestic wire communications — phone calls — between Prado, who was at all relevant times located in Florida, and Cornelsen, who was located in Brazil. See Gov. Opp. Ex. A, ECF No. 30-1. Cornelsen points to no authority to explain why such additional evidence is insufficient, or why such evidence must appear in the Indictment. Cf. United States v. Avenatti, 432 F. Supp. 3d 354, 361 (S.D.N.Y. 2020) (concluding that honest-services wire-fraud charge was legally sufficient because it "track[ed] the language of 18 U.S.C. §§ 1343 and 1346, apprise[d] [the defendant] of the nature of the accusation against him, and . . . provide[d] notice generally of where and when the crime occurred"); United States v. Upton, 856 F. Supp. 727, 739-41, (E.D.N.Y. 1994)

(rejecting argument that wire fraud charge was defective because
the indictment did not "contain a list of the particular
computer transactions, telephone calls, and radio transmissions"
used in furtherance of the scheme, but stating, in any event,
that, because the Government had supplied the "defendants with a
bill of particulars which identifies those wire communications
upon which it will rely at trial," the defendants could not "now
argue that they are not in a position to prepare an adequate
defense").

In all, Cornelsen's motion to dismiss the Wire Fraud Count,
to the extent it is based on the argument that the Wire Fraud
Count is defective, is **denied.**

B.

Cornelsen also moves to dismiss the Indictment on the
grounds that it violates due process.

Cornelsen argues that, to be consistent with due process,
the Indictment must allege that the aim of his conduct was to
cause harm inside the United States or to United States citizens
or interests, and that the Indictment fails to do so. In so
arguing, Cornelsen relies on the holding of the Second Circuit
Court of Appeals in United States v. Al Kassar, 660 F.3d 108 (2d
Cir. 2011), that, "[i]n order to apply extraterritorially a
federal criminal statute to a defendant consistently with due
process, there must be a sufficient nexus between the defendant

19

and the United States, so that such application would not be
arbitrary or fundamentally unfair." Id. at 118. However, this
test is used where there is an extraterritorial application of a
United States criminal statute. In this case, as explained
above, there is no such extraterritorial application. For this
reason alone, Cornelsen's argument is without merit.

In any event, for many of the reasons explained above, the
Indictment sufficiently alleges a jurisdictional nexus between
Cornelsen and the United States sufficient to satisfy due
process concerns. Cornelsen, while not physically present in the
United States during the relevant time period, allegedly traded
on material nonpublic information concerning Burger King, an
American company, and its acquisition by 3G, a firm with offices
in the United States. In furtherance of this scheme, Cornelsen
purchased options on the ISE, an American options exchange, and
even used his brokerage firm located in the United States to
conduct some of these transactions. To effect these purchases,
Cornelsen also used United States wires. While it is true that
the Court previously noted that Cornelsen's alleged conduct
affected the United States "only in a roundabout way," Cornelson
I, 2022 WL 970075, at *6, this does not mean that Cornelsen's
conduct was insufficiently connected to the United States to
raise due process concerns.

Cornelsen is entitled to due process. But due process does not shield from prosecution securities and wire fraud violations simply because the defendant happens to be abroad. See Bascunan v. Elsaca, 927 F.3d 108, 123 (2d Cir. 2019) ("[W]hile a defendant's location is relevant to whether the regulated conduct was domestic, the mail and wire fraud statutes do not give way simply because the alleged fraudster was located outside the United States."). "In a world of easy and rapid transnational communication and financial innovation," such a result would be untenable. Parkcentral, 763 F.3d at 217.

Cornelsen's motion to dismiss the Indictment, to the extent it is based on the argument that the Indictment violates Cornelsen's right to due process, is **denied**.

### Conclusion

The Court has considered all of the arguments of the parties. To the extent not addressed herein, the arguments are either moot or without merit. For the foregoing reasons, Cornelsen's motion to dismiss the Indictment is **denied**.

The Clerk is directed to close ECF No. 11.

**SO ORDERED.**

Dated:     New York, New York
           June 27, 2022

                                        John G. Koeltl
                                 United States District Judge